```
 1                    UNITED STATES DISTRICT COURT
                           DISTRICT OF ARIZONA
 2

 3    TRANSWESTERN PIPELINE COMPANY,    )
      LLC,                              )
 4                                      )
                        Plaintiff,      )
 5                                      )   No. CIV 07-2287-PHX-JWS
           vs.                          )
 6                                      )   Phoenix, Arizona
      9.32 ACRES, MORE OR LESS, OF      )   April 9, 2008
 7    PERMANENT EASEMENT LOCATED IN      )   10:04 a.m.
      MARICOPA COUNTY, et al.,          )
 8                                      )
                        Defendants.     )
 9    _____  )

10                   TRANSCRIPT OF EVIDENTIARY HEARING
                    BEFORE THE HONORABLE JOHN W. SEDWICK
11                      UNITED STATES DISTRICT JUDGE

12    APPEARANCES:

13    For the Plaintiff:           By: John C. Lemaster
                                       Peter Joel Borns
14                                     William B. McManus
                                       Kara Anne Ricupero
15                                  RYLEY CARLOCK & APPLEWHITE PA
                                    1 N. Central Ave., Ste. 1200
16                                  Phoenix, AZ  85004
                                        -and-
17                                  By: Martin A. Aronson
                                    MORRILL & ARONSON PLC
18                                  One E. Camelback, Ste. 340
                                    Phoenix, AZ 85012
19                                      -and-
                                    By:  Brian J. Bolves
20                                  BRICKLEMEYER SMOLKER & BOLVES PA
                                    500 E. Kennedy Blvd., Ste. 200
21                                  Tampa, FL 33602

22    For the Defendant Flood      By: Adrian Michael Gough
      Control District of Maricopa  MARICOPA COUNTY ATTORNEY'S
23    County:                      OFFICE
                                    222 N. Central Ave., Ste. 1100
24                                  Phoenix, AZ 85004

25
```

1    <u>APPEARANCES:</u>   (Continued)

2    For Defendant Town of          By: David A. Pennartz
     Buckeye, Buckeye Pollution          Richard Hood
3    Control Corporation:           GUST ROSENFELD PLC
                                    201 E. Washington St., Ste. 800
4                                   Phoenix, AZ 85004

5    For Defendant City of Mesa:    By:  Stephanie Lynn Heizer
                                    AYERS & BROWN PC
6                                   4227 N. 32nd Street
                                    Phoenix, AZ 85008
7
     For Defendant 11 Mile Road     By:  James T. Braselton
8    Investors, LLC, Sunshine Road  MARISCAL WEEKS MCINTYRE &
     Investors, Randolph Road       FRIEDLANDER PA
9    Investors, Anderson and        2901 N. Central Ave., Ste. 200
     Miller, Denhams:               Phoenix, AZ 85012
10
     For Defendants Stardust        By:  Steven A. Hirsch
11   Structured Investments No. 9,       Landon Wood Loveland
     LLC, Stardust Structured       BRYAN DAVE LLP
12   Investments No. 10, LLC,       2 N. Central Ave., Ste. 2200
     Stardust-Tartesso W12, Inc.,   Phoenix, AZ 85004
13   Agua Fria Investments,
     Vanderbilt Farms, LLC, MVSV
14   Holdings and First American
     Title, Kevin P., LLC, ABCDW
15   Trust, Irvine Land Partners,
     Irvine Land Partners, Dan
16   Thealander, Nuclear Vision,
     LLC, BIF-Buckeye:
17
     For Defendant Vistancia, LLC,  By:  Dale S. Zeitlin
18   Legends Properties, Red        ZEITLIN & ZEITLIN PC
     River/ElDorado 6500, LLC, 131  5050 N. 40th St., Ste. 330
19   Rodeo/Burris, LP, CSW Sun      Phoenix, AZ 85018
     Valley South Holdings, Grande
20   Valley Single Family, LLC,
     Scott & Scott Trailers, Sun
21   Valley Assemblage:

22   For Hidden Valley Ranch II,    By:  Damien Meyer
     LLC, Festival Ranch Community  TITUS BRUECKNER & BERRY PC
23   Facilities District, Tartesso  8355 E. Hartford Dr., Ste. 200
     West Multifamily LLC:          Scottsdale, AZ 85255
24

25

APPEARANCES: (Continued)

For DV Piper:                    By:  Shane Gosdis
                                 DLA PIPER US LLP
                                 2415 E. Camelback Rd., Ste. 700
                                 Phoenix, AZ 85016

For Lennar Communities           By:  Arthur Pedersen
Development:                     MOHR HACKETT PEDERSON BLAKLEY
                                 & RANDOLPH PC
                                 2800 N. Central Ave., Ste. 1100
                                 Phoenix AZ 85004

Court Recorder:                  Vicki Reger

Transcription Service:           A/V Tronics, Inc.
                                 365 E. Coronado Rd., Ste. #100
                                 Phoenix, AZ 85004-1525

Proceedings recorded by electronic sound recording, transcript
produced by transcription services.

<u>INDEX</u>

| | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

<u>WITNESSES FOR PLAINTIFFS:</u>

William Langston
   (By Ms. Ricupero) — Direct 53
   (By Mr. Pennartz) — Cross 71
   (By Mr. Hirsch) — Cross 72
   (By Mr. Braselton) — Cross 78
   (By Ms. Ricupero) — Redirect 84

<u>WITNESSES FOR DEFENDANTS:</u>

Robert Costello
   (By Mr. Pennartz) — Direct 5
   (By Mr. Bolves) — Cross 17
   (By Mr. Lemaster) — Cross 38
   (By Mr. Pennartz) — Redirect 41
   (By Mr. Hirsch) — Redirect 45
   (By Mr. Bolves) — Recross 50
   (By Mr. Lemaster) — Recross 51

Chris Heeter
   (By Mr. Hirsch) — Direct 87
   (By Mr. Pennartz) — Direct 178
   (By Mr. Lemaster) — Cross 186
   (By Mr. Hirsch) — Redirect 192

Woodrow Scoutten
   (By Mr. Pennartz) — Direct 187
   (By Mr. Hirsch) — Direct 226
   (By Mr. Bolves) — Cross 231
   (By Mr. Lemaster) — Cross 238
   (By Mr. Pennartz) — Redirect 239
   (By Mr. Bolves) — Recross 242

| EXHIBITS: | Marked | Received |
|---|---|---|

<u>Plaintiff's:</u>
None

<u>Defendant's:</u>

104 — Received 98
105 — Received 99

**A/V▾ TRONICS, INC.**
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 403-8024

1          <u>April 9, 2008</u>

2          THE CLERK:  All right.  The Court is now in session.

3          THE COURT:  Good morning.  Please be seated.  I think

4   we're ready to resume with Mr. Pennartz' examination of Chief

5   Costello.

6          Chief, you recall you're giving testimony under oath?

7          THE WITNESS:  Yes, I do.

8          THE COURT:  Thank you.

9          Whenever you're ready, sir.

10         MR. PENNARTZ:  Thank Your Honor.

11     ROBERT COSTELLO, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

12                    DIRECT EXAMINATION

13  BY MR. PENNARTZ:

14  Q    I'm going to use that Elmo this morning.  Can you see that

15  pretty well?

16  A    Yes, I can.

17  Q    Do you recognize that as the map we were using yesterday?

18  A    Yes.

19  Q    Okay.

20         MR. PENNARTZ:  And again, Judge, I think that's slide

21  2 in Mr. Hirsch's slide show that comes later during his

22  testimony.

23         THE COURT:  Thank you.

24  BY MR. PENNARTZ:

25  Q    Chief, we were talking yesterday about how you and the

1    Buckeye Fire Department and other emergency services people

2    respond to a gas leak or other incident today, okay, before

3    this pipeline's built, and your response to that, and your

4    concerns.  Do you have additional response plans you need to

5    make in the event this pipeline is constructed with 36 inches

6    of cover and so forth as it's proposed?

7    A    I would say yes in the aspect that that is a larger

8    source, and given an incident, the magnitude of that incident

9    would be larger, requiring additional resources to deal with

10   it.

11   Q    Okay.

12   A    That would be --

13   Q    Okay.  Can you pull that a little closer to you?  Thank

14   you.

15   A    Okay.

16   Q    So it would be a larger incident?  I'm sorry; I didn't

17   mean to interrupt you.

18   A    It would be a larger incident requiring additional

19   resources, anything from the evacuation component to actually

20   monitoring the area affected.

21   Q    Okay.  And when you saw a larger incident, why would it be

22   larger incident, in your opinion?

23   A    Be just the quantity of the material we'd be dealing with.

24   Q    Okay. The quantity of the gas that would be escaping?

25   A    Yes.

1    Q    Okay.  Again you could have <u>The Towering Inferno</u> scenario

2    where there's a  gout of flame; correct?

3    A    Correct.

4    Q    Okay  And in that instance the plan would still be the

5    same as you testified to yesterday, to close valves at either

6    end as soon as possible and let it burn itself out?

7    A    That'd be correct.

8    Q    Okay.  Is -- what about the trapped gas scenario.  I want

9    to talk about it first from the standpoint of in your

10   experience and your opinion whether that is something of the

11   same concern or a greater concern with a larger source of gas?

12   A    Again, given the volume, it could affect more areas.

13   Again, we would begin.  The area that we would be analyzing to

14   look for that gas conceivably could be much larger than a

15   smaller area.  It's just purely a matter of volume.

16   Q    Okay.  And the smaller area that you were talking about

17   yesterday, I'm not we specifically quantified it other than you

18   saying you start with those most closely affected and move out,

19   but about how many houses or blocks, if you could, from a

20   residential gas break would you normally evacuate?

21   A    It could be as small as one or two residences.  We've had

22   them as large as a block --

23   Q    Okay.

24   A    -- while we monitor and go house to house to verify that.

25   Q    Okay.  Would it also be one or two residences or a block,

1    in your opinion, if you had a rupture on this main?

2    A     It could be that size or it could be much greater.  I --

3    it -- there are way too many variables to make that prediction.

4    Q     Okay.  In terms of your ability to plan for emergency

5    response, would you plan for the one or two houses or blocks

6    scenario, or what would you plan for if this pipeline goes in?

7    A     Typically we would plan for the worst case scenario.

8    Q     Why is that?

9    A     It's normally the most difficult to deal with, and if

10   you've prepared yourself for that, then hopefully you're better

11   prepared to deal with it if it's less.

12   Q     Okay.  Let me take a half a step back and ask.  I know

13   right now we're in a housing slump, but in general is Buckeye

14   an area of growth or not growth, non-growth?

15   A     Everything I've been advised is Buckeye's a rapidly

16   growing community.

17   Q     Okay.  And is that how you plan for it in terms of

18   obtaining and deploying your resources?

19   A     Actually it's been difficult to plan for because of its

20   growth.

21   Q     Why is that?

22   A     The town is not growing in the concentrical rings that

23   most communities have.  It's grown in different master planned

24   community areas, which has created an additional taxing on the

25   resources.

1   Q    Okay.  And is that illustrated by these different colored

2   areas on the exhibit that we have in front of us?

3   A    That's correct.

4   Q    Okay.  Now in terms of the  Metropolitan Phoenix Area,

5   we're in downtown Phoenix right now, and you drove in from

6   Buckeye this morning?

7   A    That's correct.

8   Q    Okay.  How far is it from  Buckeye to downtown Phoenix,

9   roughly?

10  A    I would estimate 40 some miles.

11  Q    Okay.  What is -- is there a major transportation route

12  out to Buckeye from this part of the Valley?

13  A    The most common recognized one is I-10.

14  Q    And that's shown on here again, as we said yesterday, as

15  this red V-shape?

16  A    That's correct.  Now, I-10 is something that, is it

17  congested or is it not congested?

18  A    It is typically congested.

19  Q    Okay.  And when you have the automatic aid situation.

20  Does Buckeye have the availability to draw resources from both

21  sides of the community?

22  A    We are the farthest west located community, so all of our

23  resources would come from the East.

24  Q    Okay.  So if, if there were in the automatic aid situation

25  a need or an incident that occurred in Glendale or Peoria where

1    they have communities on both sides of them, where would

2    automatic aid come from for them?

3    A    From all directions.

4    Q    Okay.

5    A    Resources would be pulled from available stations and all

6    surrounding  the incident.

7    Q    And in fact your units roll on those calls for those

8    communities, don't they?

9    A    We have, and will again.

10   Q    Okay.  Now, being on the far West end of this automatic

11   aid consortium, you're saying all the resources that are going

12   to assist the town in an incident have to come from your East?

13   A    That's correct.

14   Q    Okay.  Now some of them come from the North, like Surprise

15   or Peoria might respond to the Sun Valley area.  On our map

16   here on the upper right from the North down to Sun Valley

17   parkway if an incident occurred; correct?

18              MR. LEMASTER:  Objection, Your Honor.

19              This is irrelevant information that has nothing to do

20   with the hearing we're here on today, and it just keeps going

21   on for a long time Your Honor.

22              THE COURT:  Well I think the point you're making can

23   be buttoned up here pretty quickly, so let's do that please.

24   BY MR. PENNARTZ:

25   Q    Chief, again, with the use of automatic aid, is there an

1  ability to draw resources around the North end of the Sun

2  Valley Parkway even from other agencies?

3  A    That is correct.

4  Q    Okay.  And it -- what is the transportation corridor

5  that's available to serve emergency services into the Sun

6  Valley Parkway area?

7  A    It would be the Sun Valley Parkway itself.

8  Q    And the pipeline runs in vicinity, or proposed to be run

9  in vicinity to the Sun Valley Parkway; correct?

10           MR. LEMASTER:  Objection, Your Honor.  This is

11  routing issues decided by FERC.  It has nothing to do with the

12  hearing we're here on today.

13           MR. PENNARTZ:  Your Honor, it has to do with the

14  Town's ability to respond to emergency situations.

15           THE COURT:  Well, it also has to do with facts that

16  everybody knows are in there.  I mean, we know where the

17  pipeline is, and where the Sun Valley Parkway is.

18           I would agree that with respect to the routing

19  decision, now that's not something this Court can make, but

20  it's not entirely clear to me that the testimony is wholly

21  irrelevant, so I'll permit it.

22           MR. LEMASTER:  Okay.

23           THE COURT:  But some of these points I think have

24  been made.

25           MR. PENNARTZ:  All right.  Thank you, Your Honor.

1  BY MR. PENNARTZ:

2  Q    Chief, with the incident where there would be a rupture in

3  this pipe, the evacuation area is, you said you have to plan

4  for worst case scenario.  What would that evacuation area be

5  for this pipe?

6  A    It would be the immediately affected area that we could

7  identify, and then we would create a safe area around that.  We

8  work in what's called zones, hot, warm, and cold zones.

9  Initially the hot zone is the area that's most affected.  We

10 would evacuate it first, and then we would work through the

11 warm, and try and keep everybody else in a colder, no danger

12 zone.

13 Q    Okay.  Would -- for a pipeline with this capacity of

14 product in it, would that place any additional strain on your

15 ability to respond from a firefighting standpoint?

16 A    It very could conceivably could just based, again, on the

17 volume and the number of residences or buildings or businesses

18 that could be affected.

19 Q    And in terms of your planning for this worst case

20 scenario, does that planning also include trying to keep up

21 with growth?

22 A    Yes, it does.

23 Q    And to keep up with what exists out there now?

24 A    Yes, it does.

25 Q    Okay.  And in the combination of those, are you prepared

1    today to deal with the worst case scenario?

2    A    We train and prepare for the worst case scenario.  Are we

3    equipped to deal with it?  Probably not.

4    Q    And why not?

5    A    You just, you -- nobody has the resources or the materials

6    to deal with that in a growing community that far out.

7    Q    So if an incident happened with regard to this pipe, if

8    you're, don't have all the resources now, how would that be

9    provided?

10   A    We would use automatic aid, and conceivably if the

11   incident was large enough, mutual aid on a State-wide basis.

12   Q    And is there a delay in obtaining those resources?

13   A    The --

14   Q    As compared to your own company's rolling to an incident

15   within Buckeye?

16   A    The initial delay is always the travel time, getting from

17   where they're stationed at to the incident, and automatic aid

18   will automatically do that, so our first delay is if we go

19   outside of that, then typically there are phone calls to be

20   made and approvals to reach in order to pull additional

21   resources.

22   Q    Okay.  And so does it end up with a shifting effect of

23   resources across this automatic aid system?

24   A    Resources would be pulled from the closest ones, and then

25   that creates vacancies or openings, and those openings are

1  backfilled with other units further into the system so that no

2  one area becomes stripped.

3  Q    So Phoenix resources might roll to Buckeye, and then other

4  communities might fill Phoenix vacancies?

5  A    That's a common deployment.

6  Q    Okay.  And does Buckeye roll to fill vacancies for other

7  jurisdictions within automatic aid?

8  A    Yes.

9  Q    And do you ever have major incidents other than pipeline

10 breaks in Buckeye?

11 A    Most of our other incidents are incidents other than

12 pipeline breaks.

13 Q    I mean, do you have major incidents that you have to

14 respond to on I-10?

15 A    Yes, we do.

16 Q    Okay.  Was there one recently that shut down I-10?

17       MR. LEMASTER:  Objection, Your Honor.  I don't know

18 how this is relevant.

19       THE COURT:  Sustained.

20       MR. PENNARTZ:  Okay.

21 BY MR. PENNARTZ:

22 Q    Does -- if your units are in the middle of responding to

23 another incident, how does that affect your ability to respond

24 to an incident with regard to this pipeline if it goes in at

25 this time?

1    A    The closest units may be tied up on other calls, and then

2    there will be a longer response.

3    Q    Is there, in your opinion as a professional firefighter,

4    is there additional risk to the town and its citizens for the

5    pipeline to go in sooner rather than later?

6    A    I would look at this pipeline and the incidents that may

7    follow it as a low frequency, high risk situation.  Given the

8    scenario today, I'm dealing with a very young workforce, as

9    many public safety organizations are.  We are actively training

10   and supporting them so that they can do their job safely.

11         We're dealing with financial issues that most

12   communities deal with.  Ideally to deal with this, we should

13   have hazardous materials technicians and the equipment to

14   support that.  And given today's economic situation, it -- that

15   doesn't exist.

16         The -- to deal with this incident and other low

17   frequency high risk incidents, it's, the longer we have to

18   prepare for it, the better we would be.

19   Q    So in the meantime if you're less prepared, does it

20   present a higher risk to the citizens of Buckeye for the

21   pipeline to go in sooner than later in your opinion from an

22   emergency services response standpoint?

23   A    It presents a higher risk for both the responders and the

24   residents.

25   Q    All right.

1          MR. PENNARTZ:  Your Honor, I would offer the chief as
2    an expert witness on the testimony that he's given.
3          THE COURT:  Any objection?
4          MR. BOLVES:  Your Honor, as long that's limited to an
5    expert in emergency services as was identified yesterday and
6    not pipeline safety.
7          THE COURT:  All right.  I understand that is where
8    you're tendering him.  All right.
9          MR. BOLVES:  That's separate.
10          THE COURT:  I do find that Chief Costello is
11    qualified by his experience and training to offer opinion
12    testimony in the area of emergency preparedness, fire
13    suppression, and related areas, and so -- and I also find that
14    his testimony in that respect may be helpful to the finder of
15    fast, so he is permitted, and has been permitted, and has been
16    giving opinion testimony, and that will be accepted.
17          MR. PENNARTZ: Okay.  We have nothing, no further
18    questions of the witness at this time.  I don't know if Mr.
19    Hirsch has --
20          THE COURT:  Thank you, sir.
21          Mr. Hirsch, do you --
22          MR. HIRSCH:  I have nothing, Your Honor.
23          THE COURT:  Any other Defense counsel have anything
24    before I see if the Plaintiffs wish to cross?
25          All right.  Will there be cross-examination from the

1    Plaintiffs?

2              MR. BOLVES:  Yes, sir, there will.

3              THE COURT:  All right, Mr. Bolves.

4              MR. LEMASTER:  And Your Honor, Mr. Bolves is going to

5    take the lead on this, but I do have a couple of parcel

6    specific questions I'd like to ask --

7              THE COURT:  That's fine.  I recognize you represent

8    different --

9              MR. BOLVES:  No.

10             THE COURT:  Well, you represent the same client, but

11   in different cases.

12        (Counsel Confer)

13                           CROSS-EXAMINATION

14   BY MR. BOLVES:

15   Q    Good morning, sir.

16   A    Good morning.

17   Q    Brian Bolves for the record on behalf of Transwestern.

18   Chief, are you aware of the fact, you've been involved in

19   public safety and specifically in the area of fire prevention

20   and -- for many years.  Are you aware of the fact that the

21   federal law requires or provides that the U.S. Department of

22   Transportation provide for regulations for pipeline, natural

23   gas transmission pipeline safety?

24             MR. BRASELTON:  Your Honor, legal opinion?

25             MR. BOLVES:  I'm asking him if, as a public safety

1  expert if he's aware of the regulatory scheme that --

2          THE COURT:  I -- that's a permissible question.  The

3  objection's overruled.

4          THE WITNESS:  I am aware that most utilities are

5  governed by other regulatory entities.  My understanding from

6  reviewing it, that would be correct, but --

7  BY MR. BOLVES:

8  Q    Have you ever heard of the Pipeline and Hazardous Material

9  Safety Administration?  FEMZA, it's referred to?

10 A    I have read about it.

11 Q    Okay.  Are you aware of the fact that FEMZA has programs

12 through the Department of Transportation that are designed to

13 assist local agencies such as yourself in understanding the

14 federal regulatory scheme and dealing with natural gas,

15 interstate natural gas pipeline incidences?

16 A    The training information that we received came under the

17 heading of DOT, so if that's the same, that would be yes.

18 Q    Yes, sir.  So you have from time to time been provided

19 information from the Department of Transportation as a

20 resource?

21 A    That's correct.

22          MR. BOLVES:  Your Honor, at this time I'd ask for the

23 Court to take judicial notice of a memorandum of understanding

24 between the Department of Transportation and the Federal Energy

25 Regulatory Commission regarding natural gas transmission

1  facilities dated January 15th, 1993.  The purpose for this is,

2  this is an official publication, an agreement entered into

3  between those two agencies whereby -- and I have copies for

4  Counsel if they would like to see it.

5          Essentially, Your Honor, the purpose for this

6  memorandum is to establish that the Department of

7  Transportation is the agency solely responsible for the

8  jurisdictional control of the operation and safety and

9  maintenance of natural gas transmission lines, and that

10  responsibility is recognized by FERC in their EIS and

11  certification program.  So I'd ask the Court to take judicial

12  notice of this at this time.

13          I don't intend to ask the Chief particularly

14  questions about it, but I think it's important for the Court to

15  be aware of that as a predicate to some of my further

16  questioning.

17          THE COURT:  Are you going to offer this as an exhibit

18  in evidence?

19          MR. BOLVES:  I could offer it as an exhibit in

20  evidence, Your Honor, but I think the Court -- I can certainly

21  do that, or the Court could just take judicial notice of it.

22  It's a publication on their website.  It's widely available.

23          THE COURT:  Well let me ask if the Defendants have

24  any objection to that?

25          MR. HIRSCH:  Well Your Honor, the Defendants have not

1   seen this document, but we would accept Mr. Bolves' avowal.  I

2   don't know how you want to handle it.  I don't think it's

3   technically a matter of judicial notice, but we wouldn't have

4   an objection to foundation to the document accepting Counsel's

5   avowal that it exists.

6           THE COURT:  I think everyone -- I shouldn't say I

7   know this, but I'm, it was my understanding that everyone

8   understood that regulation of pipeline safety was no longer

9   FERC's responsibility but was somewhere within the DOT, and I

10  gather this memorandum is the basis for that division of

11  responsibility.  My understanding was everybody was on the same

12  page on that.  Am I correct?

13          MR. HIRSCH:  Yes.

14          MR. BOLVES:  Yes.

15          MR. HIRSCH:  Obviously the distinction is pipeline

16  safety versus events on the ground to the citizenry.

17          THE COURT:  Yes.

18          All right.  Well I'll take judicial notice of the

19  memorandum of understanding to the extent that it's pertinent

20  to the questioning here.

21          MR. BOLVES:  Thank you, sir.

22  BY MR. BOLVES:

23  Q    Now Chief, you talked a little bit about the class

24  location.  You had several questions from Mr. Pennartz about

25  class location and the, where the pipe's coming through

1    Buckeye, and what classification they were.  Do you recall

2    those questions specifically dealing with the area of high

3    consequence and that conversation?

4    A    Yes, I do.

5    Q    Okay.  Have you -- are you aware of the fact -- and I'd

6    like to direct your attention again to the Elmo, specifically

7    page 4-199 of the EIS, the final EIS, which is, was promulgated

8    by the Federal Energy Regulatory Commission in connection with

9    this particular project.

10            Okay.  My question to you is this, sir.  In

11   connection with identifying class locations in this document

12   the federal government has identified specific citations, class

13   1 location within ten or fewer buildings intended for human

14   occupancy, class 2, et cetera, and you see that on that page.

15   Have you had an opportunity, or let me ask it this way.  Is it

16   your opinion that the federal government in identifying the

17   class locations through the Town of Buckeye has somehow

18   misapplied this Department of Transportation standard which

19   they're required to follow in the Memorandum of Understanding;

20   is that your opinion?

21            MR. PENNARTZ:  Object.  Exceeds -- Your Honor, he

22   hasn't given an opinion.  He wasn't offered as a pipeline

23   expert.  Mr. Bolves made that point perfectly clear.

24            THE COURT:  All right.  Well I would agree.  I don't

25   think he's in the position to offer opinion testimony on

1  pipeline safety issues.

2          MR. BOLVES:  Okay.  And that's, then might as well,

3  then my question, Your Honor, is this, asking --

4  BY MR. BOLVES:

5  Q    -- I'd like to ask him if we look at the chart on page 200

6  which identifies all of the class locations identified by FERC

7  in this process, have you done any analysis from a public

8  safety standpoint, from emergency response standpoint, that

9  would lead you to believe that this is in any way in error?  I

10 mean, in other words, you're the one who's familiar with your

11 community.  You know how many houses are out there.  You know

12 how many buildings are out there.

13         These class locations are driven by that population

14 densities.  I'm asking you as the fire chief of Buckeye, have

15 you done any work to determine whether or not FERC misapplied

16 those occupancy standards around this pipeline?

17         MR. PENNARTZ:  Your Honor, same objection.  It's not

18 within the scope of his testimony or his authority to determine

19 pipeline classifications.

20         THE COURT:  Well I would agree with that, but it also

21 within the scope of his concern to be informed about public

22 safety issues.  He may have done some sort of study like this,

23 or he may not have; I have no idea, and I'll permit the

24 question.

25         You may have to restate it, and perhaps you could

1    state it more briefly this time.

2              MR. BOLVES:  Yes, I will.

3    BY MR. BOLVES:

4    Q    Chief, did you do any work to determine the number of

5    households around the proposed pipeline corridor?

6    A    My review was based on the land that's been entitled, and

7    review of pre-plat submittals and engineering that has come

8    through, and with that review was while today it's primarily

9    undisturbed desert for most of that, the route that the

10   proposed pipeline is going through ultimately will be built out

11   much denser then it looks like the study identified.

12   Q    Is it your opinion that the class location analysis done

13   by FERC is therefore flawed; is that what you're telling the

14   Court?  Or you haven't reached that conclusion?

15   A    I don't have an opinion on that.

16   Q    Okay.  Are you aware of the fact, sir, that the FERC as

17   part of their responsibility for implementing Department of

18   Transportation regulations through the EIS, studied the impact

19   on public safety associated with this project?

20             MR. PENNARTZ:  Object.  Foundation.

21   BY MR. BOLVES:

22   Q    I'd like to go ahead and direct your attention to page

23   4-208 of the EIS specifically identified as impact on public

24   safety; I want to, I just want to know if you're aware of that?

25   A    Not off the top of my head.

1    Q    Okay.  Let's go ahead and flip the page to page 209.  Are

2    you aware of the fact, sir, that under the FEMZA or Department

3    of Transportation regulations each operator must establish and

4    maintain a liaison with appropriate fire, police, public

5    officials to learn the resources and responsibilities of each

6    organization that may respond to a natural gas emergency and

7    then coordinate mutual assistance?  Are you aware of the fact

8    that this operator, Transwestern, has a federal requirement to

9    work with you as a local first responding agency to help deal

10   with the emergencies that you're talking about; are you aware

11   of their obligation to do that?

12   A    I'm not aware of Transwestern's.  We've worked with other

13   utility companies.

14   Q    Have you had the opportunity -- there are other

15   communities within the State of Arizona that have existing

16   interstate natural gas transmission pipelines; are there not?

17   A    Yes, there are.

18   Q    Have you had the opportunity, or have you, have you had

19   the opportunity to discuss with those agencies the plans that

20   they have in place for dealing with these type of facilities?

21   A    Specifically or --

22   Q    Specifically.  Have you called up any of your counterparts

23   at other cities or towns and said, "Hey, you guys have a

24   natural gas transmission line.  What's your plan?"  Have you

25   done that?

1   A    We actually address that through standardized training and

2   operating procedures.

3   Q    So you do receive some sort of standardized training and

4   operating training --

5   A    Yes.

6   Q    Okay.  Have you formulated -- now you indicated that you

7   have to plan for the worst case scenario for this type of a

8   line.  Have you indeed formulated such a plan?

9   A    We continually work on that plan.

10  Q    Okay.  Are you aware of the fact that this application,

11  the pre-application for this project, was filed in November

12  2005?

13  A    No, I'm not.

14  Q    Are you aware of the fact that your town intervened in the

15  process with FERC?

16  A    Yes, I am.

17  Q    And have you taken any steps within your department, or

18  within your town to plan for the contingencies that may arise

19  in connection with these pipelines?

20  A    Yes, we have.

21  Q    Okay.  And have you submitted any budget requests to the

22  town council associated with that?

23  A    Specifically with the pipeline we have not.

24  Q    Okay.

25  A    We have research grants for hazardous materials support.

1   Q    All right.  Have you had the opportunity to review the

2   liaison program that Transwestern is required to maintain as

3   part of the operation of these pipelines?

4   A    No, I have not.

5   Q    Are you aware of the fact that Transwestern has an

6   obligation to inform individuals such as yourself as to the

7   nature of these facilities?

8   A    I'm unclear as to the question, sir.

9   Q    In fact -- well my question is, are you aware of the fact

10  that Transwestern is required to reach out to agencies such as

11  yourself by federal regulation and provide you with information

12  regarding the nature of the facility?

13  A    Again, if they're required by federal regulation, then I

14  would say yes.  I'm not aware of that regulation.

15  Q    Are you aware of the fact that Transwestern's liaison

16  program requires, the federal regulation requires that they

17  provide periodic fire fighting demonstrations within each

18  district; are you aware of that?

19  A    No, I'm not.

20  Q    Okay.  Are you aware of the fact that they're required t o

21  meet with public safety officials to inform them of the nature

22  of the facilities and the type of emergency response that may

23  be required in the event of an incident?

24  A    Specifically Transwestern or other utilities?

25  Q    Any operator of an interstate natural gas pipeline under

1  the DOT regulations?

2  A    Then I would say yes, because we've met with other

3  operators.

4  Q    You have met with other operators?  And are you, are you

5  aware of the fact that Transwestern has an obligation to have

6  inform, informational meetings and trainings if requested by

7  the municipality?

8  A    No, I'm not.

9  Q    Okay.  So you haven't asked for that kind of training,

10  have you?

11  A    Have not.

12  Q    In fact, isn't it true that Transwestern has on at least

13  two occasions met with your agency for the purpose of

14  providing, beginning this liaison?

15  A    With --

16  Q    With Buckeye --

17  A    With the town?

18  Q    -- yes, sir?

19  A    I have met with Transwestern representatives one time.

20  Q    Okay.  Are you aware of a prior meeting -- let me go into

21  that.

22           MR. BOLVES:  Excuse me, Your Honor.

23  BY MR. BOLVES:

24  Q    Are you aware of -- do you happen to know who Scott Rounds

25  is?

1    A    Yes.

2    Q    And who is that, sir?

3    A    Scott Rounds was the previous fire chief.

4    Q    Okay.  Are you aware of a meeting which took place with

5    Mr. Rounds and other representative of the city's on October

6    15th of 2007 regarding this project?

7    A    Not specifically.

8    Q    Excuse me?

9    A    Without looking at a calendar, not specifically.

10   Q    Okay.  But you did know that Mr. Rounds had met with

11   Transwestern?

12   A    Not specifically.

13   Q    Okay.  Now there was a second meeting held on January

14   30th, 2008, was there not, since you were in attendance?

15   A    Without a calendar I don't know the date that I was --

16   Q    Well sometime earlier this year?

17   A    Okay.

18   Q    Did you meet with Transwestern representatives?

19   A    Yes.

20   Q    And isn't it true that the specific purpose of that

21   meeting was to begin to provide you with information regarding

22   the nature of the emergency, and the type of notification, and

23   the type of response that would necessary in the event of an

24   incident?

25        MR. PENNARTZ:  I object to foundation, Your Honor.

1    For him to testify to what was Transwestern's purpose in

2    attending the meeting I think is beyond his --

3            MR. BOLVES:  Well, and I'll withdraw that question.

4    BY MR. BOLVES:

5    Q    Can you tell me what you guys talked about?

6    A    It was a general conversation over how they monitored an

7    introduction of some of their staff.

8    Q    And did they provide you with a contact list of

9    individuals within Transwestern?

10   A    I don't recall that.

11   Q    Did they provide you with documentation regarding the

12   emergency response guidelines?

13   A    If I remember correctly, the only thing we had was a flyer

14   that was to be distributed --

15   Q    Okay.  Is it fair to say that the, that Transwestern in

16   connection with this project has begun to comply with their

17   federal requirements by reaching out to your agency to begin

18   this liaison; is that a fair statement?

19           MR. PENNARTZ:  Object.  Legal -- object. Legal

20   conclusion, Your Honor, as to whether they're complying with

21   the regulations or not.

22           MR. BOLVES:  I'll rephrase that, Your Honor.

23   BY MR. BOLVES:

24   Q    Is it fair to say that Transwestern as the pipeline

25   operator proposed in your community has reached to your agency?

1    A    I think it'd be fair to say that they've made contact with

2    us.

3    Q    Okay.  And have you asked for further information or

4    assistance from them?

5    A    I have not.

6    Q    In your testimony yesterday you indicated that you, one of

7    the things that you do in order to prepare for incidences is

8    have kind of a tabletop, I think the phrase you used was a

9    tabletop scenario  --

10   A    Correct.

11   Q    -- whereby you work it out on paper, what resources will

12   be need, how will we respond to this, and those type of

13   scenarios; is that correct?

14   A    That's correct.

15   Q    Have you done any of these tabletop work-it-out-on-paper

16   scenarios for a natural pipeline incident?

17   A    We have done natural gas incidents.  I would not say we've

18   done a transmission line incident specifically.

19   Q    Now I think you testified yesterday that you currently

20   have six fire stations and seven companies; is that correct?

21   A    That's correct.

22   Q    And in fact two of those stations are located along this

23   pipeline corridor, are they not?

24   A    That is correct.

25   Q    And the pipeline, in addition to those resources, one of

1   those fire stations is in  Tartesso; right?

2   A    That is correct.

3   Q    With a new fire station on the drawing board at Tartesso?

4   A    That is correct.

5   Q    And you've indicated, and you talked about it this

6   morning, that you're also a member of the automatic aid

7   consortium; is that correct?

8   A    That is correct.

9   Q    And that provides you with additional resources beyond

10  those which you have?

11  A    That is correct.

12  Q    Did you at any time provide information to FERC through

13  the process, did you, meaning your company or your town, if you

14  know, provide information to FERC regarding the resources that

15  were available to your agency in the Town of Buckeye from an

16  emergency response standpoint?

17  A    I don't recall anything directly related to that.

18  Q    Isn't it true that in dealing with FERC the Town of

19  Buckeye raised the issue of emergency response and the risks

20  associated with the construction of a natural gas pipeline

21  through the community?

22  A    That is my understanding.

23  Q    So FERC has had an opportunity to hear your concerns with

24  respect your ability to respond to these emergencies; is that

25  right?

1  A    To my knowledge.

2  Q    Now with respect to dealing with these, any kind of a

3  natural gas incident, you said yesterday that in the event that

4  you have a rupture that has a flame, that that's probably, that

5  that's an easier incident to deal with because you know where

6  the flame is, you know where the gas is leaking, and it's a

7  matter of evacuating the area and dealing with I think what you

8  called secondary fires; is that correct?

9  A    That's correct.

10 Q    And in fact you said that those secondary fires are

11 relatively easy to contain, didn't you?

12 A    It depends on what's burning.

13 Q    Okay.  But I mean, in general though, you have an idea of

14 how you would handle those scenarios?

15 A    Yes, we do.

16 Q    Now the other type of incidence you talked about occur

17 with other gas leaks, and that is the accumulation of gas in

18 buildings or in some kind of a closed area which could be

19 combustible; is that, is that essentially what you're talking

20 about with this confined area scenario?

21 A    That is correct.

22 Q    Now you said yesterday that your typical response to these

23 type of incidences is that you roll three engine companies, a

24 ladder company, a chief, maybe an ambulance, and a hazmat unit

25 to maintain the, to monitor the air; is that consistent with

1  your testimony that you can recall?

2  A    Yes.

3  Q    Okay.  And essentially you said that that's similar to how

4  you'd respond to house fire?

5  A    That is correct.

6  Q    Okay.

7  A    As far as the resources.

8  Q    Yes, sir, as far as the resources and the equipment that

9  you would have to apply to that kind of a scenario.  You also

10 said that life safety was your first priority, and that what

11 you would do is you first evacuate the area around the leak, I

12 guess that hot zone.  You determine which way the air's blowing

13 or which way the gas might be flowing, and then you evacuate

14 that area, and then you work with the gas company to shut down

15 the source; right?

16 A    That is correct.

17 Q    So in both scenarios, in both the scenario where there's

18 an open flame, and in the scenario where there's a leak of gas

19 but no flame, a significant part of your protocol is to work

20 with the gas company to shut down gas; is that correct?

21 A    That is correct.

22 Q    Are you aware of the type of valves that are required to

23 be installed by the Department of Transportation to deal with

24 gas control in a rupture situation?

25 A    As far as?

1  Q    When these pipes -- you said yesterday that one of the big

2  threats to pipeline is third party incidents, someone hits it

3  with a backhoe or some other kind of equipment, did you not?

4  A    Yes, I did.

5  Q    And in fact you did some Internet research on that, didn't

6  you?

7  A    Yes, I did.

8  Q    When you talked about all of these gas incidences that

9  you, that come up in your community, you were talking primarily

10  about ruptures of distribution lines which snake through the

11  neighborhoods, weren't you?

12  A    I would say distribution lines, yes.

13  Q    Distribution lines that are, that occur throughout the

14  community bringing gas from a transmission line to a user?

15  A    Correct.

16  Q    Okay.  And in fact are you aware of the fact from your

17  internet research that there have only been three pipeline,

18  natural gas transmission pipeline ruptures in the State of

19  Arizona in, since 2004?

20  A    I didn't come up with that number in my research, but.

21  Q    And you wouldn't know then whether or not they involved

22  incidents -- no one was injured or killed in those; you

23  wouldn't know?

24  A    The one incident that I referenced in Arizona, the

25  individual was severely burned.

1   Q    Okay.  And did that happen since 2004?

2   A    I believe that was earlier than 2004.

3   Q    Are you aware of the type of materials and Cathodic

4   protection systems which will be employed on this particular

5   facility, this natural gas transmission pipeline that's

6   proposed by the, by FERC?

7   A    I am not fully aware of your engineering.  I know that

8   pipelines require cathodic protection.

9   Q    Do you recall Mr. Runte's -- I think you were in the

10  courtroom yesterday when Mr. Runte testified, weren't you?

11  A    For part of his testimony.

12  Q    Okay.  Were you here when Mr. Runte said that the line

13  through Buckeye was going to be placed within the SRP corridor?

14  Or are you aware of that, let's -- are you aware of that, that

15  it's going to be placed primarily within the SRP corridor

16  through the town?

17  A    I know it's in a utility corridor.

18  Q    Okay.

19  A    There's, there's --

20  Q    There's an electrical transmission corridor.  Will you

21  describe what that transmission corridor looks like?

22  A    As far as?

23  Q    What, I mean, is it one tower, is it wide; do you know

24  anything about that corridor, have you looked at that corridor?

25  A    There are numerous corridors that run through Buckeye.

1    Some are one tower wide.  Some expand up to three towers

2    wide.

3    Q    Okay.  And in your observations as the fire chief, have

4    you observed whether or not they have, there are buildings

5    constructed within that corridor, those electric transmission

6    corridors that go through Buckeye?

7    A    There are not buildings constructed within the corridor.

8    Q    Are you aware of the fact that Mr. Runte testified

9    yesterday that the SRP corridor that's going to be the host of

10   this pipeline has a restriction against development within the

11   corridor; did you hear him say that?

12   A    No, I did not.

13   Q    Okay.  Is that consistent with your observations though

14   regarding these corridors?

15   A    As far as buildings being built within the corridor

16   itself?

17   Q    Yes, sir.

18   A    My understanding is construction's prohibited.

19   Q    And if -- is it -- if FERC directed that the pipeline be

20   constructed within one of these transmission line corridors

21   that has a restriction against building, wouldn't that further

22   the goal of avoiding third party incidences as you described as

23   being the leading cause of a pipeline rupture?  Do you have an

24   opinion about that?

25   A    I think you have other utilities that cross those

1    corridors.

2    Q   Okay.  But in terms of building buildings, it's less

3    likely to occur in that area; is that true?

4    A   If it was specifically within that corridor that would be

5    true.

6    Q   And those crossings that do occur are predominantly other

7    utilities?

8    A   I would say it would be other infrastructure.  It's

9    probably beyond just utilities.

10   Q   And  you work with those agencies in terms of their

11   ability to be aware of and deal with co-location of

12   utilities?

13   A   The fire department does not.

14   Q   Okay.  Are you aware of the fact that they maintain, that

15   those maintain those programs?

16   A   Specifically?  No.

17   Q   Are you aware of the blue stake program?

18   A   Yes, I am.

19          MR. BOLVES:  If I might have a moment, Your Honor?

20          THE COURT:  You may.

21          MR. BOLVES:  That's all I have on behalf of the Sun

22   Valley Assemblage parcel, Your Honor.

23          THE COURT:  Thank you, Mr. Bolves.

24          Mr. Lemaster, I believe had some parcel specific

25   questions?

1          CROSS-EXAMINATION

2    BY MR. LEMASTER:

3    Q    Good morning, Chief Costello.  How are you?

4    A    Good.  Good morning.

5    Q    I want to ask you about this map that you had for the Sun

6    Valley corridor.  The developments in here, the colored

7    developments, how many of those exist right now?

8          MR. PENNARTZ:  Object, Your Honor, to the form of the

9    question.  "Exist," I don't know what he means by that?

10   Partially built out?  Completely built out?  It -- I don't know

11   what he means?

12         THE COURT:  Perhaps you could elaborate.

13   BY MR. LEMASTER:

14   Q    How many of those are developed?

15   A    Meaning with buildings in them?

16   Q    With buildings?

17   A    With buildings there are two.

18   Q    Which two?

19   A    One would be the Sun City Festival property located on the

20   north side that we discussed yesterday, and the other would be

21   the Tartesso Development located farther to the south.

22   Q    So one, the Tartesso, it's by I-10, and then the Festival

23   is up at the beginning of this map?

24   A    That's correct.

25   Q    And it's all desert in between?

1   A    There is one section that's been rough graded, and, and

2   stopped.

3   Q    One of the parcels that the Town of Buckeye is named in is

4   the Tartesso West parcel, and that's what we refer to as

5   MA-215, and there's, this is a development agreement between

6   the Town of Buckeye and Stardust Structured Investments.  Are

7   you familiar with this agreement at all?

8   A    I am familiar with the development agreements.  Without

9   reviewing that in its entirety, I can't say whether or not I'm

10  familiar with that exact one.

11  Q    You're familiar that the town enters into development

12  agreements with developers in the Town of Buckeye?

13  A    I am familiar with that.

14  Q    And you see this one is dated August 25th of 2003?

15  A    Correct.

16  Q    We'll look at, just so we get a reference.  This is

17  paragraph 11, and you're aware that these development

18  agreements generally provide that the town's going to provide

19  fire, police, and other services to these developments;

20  correct?

21  A    That is correct.

22  Q    And these development agreements generally also provide

23  that the developer has to do certain things for the town;

24  correct?

25  A    Depending on the agreement.

1    Q    For example, this on in paragraph 11-C-1 requires Tartesso

2    to dedicate land to the Town of Buckeye for fire stations; are

3    you aware of that?

4    A    Okay.

5    Q    Are you aware of that?

6    A    Yes.

7    Q    And are you also aware that Tartesso has to build or pay

8    for the fire stations build under this agreement?

9    A    Yes, I am.

10   Q    And that's not uncommon for the town to enter into these

11   types of agreements, is it, with developers?

12   A    It's not uncommon for development agreements.  All of them

13   have different requirements.

14   Q    So as the Town of Buckeye grows through the Sun Valley

15   Corridor, it's likely there's going to be more fire services

16   available as the population increases; correct?

17   A    There should be.

18   Q    The other parcel that the town is named in on the cases

19   that I'm involved in is the Buckeye Pollution Control

20   Corporation.  That's what has been referred to as the Southwest

21   Regional Landfill.  Are you familiar with that property?

22   A    If that is the property generally located at SR 85 and

23   what would be the Riggs Road Alignment, I would say yes.  I

24   can't tell that from your map.

25   Q    That's where the Southwest Regional Landfill is; correct?

1   A     Okay.

2   Q     And you're aware that it's the Buckeye Pollution Control

3   Corporation that owns the landfill and the Town of Buckeye owns

4   a 100 foot strip around that landfill?

5   A     I'm not aware of that?

6   Q     You're not aware of that?  Are you aware that there's an

7   existing El Paso Natural Gas pipeline that runs through that

8   landfill property?

9   A     Yes, I am.

10  Q     So you're are that the pipeline route certificated by FERC

11  is not going to be the first natural gas pipeline in Buckeye;

12  correct?

13  A     That is correct.

14          MR. LEMASTER:  That's all I have, Your Honor.

15          THE COURT:  Thank you, Mr. Lemaster.

16          Anything further from Defendants?

17                  REDIRECT EXAMINATION

18  BY MR. PENNARTZ:

19  Q     Okay, Chief, with respect to one question you had by Mr.

20  Lemaster.  I might kind of go backwards to more recent things

21  that you were asked about the development agreements.

22  A     Yes.

23  Q     And again, you're, you don't write these development

24  agreements for the town, do you?

25  A     No, I do not.

1   Q    Okay.  So you're just providing your understanding of

2   their provisions at this point?

3   A    My understanding from reviewing them.

4   Q    Okay.  Now, from your understanding, even if a developer

5   builds a fire station and dedicates the land to the City, does

6   the town -- the town, does the town still have staff that fire

7   station?

8   A    It would depend on the content of the agreement.

9   Q    Okay.  Are you aware of whether the developers are going

10  to pay firefighters' salaries in those development agreements?

11  A    Some development agreements have shortfall provisions in

12  them, some do not.

13  Q    But shortfall meaning for a period of time?

14  A    A shortfall for a period of time to cover the operating

15  deficits.

16  Q    Okay.  And how long as the periods of time that you're

17  aware of, how short?

18  A    That's a formula worked out between the attorneys and the

19  finance people.

20  Q    Okay.  What about training, are there training costs that

21  the town would incur with respect to bringing new firefighters

22  on and training them to perform?

23  A    Yes, there is.

24  Q    Equipping them, would the town incur expenses there?

25  A    Yes.

1    Q    How about planning for using those resources to respond to

2    fire incidents or other emergency services incidents; does the

3    town incur expenses sometime for doing that?

4    A    Yes.

5    Q    Okay.  Maintaining proficiency by those firefighters and

6    maintaining the plans up to date, or was that resources that

7    the town would be required to expend?

8    A    Yes, it is.

9    Q    Okay.  With respect to your testimony about, that you were

10   asked about on the Department of Transportation regs and the

11   DOT, who's responsible for regulating pipeline safety,  you're

12   not here telling the Court that you're responsible for

13   regulating the siting or construction of pipelines, are you?

14   A    No, I am not.

15   Q    Okay.  But if an incident occurs, do you expect the feds

16   to roll in and fight that fire or evacuate those people?

17   A    I do not.

18   Q    Okay.  Do you have any arrangements with the feds where

19   they would do that outside of a presidential declaration of

20   emergency?

21   A    It would take a declaration before you'd get federal

22   response.

23   Q    Okay.  And that's not going to be immediate from your

24   planning standpoint in terms of actually evacuating people or

25   dealing with an emergency incident?

1    A    Typically you use the 72 hour window before you have

2    federal support.

3    Q    And that usually comes in the form of financial support?

4    A    Depends on the incident.

5    Q    Looking at this map again, because I think this does go

6    back somewhat to your testimony that I believe your testimony

7    was that you deal with a planning and fire resources standpoint

8    with existing households and other development that's planned;

9    correct?

10   A    That is correct.

11   Q    Okay.  And so from  your standpoint you're planning for

12   this development to occur as shown on the slide that's on the

13   Elmo as entitled; correct?

14   A    Yes.

15   Q    Okay.  And that you're going to have to respond in this

16   worst case scenario to people living in these residences and

17   shopping in these shopping centers and things?

18   A    Respond in all scenarios.

19   Q    Okay.

20        MR. PENNARTZ:  Okay.  No further questions, Your

21   Honor.

22        THE COURT:  Thank you, sir.

23        Mr. Hirsch, did you -- you didn't have any direct, so

24   I'm, but I'll permit some redirect.

25        MR. HIRSCH:  Yeah, if you would, Judge?  I'll be

1    brief.  They're questions suggested by the cross-examination on

2    behalf of the developer clients.

3              THE COURT:  Very well.

4                        REDIRECT EXAMINATION

5    BY MR. HIRSCH:

6    Q    Mr. Costello, we haven't had a chance to meet other than

7    in the hallway.  I'm Steve Hirsch, and I represent the

8    developers of Tartesso and WBSV and some of their affiliates

9    and subsidiaries.  I'm also tasked to ask questions on behalf

10   of the developers along the Sun Valley Parkway and elsewhere

11   along the pipeline route; okay?

12   A    Okay.  The WVS --

13   Q    WBSV Holdings is the large series of master planned

14   communities located if we look at this exhibit, in this area.

15   A    Okay.  I --

16   Q    We'll have more testimony today on that.

17   A    I'm a little more familiar with the individual holdings

18   than the overall holding.

19   Q    This is Pipe Oliver's group, W group, does that help at

20   all?

21   A    Okay.  Thank you.

22   Q    Thank you.  I wanted to ask some follow up on Mr. Bolves'

23   questions concerning this degree of thoughtful analysis and

24   consideration by FERC and its consultant.  Were you aware that

25   FERC's consultant was hired and paid for by Transwestern?

1   A    No, I was not.

2   Q    Did you -- were you ever visited by FERC/Transwestern's

3   consultant when he -- when their firm was working up the draft

4   environmental impact statement, or the final environmental

5   impact statement?

6   A    I was not specifically, no.

7   Q    Okay.  You've been affiliated from your resume with the

8   Town of Buckeye Fire Department, initially as fire marshal,

9   then as assistant chief, and now fire chief since July of '04;

10  is that right?

11  A    That is correct.

12  Q    To your knowledge, was Mr. Rounds or anyone else within

13  the Town of Buckeye Fire Department ever contacted and

14  interviewed or asked to provide any information whatsoever to

15  FERC or its consultant concerning the fire safety concerns

16  you've stated in your testimony?

17  A    Not to my knowledge.

18  Q    Are you aware that Buckeye through its attorneys submitted

19  objections to the proposed route stated in part on the public

20  safety concerns you've stated?

21  A    Yes, I am.

22  Q    And that was part of the paperwork, and if they hired

23  their own expert who elaborated on the public safety concerns

24  among many other concerns that were submitted to the FERC

25  docket; correct?

1   A    Correct.

2   Q    Okay.  Are you aware that Buckeye, together with several

3   of the Sun Valley Parkway defendants, have appealed the grant

4   of the FERC certificate to the DC Circuit Court of Appeals?

5        MR. LEMASTER:  Objection, Your Honor.  This goes

6   outside of the scope of re, redirect, and he didn't even ask

7   questions on it in --

8        THE COURT:  Sustained.

9        MR. HIRSCH:  Okay.  If I could just line it up this

10  way, judge.

11  BY MR. HIRSCH:

12  Q    Mr. Costello, you're aware that your town has actively

13  preserved its arguments that FERC in fact did not consider or

14  weigh properly the concerns you testified about today; are you

15  aware of that?

16  A    Could I get that question one more time, please?

17  Q    Right.  Are you aware of the fact that the town has

18  appealed the FERC certificate and is arguing that FERC in fact

19  did not carefully weigh the building safety and fire safety

20  concerns that you've testified to?

21  A    I am aware of the appeal.  The exact core of that total

22  argument I'm not aware of.  I understand that's part of it.

23  Q    All right.  The judge will have access to that.

24        Has Transwestern visited you or to your knowledge,

25  anyone in the Buckeye Fire Department with a specific offer at

1    any time, or periodically, to provide a firefighting

2    demonstration?

3    A    Not to my knowledge.

4    Q    Has Transwestern ever offered to provide money to allow

5    the town to equip itself with labor in terms of more responders

6    or equipment to allow the expanded scope of response that will

7    necessary if the pipeline is put in?

8    A    Not to  my knowledge.

9    Q    You recall attending personally one meeting with

10   Transwestern?

11   A    Yes, that I can recall.

12   Q    Okay.  Do you recall Transwestern referencing a manual on

13   fire safety during that meeting?  Or do you remember one way or

14   the other?

15   A    I don't remember a manual specifically.

16   Q    Do you remember Transwestern giving you an entire copy of

17   a manual or any materials concerning what Mr. Bolves asked you

18   about concerning its view of fire safety and preparation?

19   A    If I remember correctly, there were a couple of business

20   cards and a pamphlet is what -- it was a very general meeting.

21   Q    I think you're aware that the Transwestern FERC

22   certificate allows it to provide only 36 inches of cover on top

23   of a 36-inch more than 1,000 pound per square inch natural gas

24   pipeline?

25            MR. LEMASTER:  Objection, Your Honor.  This is

1   clearly outside the scope of the redirect.

2           THE COURT:  Sustained.

3   BY MR. HIRSCH:

4   Q    Are you aware -- I want to ask some questions concerning

5   the lack of structures on the easement.  Do you perceive, Chief

6   Costello, that there are any dangers to buildings that might be

7   neighboring the electrical transmission easement as opposed to

8   being on top of the easement?

9   A    The buildings that could be built along the easement

10  certainly could be an exposure for the release of product.

11  Q    Okay.  Are you aware of the fact that the pipeline is

12  permitted to be physically placed 15 feet from the western edge

13  of the SRP easement as it runs north/south through Sun Valley

14  Parkway?

15          MR. LEMASTER:  Again, Your Honor, objection.  This is

16  outside the scope of the redirect.  We didn't even ask

17  questions on this topic.

18          THE COURT:  Sustained.

19          MR. HIRSCH:  Well, Your Honor, if I -- may I be heard

20  on that?

21          THE COURT:  No.

22          MR. HIRSCH:  Okay.

23  BY MR. HIRSCH:

24  Q    Chief Costello, has Transwestern Pipeline offered to do

25  anything, in your view, for the Town of Buckeye to augments its

1   ability to respond to a incident involving its proposed

2   pipeline as it runs through the Town of Buckeye?

3   A     Nothing direct to this point.

4   Q     Thank you.

5              THE COURT:  Thank you, Mr. Hirsch.

6              Will there be any recross?

7              MR. LEMASTER:  Your Honor, I just have two quick

8   questions if I may?

9              THE COURT:  Mr. Bolves was first.

10             Do you have anything, sir?

11             MR. BOLVES:  Yes, sir, I do have just one question.

12                         RECROSS-EXAMINATION

13  BY MR. BOLVES:

14  Q    Mr. Hirsch referred to a, asked you if Transwestern had

15  done this or that --

16             THE COURT:  I'm not sure we're picking you up.  You

17  may need to go to a microphone.

18             MR. BOLVES:  Oh, I'm sorry, Your Honor.

19  BY MR. BOLVES:

20  Q    Sir, Mr. Hirsch asked you questions about what assistance

21  Transwestern has provided, and my question is, have you or your

22  attorneys who have been involved in this FERC process for over

23  two years ever requested specifically any of the assistance

24  that is set forth as mandatory under the federal regulations?

25  A     I cannot --

1   Q    Have you ever asked for that?

2   A    I cannot speak for anybody other than myself; I have not.

3   Q    Okay.  And have you ever asked El Paso, who has an

4   existing natural gas transmission line through your own for

5   that kind of information or assistance?

6   A    We have received it through them automatically.

7   Q    Okay.  After their line was in service?

8   A    Their line's been in service well before I was there.

9   Q    Okay.

10         MR. BOLVES:  Nothing further.

11         THE COURT:  Thank you, sir.

12         Mr. Lemaster.

13                 RECROSS-EXAMINATION

14   BY MR. LEMASTER:

15   Q   Chief Costello, you were asked if you're aware that

16   Buckeye has appealed this matter to the DC Circuit, I want to

17   talk to the FERC certificate, and you said yes, you were?

18   A    I'm aware of some legal proceedings.  Exactly what those

19   are I am not.

20   Q    Are you aware that the Town of Buckeye hasn't requested a

21   stay from the DC Circuit?

22         MR. PENNARTZ:  Your Honor, I -- he says he doesn't

23   know the nature of the --

24         THE COURT:  Sustained.

25         MR. LEMASTER:  That's all I have.

1          THE COURT:  Thank you, Mr. Lemaster.

2          All right.  Well Chief Costello, thank you very much,

3   sir, for coming in.  I appreciate your being here.  You're

4   excused at this time.

5          THE WITNESS:  Thank you.

6          THE COURT:  I believe you indicated you had a witness

7   who's going to testify on behalf of, of one of the contractors;

8   right?

9          MR. LEMASTER:  Yes, Your Honor, Rockford Corporation.

10   Ms. Ricupero came back with this --

11          THE COURT:  All right.  Is the witness available at

12   this time?

13          MS. RICUPERO:  Yes, he is, Your Honor.

14          THE COURT:  All right.  If you'd come forward, sir,

15   the clerk will give you an oath.

16          THE CLERK:  Would you please state your name and

17   spell it for the record?

18          MR. LANGSTON:  William Michael Langston,

19   W-I-L-L-I-A-M, M-I-C-H-A-E-L, L-A-N-G-S-T-O-N.

20          THE CLERK:  Thank you.  Please raise your right

21   hand.

22       WILLIAM MICHAEL LANGSTON, PLAINTIFF'S WITNESS, SWORN

23          THE CLERK:  Thank you.  Please have a seat.

24          THE COURT:  Whenever you're ready, ma'am.

25

1                    DIRECT EXAMINATION

2     BY MS. RICUPERO:

3     Q    Good morning, Mr. Langston.  Thank you for coming today.

4     Please state your occupation?

5     A    Superintendent.

6     Q    And for what corporation do you hold that position?

7     A    Rockford Corporation.

8     Q    How old are you, Mr. Langston?

9     A    Fifty-four.

10    Q    Can you describe how long or explain for the Court how

11    long you've worked in the pipeline construction industry?

12    A    I started, began in the pipeline industry when I was 15

13    years old in England.

14    Q    And have you continued in that business from 15 on?

15    A    Yes, I have.

16              THE COURT:  Where did you say you began?

17              THE WITNESS:  In England, Great Britain.

18              THE COURT:  You've managed to lose that accent?

19              THE WITNESS:  Thank goodness.

20         (Laughter)

21              THE COURT:  That's what 30 or 40 years in the

22    pipeline business will do for you, I guess.

23              THE WITNESS:  Well what that does for you is what you

24    see up here.

25              THE COURT:  I'm sorry to interrupt.  Go ahead.

1      MS. RICUPERO:  No problem, Your Honor.

2  BY MS. RICUPERO:

3  Q    Can you describe for the Court briefly how many, or

4  approximately how many pipeline projects you've worked on

5  through your years, the 40 years in the business?

6  A    Well I've averaged at least one a year.

7  Q    And where have you done the pipe or performed your

8  pipeline construction projects?  Nationally, or, you know, in

9  other countries as well?

10 A    I worked overseas for eight years.  I was in Canada four

11 and a half years.  Been in the States ever since.

12 Q    And how long have you been with Rockford Corporation?

13 A    Four years.

14 Q    What are your responsibilities as a superintendent for

15 Rockford?

16 A    Oversee the construction and the cost directly for

17 Rockford.

18 Q    Do you have any employees that you supervise as part of

19 your responsibilities as superintendent?

20 A    Yes, I do.

21 Q    Approximately how many employees do you oversee on a

22 pipeline project?

23 A    This size project, between five and six hundred.

24 Q    So you said you also make the financial decisions that go

25 into the actual construction of the pipeline; is that correct?

1    A    Yes, the job related ones.

2    Q    So do you invoice, is part of your responsibilities to

3    invoice actual charges to the client as the construction goes

4    on?

5    A    That is correct.

6    Q    And you already indicated this in your testimony but just

7    for the record, are you the superintendent overseeing the

8    Phoenix expansion or pipeline expansion project with regard to

9    the Rockford portion of the construction?

10   A    That is correct.

11   Q    Have you begun actual construction on the  Phoenix

12   pipeline expansion project to date?

13   A    One small, in one small location only.

14   Q    And what location is that?

15   A    It's the nuclear power plant, a 66-inch waterline bore.

16   Q    And why was it important, or was it important to start

17   that bore at the power plant within a certain time frame?

18   A    They have an outage window of when they shut that cooling

19   line down, and we have seven days to bore under that water line

20   while it's out of service.

21   Q    Okay.  And if you weren't able to bore under the water

22   line within that seven day period, when would, from your

23   understanding, if you know, when would the next time that you

24   could bore under that line be?

25   A    I believe I understand that it, they shut it down

1   annually, one time.

2   Q    So --

3   A    So it'd be next year.

4   Q    Okay.  Are there any other timing specific type windows or

5   specialty type windows that you're dealing with on this

6   particular project?

7   A    Yes, there's two more canals.  One of them is the Gila

8   River Canal along Old Highway 80, and then there's the

9   Centralia Canal, which is actually back to the, would be to the

10  north or to the west of the Gila River.

11  Q    So in addition, or in addition to this boring project at

12  the Palo Verde Power Plant, have you been able to make, do any

13  other construction or release any crews on this job?

14  A    No, ma'am.

15  Q    And why not?

16  A    We've not been given the notice to proceed by Transwestern

17  due to right-of-way issues.

18          MR. HIRSCH:  Objection Your Honor as to the last part

19  of that.  There's no foundation as to the reason, whether it's

20  permit related or not requesting approval by FERC or other

21  reasons.

22          THE COURT:  Well he's only giving the reason that he

23  hasn't released anybody.  Somebody else would have to speak to

24  those issues.

25          MR. HIRSCH:  Okay.

1           THE COURT:  Go ahead.

2    BY MS. RICUPERO:

3    Q    Is it your understanding from your conversations with the

4    client in regard to your position that the reasons Transwestern

5    has not released you to begin construction is failure to access

6    right-of-way?

7           MR. HIRSCH:  Object.  Hearsay.

8           THE WITNESS:  That is correct.

9           MR. HIRSCH:  Your Honor, object.  Hearsay, and

10   foundation.

11          THE COURT:  Sustained.

12   BY MS. RICUPERO:

13   Q    I want to focus on the actual state of the pipeline

14   industry right now, Mr. Langston.  What, what's the nature of

15   the pipeline industry with regard to how busy it is or, right

16   now?

17          MR. HIRSCH:  Objection.  Foundation.

18          MS. RICUPERO: Your Honor, he's just testified he has

19   40 years in the business and --

20          THE COURT:  Well I realize that he does --

21          MR. HIRSCH:  As a superintendent.

22          THE COURT:  -- but I do think you're going to need to

23   lay a little bit better foundation than that.  It's conceivable

24   somebody could spend 40 years in the business and still not

25   know much about other companies and resources that are

1   available, so you need to do a little bit more.

2          MS. RICUPERO:  Okay.

3   BY MS. RICUPERO:

4   Q    Mr. Langston, are you familiar with other companies -- in

5   your dealings as superintendent do you have to know or do you

6   have any reason to know what other companies' schedules are?

7          MS. RICUPERO:  Strike that, Your Honor.  That's --

8   BY MS. RICUPERO:

9   Q    In your position as superintendent, do you, are you, do

10  you have access to information regarding the nature of how busy

11  the industry is?

12  A    Yes.  We're actually one large family.

13  Q    So you speak to other people within the industry?

14  A    Daily.

15  Q    Are you aware how busy Rockford is?

16  A    Yes, I am.

17  Q    Do you know what your scheduling is like and whether or

18  not you'll have work available in the coming years?

19  A    Yes, I do.

20  Q    Can you tell the Court how, based on your conversations

21  with these other individuals within the pipeline industry can

22  you tell the Court whether or not the industry is busier or,

23  than normal?

24          MR. HIRSCH:  We'd still object.  Foundation.  And as

25  to what's, the frame of reference is.

1    MS. RICUPERO:  I'm sorry, Your Honor.  I mean with

2    regard to the fact that he's just testified that he speaks

3    daily to people in the industry.  He bids or he works on the --

4    THE COURT:  Well you can pursue this matter a little

5    further, but I don't think the foundation is quite adequate

6    yet.

7    BY MS. RICUPERO:

8    Q    Does Rockford have other commitments in the future?

9    A    Yes, we do.

10   Q    How far up in the future is Rockford committed on

11   projects?

12   A    We're committed through next year and partially through

13   0-10, and we're quoting estimating work for 2011 now.

14   Q    Have you received jobs for Rockford because other

15   contractors have turned them down?

16   MR. HIRSCH:  Object.  Foundation.

17   THE COURT:  Overruled.

18   THE WITNESS:  Yes, we have.

19   BY MS. RICUPERO:

20   Q    And do you know why those other contractors have either

21   turned them down or turned them back?

22   MR. HIRSCH:  The same objection.

23   THE WITNESS:  They have --

24   MR. HIRSCH:  The same objection, Your Honor.  Why

25   other contractors turned down jobs.

1        THE COURT:  Sustained.

2        MR. HIRSCH:  It's hearsay and foundation.

3    BY MS. RICUPERO:

4    Q    What was the initial -- initially what was Rockford going

5    to build on this project?

6    A    From mile marker 135, 133 to 255, 133.5.

7    Q    And what is it building now?

8    A    From 114 through 255.

9    Q    Why did you receive that additional 23 miles of work?

10   A    Our joining contractor had obligations that he couldn't

11   stay here long enough to fulfill his contract.

12   Q    What is a spread, the term spread mean to you with, as it

13   relates to pipeline construction and the crew that will be

14   constructing that?

15   A    The spread is just a pipeline term of all the people

16   that'll be grouped within our organization here to do the work.

17   Q    Could you put together a additional spread of pipeline

18   workers right now if you wanted to?

19   A    No, I could not.

20   Q    Why not?

21   A    They're not out there.

22   Q    Could you get the equipment available?

23   A    No, I could not.

24   Q    And why not?

25   A    The same reason, the work demand.  The work is just so, so

1  great now we can't get to it.

2  Q    So you stated that right now Rockford is bidding work out

3  to 2011, is that something that Rockford previously did?

4  A    Not over the past years.  We've never had work this good.

5  Q    And why are you now able to bid out jobs several years in

6  advance?

7  A    There's just so much work.  They can't get contractors to

8  do it.  They try to get us to come in years in advance now.

9  Q    How many pipeline construction contractors are you aware

10  of nationwide with the capability to perform large diameter

11  pipeline construction?

12  A    I would guess ten major contractors, maybe a dozen at the

13  most.

14  Q    Based on your experience in the industry and the fact that

15  you're bidding out jobs yourself until 2011, what are the

16  chances in your opinion that Transwestern could find another

17  qualified pipeline contractor --

18        MR. HIRSCH:  Objection.  Oh, sorry.

19  BY MS. RICUPERO:

20  Q    -- if Rockford left the job?

21        MR. HIRSCH:  The objection here is foundation, and

22  calls for an expert conclusion.

23        THE COURT:  Well, overruled.

24        THE WITNESS:  They're not there.  It's just, it's not

25  going to happen.  All the contractors are busy.  There is no

1  one available to come in here.

2  BY MS. RICUPERO:

3  Q    And what is the likelihood, again based on the fact that

4  you're bidding on jobs to 2011 and your work in the industry,

5  that they could find someone to build it in 2009 if you left

6  the job?

7              MR. HIRSCH:  The same objection.

8              THE COURT:  The same ruling.  Overruled.

9              THE WITNESS:  All of the contractors are busy through

10  next year.

11  BY MS. RICUPERO:

12  Q    We've heard a lot in this case or in this  evidentiary

13  hearing so far about stand-by charges.  Can you explain to me

14  what stand-by charges are?

15  A    In what magnitude?  Stand-by that we would expect from the

16  client, or stand-by that my people expect from me?

17  Q    Stand-by that you would expect from the client?

18  A    When we go into a project, we put a schedule together, and

19  when the client, as here's Transwestern, cannot put us in a

20  productive mode at the time we were supposed to start this

21  schedule, we start asking for stand-by rates.

22  Q    And what are stand-by rates; what does that entitle you

23  to?

24  A    It's a cost that we're, we're dealing with, with no profit

25  margin whatsoever, and we ask the client to take care of what

1  we call stand-by rates because we're not productive.

2  Q    So does that include the costs that you're incurring for

3  equipment?

4  A    It'll be equipment and personnel that are not able to go

5  to work, yes.

6  Q    So then it's also paying the wages of the crew?

7  A    That is correct.

8  Q    This 500 to 600 men, potentially?

9  A    Yeah, you wouldn't, in the time right now it wouldn't be

10 all of them, but it would be great percent of them, yes.

11 Q    I'll go back to another point. How many -- what percentage

12 of your crew have you mobilized on this project so far?

13 A    I have virtually 90 percent of my key people here.

14 Q    Okay.  And what percentage of the equipment have you

15 mobilized so far?

16 A    Probably 95 to 99. I only lack a couple more pieces of

17 equipment being fully staffed up here.

18            THE COURT:  Let me inquire, sir.  You said 90 percent

19 of your key people.  Well what percentage of those 500 to 600

20 people are key people?

21            THE WITNESS:  Probably 60 of my foremen and

22 supervisors that work under me.

23            THE COURT:  All right.  So out of the five to 600 you

24 might have about 54 percent or something like that?

25            THE WITNESS:  That's probably more correct, yes.

1    THE COURT:  All right.

2  BY MS. RICUPERO:

3  Q    And when would those additional people need to be

4  mobilized to keep them on the job?

5  A    Daily, weekly.  I'm bringing more and more in every week.

6  Q    Are you paying the people that have not been mobilized

7  yet?

8  A    Yes, I am.

9  Q    So your people who are not here are still collecting a

10  paycheck?

11  A    Not 100 percent of them.  My key people are.

12  Q    Okay.  As you mobilize the additional people that you're

13  bringing in weekly and daily, do you begin paying them?

14  A    Yes.

15  Q    And does Rockford invoice that cost to Transwestern?

16  A    Yes.

17  Q    Last week what was that cost?

18  A    Equipment and manpower alone last week, without having the

19  general ledger or my cost report right in front of me, the

20  dollar amount won't be exact.  It was approximately $1.2

21  million.

22  Q    Is that cost going up this week?

23  A    Yes.

24  Q    And is that being invoiced to Transwestern?

25  A    It has not been invoiced.  We will invoice it this week.

1    Q    But you will invoice it to Transwestern and expect

2    payment?

3    A    Yes.

4    Q    What are move-around charges?

5    A    Move-around charges are something that's not within your

6    bid.  It's when a certain crew gets to a stopping point for

7    some reason, shape, form, or fashion, we're not allowed to

8    continue on down the route, we have to move around.

9    Q    And on the Phoenix Pipeline Expansion Project, if you have

10   to move around are you entitled to charge Transwestern for

11   those move-around costs?

12   A    Yes.

13   Q    And why do they charge -- well, strike that.  What effect

14   does a move-around have on the project?

15   A    It kills your productivity.  It just shuts it completely

16   down for the time you're moving and tearing down, moving, and

17   rigging back up in order to be able to start again.

18   Q    Can you explain for the Court what you mean when you use

19   the term rigging back up?

20   A    The equipment we use all have detachments on them that

21   make them not legal to haul complete, so we have to take this

22   equipment apart to make it legal by DOT regulations to haul to

23   another location.  Then we have to assemble it back together to

24   start over.

25   Q    And then when you're done and you get -- you can go back

1    to that part, do you have to do the same, go through the same

2    process all over again?

3    A    The same thing.  The same thing.

4    Q    And how long does it take to usually to rig back up this

5    type of equipment?

6    A    The crews are different sized.  It would take different

7    times on the crews, but for our major crew like our pipe gang

8    crew, you're going to lose at least one full day of production.

9    Q    And are you still paying the crew?

10   A    Yes, you are.

11   Q    And you're still paying for the equipment during that day?

12   A    That is correct.

13   Q    And how much, if you know, does it cost for such a

14   move-around?  Let's say a move around, back up.  If you had to

15   move around 30 miles, and then get back to that 30 mile

16   stretch, what would be the approximate cost and production

17   loss, if you know?

18   A    Just in the pipe gang alone?

19   Q    Yeah?

20   A    I mean, that could get pretty wild.  It could be, it could

21   go up to a half a million dollars just really quick.

22   Q    And that's just for one crew, the large crew?

23   A    Yes, the -- what's so hard to figure is the production you

24   lose.

25   Q    So you'd actually incur, if you had to move around the

1    entire -- well, what are there, how many crews are you dealing

2    with?

3    A    Probably on this project a dozen.

4    Q    So if you had to move all 12 crews around a 30-mile span,

5    any approximation or --

6    A    No, it -- I mean, at least a day per crew --

7    Q    And --

8    A    -- for each move-around.

9    Q    So that would be considered two move-arounds, because

10   you're moving there once and back another time?

11   A    That is correct.

12   Q    And then when you move back, okay, so breaking this out,

13   you have to move once around a 30-mile spot. Eventually you

14   have to move back to it; that's your second move. When you go

15   back to resume on the other end of the line, would that be

16   another move-around charge?

17   A    That is, that is correct.

18   Q    So potentially you charge three times to move around?

19   A    That's right. That is correct.

20   Q    And would you -- you said for the one crew it would be

21   approximately $500,000. If you're moving around the whole crew

22   it would be in excess of $500,000 I expect each time you moved

23   around?

24            MR. HIRSCH:  Objection. Leading and foundation.

25            THE COURT:  Sustained as to leading.

1 | BY MS. RICUPERO:

2 | Q    Would it be in excess of $500,000 each time you moved

3 | around all 12 crews?

4 | A    Yes.

5 | Q    Okay.  Do you have any estimation of what it would be?  I

6 | believe, I might have asked this already.  I apologize if I

7 | did.

8 | A    Yeah, that would be hard, I mean, the difference in the

9 | size of crews.  It would be a substantial amount.

10 | Q    Okay.  With regard to this additional 23 miles that you

11 | picked up from Gregory & Cook, what type of contract did

12 | Rockford enter into?

13 | A    We entered into a reimbursable contract.

14 | Q    So under a reimbursable contract, I -- they're paying you

15 | for everything that you're spending; is that correct?

16 | A    Yes, but we -- even at that there is a budget.  They set

17 | forth a budget for a reimbursable rate.

18 | Q    Okay.

19 | A    We charge what we spend, plus our fee, a percentage of

20 | profit that we put into, to what it is, and we still try to

21 | work off of a estimated, a targeted budget --

22 | Q    In your experience is a reversible plus fee type contract

23 | the type that pipeline companies like entering into?

24 |         MR. PENNARTZ:  Object to foundation, Your Honor.  He

25 | doesn't indicate that he negotiates the contracts.

1    THE COURT:  Sustained.

2  BY MS. RICUIPERO:

3  Q    In order to realistically finish the, I believe it's 127

4  approximately miles that Rockford is working on in the Phoenix

5  Pipeline Expansion Project, when do you need to release your

6  front end crews?

7  A    Well last week I worked on a schedule bar chart for a job

8  that we're, we have to move to next, and April 21st would be

9  the latest my front-end crews could possibly get started and

10  get out to meet my next schedule.

11  Q    Will it be difficult to meet your next schedule even with

12  a April 21st date?

13  A    Yes, for many reasons.  One, monsoon season will hit us

14  here in this project.

15  Q    Are there any other reasons that you can articulate for

16  the Court that will make it more difficult?

17  A    Well, just the elements of the desert, the dust, the heat.

18  Q    And when do you need -- when does your front-end crew need

19  to leave the job to head to your next job?

20  A    Have to start mobilizing by August 1st.

21  Q    Does that mean they have to leave Phoenix by August 1st?

22  A    Yes.

23  Q    What will happen to this project if you are not allowed to

24  get access to the right-of-way as soon as possible to begin

25  construction?

1          MR. HIRSCH:  Objection.  Foundation.

2          THE COURT:  Are you asking what will happen to his

3    company, what they're going to do?

4          MS. RICUPERO: Yes,  Your Honor.

5          MR. HIRSCH:  That's, that's fair.

6          THE COURT:  Overruled.

7          THE WITNESS:  We'll have to move out.

8    BY MS. RICUPERO:

9    Q    So you'll have to leave the project?

10   A    That is correct.

11         MS. RICUPERO: One moment, Your Honor.

12   BY MS. RICUPERO:

13   Q    If that happened, Mr. Langston, and you had to move on to

14   your next project, when would Rockford be able to come back and

15   complete the project?

16   A    Come back to this Phoenix Project?

17   Q    Yeah?

18   A    I can't answer that.  We're booked up as far as we can see

19   in the future.

20   Q    Are you aware of any other contractor that could come in

21   and perform the project?

22   A    None of the ones we know.  They're trying to rent

23   equipment and steal people from us.

24   Q    Thank you.

25         MS. RICUPERO:  I believe that's all I have, Your

1    Honor.

2              THE COURT:  All right.  Thank you, ma'am.

3              Cross-examination, please.

4              MR. PENNARTZ:  For the record, Mr. Pennartz for the

5    Town of Buckeye.

6                        CROSS-EXAMINATION

7    BY MR. PENNARTZ:

8    Q     Good afternoon, sir.  You indicated that at one point

9    Rockford is not doing more than the limited amount of boring

10   work because it hasn't been given a notice to proceed from

11   Transwestern; correct?

12   A     That is correct.

13   Q     And from Rockford's standpoint, and your standpoint at the

14   superintendent level, it doesn't matter why the notice to

15   proceed hasn't been given.  You just haven't gotten it yet;

16   right?

17   A     That is correct.

18   Q     Once you invoice any of these charges that Ms. Ricupero's

19   questions referred to, stand-by charges, or move-around

20   charges, I guess to use a military term, any negotiations over

21   adjustments to those are above your pay grade; correct?

22   A     No.  I will negotiate some of those.

23   Q     Okay.  And that is something that you would do with

24   Transwestern?

25   A     Yes, I have a project manager.  He and I would do that

1    with Transwestern.

2    Q    Okay.

3              MR. PENNARTZ:  I have no further questions.

4              THE COURT:  Thank you, Mr. Pennartz.

5              Mr. Hirsch.

6              MR. HIRSCH:  Thank you.

7                          CROSS-EXAMINATION

8    BY MR. HIRSCH:

9    Q    Good morning, Mr. Langston.  Just a couple of follow up

10   questions.  We spent quite a bit of time with Mr. Runte at

11   Transwestern.  Do you know Dave Runte?

12   A    Yes, I do.

13   Q    All right.  Were you involved in the negotiation of the

14   Rockford/Transwestern contract which started back in '06 with a

15   call for bid?

16   A    No.

17   Q    Okay.  You were out building pipe in the field as a

18   superintendent, I gather?

19   A    Yes, sir.

20   Q    You let the white collar guys do the contract negotiation?

21   A    That's right.

22   Q    All right.  Are you familiar with the stand-by charges or

23   move-around charges that may have been negotiated in that

24   contract?

25   A    Yes, from past experience.

1    Q    Okay.

2    A    That doesn't really change a lot.

3    Q    Let me, let me help you out.  We marked an exhibit with

4    Mr. Runte yesterday, Exhibit 102, that I'll put on the TV

5    screen here and you can look at it.  This is coming out a

6    little bit.  This is the, I believe, last page of Exhibit 102

7    in these proceedings, and I'll avow to you, right up in the

8    upper left there do you see contractor Rockford Corp.?

9    A    Yes, I do.

10   Q    Okay.  I'll avow to you this was presented to us and the

11   entire exhibit makes it clear that this is the part of the

12   contract that addresses stand-by charges and move-around

13   charges.  Now, if I look at this, I see many different

14   references to various crews, and we went over this as to

15   Gregory & Cook yesterday with another witness, but these are

16   individual crews that Rockford would have stay, and then

17   individual charges for each of the crews; correct?

18   A    Yes.

19   Q    Now I was a little unclear as to the boring job down at

20   the Palo Verde water line.  That's underway now and you have

21   been able to do that?

22   A    We were able to clear right-of-way in a short area on both

23   sides.  The boring, the boring itself cannot start till Monday,

24   the 14th.

25   Q    Okay.  But you've, as far as you know you have full

1    right-of-way access and approvals to get going on that?

2    A    Only in that location, yes, sir.

3    Q    So you've been able to use some of your crews for that

4    part of the job; correct?

5    A    No, we were only given the notice to proceed the day

6    before yesterday.

7    Q    Okay.  And to your knowledge that didn't have to do with a

8    right-of-access issue, or do you know?

9    A    I can't answer that.

10   Q    Okay.  And the 1.2 million you mentioned, is that the sum

11   total of the individual crews that were calculated last week to

12   have been standing by, or was it just the lump sum of $400,000

13   per day that we see at the bottom of the list, times three

14   days?

15   A    What this does not show is a, a clarification of the

16   equipment affiliated with these crews that's sitting on my yard

17   and not working.

18   Q    So that's part of the 1.2 also?

19   A    That is correct.

20   Q    All right.  I don't see on here a move-around charge like

21   we saw with the Gregory & Cook for that you may not have seen.

22   Do you know if there's a written move-around charge that was

23   agreed to as part of the contract?

24   A    I cannot answer that, honestly.

25   Q    I'll tell you that in documents that were disclosed to us,

1    including this form, I don't see any such number.  Do you know

2    whether or not Rockford negotiates a form as they did the

3    stand-by charge as a lump sum, or is that something that's just

4    done on the fly once it's occurred?

5    A    That's done above me.

6    Q    Okay.  Fair enough.

7    A    But we never go into a job without having that.

8    Q    So it's fair to say that the exact amount of the monetary

9    pad, if you will, or charge-back to Transwestern, can't be

10   determined until the actual delays are encountered by Rockford?

11   A    Ask that question again, please?

12   Q    Okay.  Sorry to be so confusing.  The factor of what

13   you're going to charge back to Transwestern is based on what

14   you actually incur by way of stand-by charges?

15   A    Like now, yes.

16   Q    Okay.  You have to experience what you're incurring, look

17   at what you were able to do, and have the accounting people

18   generate the chart so, until you know what that number is; is

19   that right?

20   A    We generate it.  My project manager is here on the site.

21   We generate it here.

22   Q    Okay.  And then it is prepared into some sort of invoice

23   and sent to Transwestern?

24   A    That is correct.

25   Q    And as of today's date that invoice step hasn't yet

1   happened; right?

2   A     No, that is incorrect.  We have started with some

3   invoices.

4   Q     Okay.  So you prepared the spreadsheet and you've

5   physically sent or delivered an invoice to Transwestern?

6   A     That is correct.

7   Q     How many?

8   A     Three as of Monday morning, probably five by the end of

9   this week, or six.

10  Q     Okay.  And at that point you indicated that you know that

11  there'll be some negotiation requests concerning those charges;

12  is that fair enough?

13  A     I don't expect it to be.

14  Q     Okay.  I'm sure from your perspective you don't, but you

15  and your project manager are geared up to -- I think your

16  answer to Mr. Pennartz was to engage in such negotiations?

17  A     Yes.

18  Q     And you know Transwestern will try to beat you down on

19  those charges, don't you?

20  A     No, sir.

21          MS. RICUPERO:  I'll object to --

22          MR. HIRSCH:  Okay.

23  BY MR. HIRSCH:

24  Q     Do you know that they did so with Gregory & Cook as to

25  charges that were incurred on the northern part of the pipeline

1   for each --

2              MS. RICUPERO:  Objection.  Lacks foundation, Your

3   Honor.

4              THE COURT:  Sustained.

5              MR. HIRSCH:  Well I'm asking if he knows whether that

6   happened.

7              THE COURT:  Well, first you need to ask him if he

8   knows anything about the Gregory & Cook contract.

9              MR. HIRSCH:  Okay.  Well, we heard a lot about his

10  knowledge of other pipeline --

11             THE COURT:  I'll permit you to pursue the matter,

12  but --

13             MR. HIRSCH:  Thank you, Judge.

14  BY MR. HIRSCH:

15  Q    Do you know, Mr. Langston, that Gregory & Cook has got the

16  northern spread of this job?

17  A    Yes.

18  Q    And are you familiar personally with any of the

19  negotiations that were had between Gregory & Cook and

20  Transwestern concerning discounts that may have been awarded on

21  Gregory & Cook's asserted stand-by and move-around fees?

22  A    No.

23  Q    Okay.  If approval to proceed is not given arising out of

24  these court proceedings or for any other reason, you've got

25  plenty of other work to take your crews to, don't you?

1   A      Not in this state.

2   Q      Okay.  But if there is notice given to you that this

3   pipeline, or at least a section of this pipeline is going to be

4   deferred, you've got places to remobilize equipment and labor

5   elsewhere on other projects, don't you?

6   A      We have future work to go to, yes.

7   Q      Okay.  And you're aware -- are you aware -- I'll ask you,

8   and if you're not, that's fair enough, that under the contract,

9   you're not in default for refusing to perform, and pulling your

10  equipment and men and taking them elsewhere under the

11  circumstances of not being given access to the line?

12  A      I can't answer that.

13             MR. HIRSCH:  That's all I have.

14             THE COURT:  Thank you.

15             Any other Defense counsel?

16             MR. BRASELTON:  Yes, Judge.

17             THE COURT:  Mr. Braselton?

18                          CROSS-EXAMINATION

19  BY MR. BRASELTON:

20  Q    Good morning, Mr. Langston.  My name is Jim Braselton.  I,

21  I represent Mr. and Mrs. Denham who are property owners in

22  connection with this matter.  I'm going to call your attention

23  first to a map that has been, it's been used as a, as part of

24  these proceedings, and I believe it's an exhibit.  It's an

25  addendum to an affidavit that was filed by Mr. Runte.  You

1    indicated that the miles post for your segment of the project

2    now are, is mile 114 to 255; is that right?

3    A    That is correct.

4    Q    Okay.  Is mile 114 somewhere right about in this area

5    where the pipeline changes from 42 to 36-inch?

6    A    Yes.

7    Q    Okay.  And then 255 is all the way to the southeast

8    termination of the project down in here?

9    A    Yes.  Yes.

10   Q    Have you either walked or driven that entire reach prior

11   to your testimony here today?

12   A    No.

13   Q    Have you walked or driven the reach from -- well let me

14   ask you.  Do you know where the Sundance Power Plant is

15   located, near the Coolidge area?

16   A    Basically.

17   Q    Okay. Do you -- have you walked or driven that segment of

18   the project from the Sundance Power Plant east to the

19   termination point?

20   A    Not directly down the right-of-way.

21   Q    Okay.  Do you know whether there is any -- well, let me

22   ask you this.  Do you know where the proposed design for the

23   Transwestern pipeline is located through that reach in relation

24   to the existing El Paso pipeline?

25   A    Basically from our drawings, yes.

1    Q    And where is that?

2    A    It would be to the south side of it back up here.  Before

3    you get along the, before you encounter the Gila River, we

4    encounter El Paso's gas line.

5    Q    Okay. That was going to be one of my other questions.  As

6    long as you brought that up, where is the Gila River crossing?

7    You've, you've referenced that as being one of the critical

8    areas that you have to cross within a certain time period; is

9    that right?

10   A    It's back on the north side, or I'd call it the west side

11   of Highway 80, which is actually still back west of 85.

12   Q    Back in this area over to the west?

13   A    Yeah.

14   Q    West of Pinal County?

15   A    Yeah, it'd be farther back than that, back up --

16   Q    Back up in here?

17   A    Somewhere along -- that map's not very detailed.

18   Q    Right.  But it'd be west of Pinal County; it's not in

19   Pinal County; right?

20   A    I believe that's correct.

21   Q    And then there, the, the other two critical areas that you

22   mentioned were the Palo Verde site that you're working on right

23   now; right?

24   A    Yes.

25   Q    And that's west of Pinal County; correct?

1    A    Yes.

2    Q    And then the third one, if my notes are correct, you said

3    the Centralia Canal?

4    A    No, it's Centennial Canal.  It's actually on the west side

5    of the Gila River.

6    Q    Okay.

7    A    Or north, you call it northwest.

8    Q    Okay.  So that also is west of Pinal County; right?

9    A    Yes, yes.

10   Q    So none of the critical areas are located within the Pinal

11   County reach of the proposed project; correct?

12   A    I can't answer that.  There may be more that I, than I

13   know about up there.

14   Q    Oh, okay.  So, but of the three that you know of, they're

15   all located outside Pinal County?

16   A    That's correct.

17   Q    Okay.  You, you mentioned that one of the things you were

18   concerned about is the fact that the monsoon season will hit us

19   here.  That, is my, am I correct in that?

20   A    Yes.

21   Q    Are you a resident of Arizona?

22   A    No.

23   Q    Have you spent a summer living in the Phoenix Valley at

24   all?

25   A    Been doing pipeline work here the last three years.

1   Q     Now try to answer my question now.  Have you lived here

2   for a summer in this area?

3   A     Yes.

4   Q     Okay.  For the last three summers, is that what you're

5   saying?

6   A     Yes, but split up through many areas of Arizona.

7   Q     Where, where in the Phoenix area have you been doing

8   construction of --

9   A     Casa Grande.

10  Q     Okay.  And when was that?

11  A     Two years ago.

12  Q     Okay.  Have you done any other construction within the

13  Phoenix Metropolitan Area over the last summers?

14  A     Not right in the Phoenix area, no.  In Arizona, yes.

15  Q     Okay.  To go back then to the, this reach from the

16  Sundance Power Plant east to the end, do you know about,

17  anything about whether there are any existing customers that

18  Transwestern is intending to serve that are located within that

19  reach of the project?

20          MS. RICUPERO:  Objection.  Lacks foundation.

21          MR. BRASELTON:  I'm just asking him if he knows,

22  Your Honor.

23          THE COURT:  I'll permit the question then.

24          Go ahead, if you know.

25          THE WITNESS:  Laterals were not within our contract.

1   BY MR. BRASELTON:

2   Q    No, I'm not asking you about laterals.  I'm asking you

3   about the termination, the last reach of the project itself?

4   A    No, I would have no knowledge of that.

5   Q    Okay.  And then to go back to that, my question with

6   regard to  your understanding of the existing topography or

7   that reach. You said the proposed design is for the pipeline to

8   go on the south side of the El Paso line; correct?

9   A    At the area back northwest of, northwest of the Gila

10  River.

11  Q    Oh, okay.  No.

12  A    Yeah.

13  Q    I'm asking you again to focus you pack on this south, part

14  of the south region.

15  A    Without my drawings I can't answer that.

16  Q    You don't know what milepost that Sundance Power Plant is

17  located at?

18  A    With not having the drawings in front of me, no.

19  Q    Okay.  That's all I have.  Thank you.

20       THE COURT:  Thank you, Mr. Braselton.

21       Any other Defense counsel wish to pose questions?  If

22  not then, any redirect?

23       MS. RICUPERO:  I just have a couple, Your Honor.

24

25

1                    REDIRECT EXAMINATION

2   BY MS. RICUPERO:

3   Q    Mr. Hirsch was asking you a couple questions about the

4   contract that Rockford has.  Are you aware whether this

5   additional 23 miles that you had picked up is under a different

6   contract?

7   A    Yes, it is.

8   Q    If you haven't started any of your crews, aren't you

9   paying for all the crews to stand by?

10  A    Yes.

11  Q    Rock -- is it, it's true that Rockford has future work to

12  go to; is that correct?

13  A    Yes.

14  Q    But based on your knowledge, Transwestern does not have

15  another contractor to fill your spot; is that correct?

16  A    That is correct.

17  Q    Thank you.

18           MS. RICUPERO:  That's all I have, Your Honor.

19           THE COURT:  Thank you, ma'am.

20           Well Mr. Langston, thank you very much for coming in,

21  sir.  Appreciate your being here.  You're excused at this time.

22           Ladies and gentlemen, we'll take a 15 minute recess

23  at this time and resume with -- the next witness would be who?

24           MR. LEMASTER:  Oh, that's all the witnesses, that's

25  all the witnesses we have, Your Honor.

1              THE COURT:  All right.

2              And will the Defendants have their next witness

3    available?

4              MR. HIRSCH:  Yes,  Your Honor.

5              THE COURT:  Very well.  And who will that be?

6              MR. HIRSCH:  We will lead off with Mr. Chris Heeter

7    of Stardust/Tartesso.

8              THE COURT:  All right.  Thank you.

9              We'll adjourn at this time for 15 minutes.

10        (Recess)

11             THE CLERK:  All rise.  Court is now in session.

12             THE COURT:  Good morning again.  I think we're ready

13   to resume.  Please be seated.

14             Mr. Hirsch, I believe you were going to call the

15   first witness?

16             MR. HIRSCH:  Yes, Your Honor.

17             Before that a legal matter.  On behalf of the

18   Defendants, we would rule under, or we would move under Federal

19   Rule 41(b) for an involuntary dismissal of the preliminary

20   injunction application based on our view that the Plaintiffs

21   have not met, have not stated a claim now that they've rested

22   their case for purposes of this preliminary injunction hearing.

23             THE COURT:  All right.  And that's based on the,

24   on--just briefly tell me what that's based on?  You're talking

25   about the inadequacy of the evidence, or are you talking about

1  a legal issue?

2         MR. HIRSCH:  I'm talking, well, about both.  We've

3  previously briefed, and I don't intend this, unless you wish us

4  to, to turn it into the arguments that will be held likely

5  tomorrow --

6         THE COURT:  No.

7         MR. HIRSCH:  -- on the motions that have been filed

8  before you.

9         Now that the evidence has rested, the argument under

10 41(b) is that the facts presented, augmented by the matters of

11 record that were filed, do not rise to the level of stating a

12 claim supporting a preliminary injunction under the law we've

13 cited.

14        THE COURT:  All right.  I will deny that motion at

15 this time.  That isn't to say how I might rule later after I've

16 considered everything that has come before the Court.

17        So I think we're ready for your, your witness, sir?

18        MR. HIRSCH:  Thank you.

19        We would call Chris Heeter.

20        THE COURT:  If you'll come forward, sir, and stand in

21 front of the clerk here, who's just seated in front of me, she

22 will give you an oath.

23        THE CLERK:  Would you please state your name and

24 spell it for the record?

25        MR. HEETER:  Chris Heeter, C-H-R-I-S, H-E-E-T-E-R.

1          THE CLERK:  Please raise your right hand.

2           CHRIS HEETER, DEFENDANTS' WITNESS, SWORN

3          THE CLERK:  Thank you.  Please have a seat.

4          THE COURT:  Mr. Hirsch, whenever you're ready, sir.

5          MR. HIRSCH:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7    BY MR. HIRSCH:

8    Q    Would you state your full name for the record?

9    A    Chris Bradley Heeter.

10   Q    And what is your occupation, sir?

11   A    President of Stardust Companies.

12   Q    And what is the Stardust Companies?

13   A    It's a group of affiliated entities that are involved in

14   the development of, and financing of residential subdivision

15   land in Arizona.

16   Q    And where generally is the land located that Stardust

17   Companies is involved in developing?

18   A    We've developed communities in Yavapai County, Pima

19   County, and Maricopa County.

20   Q    How long have you been affiliated with Stardust or its

21   companies?

22   A    Nineteen ninety-two.  I was the first employee.

23   Q    And what is your title at Stardust Companies or do you

24   have such a thing?

25   A    I'm the president.

1  Q    As part of your role as president of Stardust Companies,

2  are you familiar with the Tartesso Development in Western

3  Maricopa County, in Buckeye?

4  A    Yes, I am.

5  Q    Can you give us an idea, Chris, of some of the other

6  developments in Maricopa County that Stardust has undertaken

7  during your years with Stardust?

8  A    We've developed literally hundreds of subdivisions and

9  tens of thousands of residential lots in almost all the cities

10 within Maricopa County have active residential development

11 since 1992.

12 Q    Now when you say you're developing lots within the

13 development continual, can you explain to the Court what that

14 means in terms of the progression of raw land to finished

15 homes, what steps in that process does Stardust typically get

16 involved in?

17 A    We're involved in all steps of development, all the way

18 from the initial acquisition of the land and titling it through

19 the various municipal and governmental agencies, they physical

20 installation of the horizontal infrastructure, and the ultimate

21 sale to merchant home buildings, and then we also in certain

22 instances provide financing to those builders to purchase the

23 lots.

24 Q    When you say vertical infrastructure, can you explain what

25 that is?

1    A     Horizontal.  Horizontal, excuse me.

2            THE COURT:  He said horizontal.

3            MR. HIRSCH:  Oh, your words control over mine.

4    BY MR. HIRSCH:

5    Q     Horizontal infrastructure; what is that?

6    A     Basically we install everything that you would, that you

7    would normally see under a paved street, water, sewer, dry

8    utilities  which include cable TV, electric, gas, telephone.

9    We also install storm drainage systems, street signs, traffic

10   signals, street lights.  We install perimeter walls,

11   landscaping, and project amenities such as parks, tot lots,

12   various things like that.

13   Q     And then do others in the chain, well we'll go to my word,

14   vertical improvements, build the actual homes on the finished

15   lots?

16   A     Yes.

17   Q     Is Stardust involved in the retail construction and sale

18   of homes?

19   A     No, we aren't.

20   Q     With reference specifically to Tartesso, what is Stardust

21   engaged in doing in Tartesso on that same development chain?

22   A     We're involved in the entirety of what I described

23   earlier.  We bought the raw land, took it through the

24   entitlement process and have the first phase under development,

25   and have sold all the lots in the first phase to merchant

1    homebuilders.

2    Q    Okay.  We'll look at some maps here shortly that will

3    identify that a little more specifically.  Can you tell us when

4    what is now known as Tartesso began to be developed by

5    Stardust?

6    A    The owner of our company, Gary Bisgrove, originally bought

7    about 1,700 acres of the project in 1986.  I joined Gary in

8    1992, and since that date we've assembled another 126 parcels

9    that comprise the entirety of the 12,800 acres.

10   Q    Within -- let's focus now on Tartesso.  Within Stardust

11   what various divisions of the development services report to

12   you as president?

13   A    All of them.

14   Q    Give us a general example of the folks you have under your

15   supervision and control working on Tartesso?

16   A    We have all the engineering staff, project managers,

17   entitlement people, accounting, finance, the -- everybody in

18   the company reports to me.

19            THE COURT:  If I might just interject, you've used a

20   term I don't understand, sir; entitlement.  What do you mean by

21   that?

22            THE WITNESS:  That's an industry term, Your Honor.

23   Basically the entitlement process, and what we do as an

24   industry, we're in the highly-est regulated industries.  We

25   have a number of various municipal and county, state, federal

1   agencies that we have to process our improvement plans through

2   to get approval to build what we do.  And that process is

3   called an entitlement process because we receive entitlements

4   from the various approving entities to construct the various

5   things that we build.

6           THE COURT:  In some other industries would a similar

7   term maybe be regulatory affairs, something like that?   You

8   deal with the regulators, the people who regulate the

9   development; is that what you're talking about?

10          THE WITNESS:  I think that would be a similar

11  approach, although I'm not familiar with that term, either, so.

12          THE COURT:  Okay.  In any event, by entitlement you

13  mean going to whatever local government authority or state

14  authority you need to to get whatever piece of paper is

15  required in order to proceed?

16          THE WITNESS:  Yes.

17          THE COURT:  All right.  Thank you.

18  BY MR. HIRSCH:

19  Q    Let me try to ask some questions that'll be important for

20  the record in that regard.  When Mr. Bisgrove bought this land

21  in '86, was it considered to be unentitled?

22  A    Yes, it was.

23  Q    And give the judge an example of what unentitled  desert

24  land means?

25  A    At the time the initial portion of the property was

1    purchased, it was basically raw desert.  It didn't have

2    approval to do -- you literally couldn't do anything with it

3    except leave it in its condition that it existed in at that

4    time.  There were no approvals in process to do anything.

5    Q    Okay.  At the time you became involved, did you say it was

6    1992?

7    A    Yes, sir.

8    Q    Was the Tartesso land still in Maricopa County?

9    A    There was a portion of it that had been annexed into the

10   Town of Buckeye, and there's a portion of it that was still in

11   Maricopa County.

12   Q    Is a step along the entitlement path potentially getting

13   the property annexed into a municipality?

14   A    Not always, but in this case it was.

15   Q    Give us an example of some of the, specifically of some of

16   the other agencies you'd have to deal with reference to

17   Tartesso that you did deal with to get it to the entitlement

18   status it enjoyed when this condemnation suit was filed?

19   A    Various departments in the County, Maricopa County

20   Department of Transportation, Maricopa County Flood Control

21   District, Maricopa County Health Department.

22          At the State level we deal with the Arizona

23   Department of Water Resources, Arizona Department of

24   Environmental Quality.  We also have to deal with in this case

25   because of the existence of the SRP transmission line that we

1   own and fee that they have an easement over, they have certain

2   conditions attached to that easement, so we had to process our

3   improvements through SRP, Arizona Public Service, Cox

4   Communication, Mountain Bell or Qwest.

5          At the federal level we were dealing with the Army

6   Corps of Engineers and FEMA, so pretty much top to bottom.

7          MR. HIRSCH:  I don't want to elaborate, Judge, if you

8   have knowledge of some of this.

9   BY MR. HIRSCH:

10  Q    But can you explain to the judge in terms of what people

11  hear FEMA they think of Hurricane Katrina or something.  Tell

12  the judge what role FEMA and the Corps of Engineers has in the

13  entitlement process with raw desert land?

14  A    In the case of FEMA, all of the property that's located in

15  the Sun Valley Parkway area is located in four alluvial flood

16  plains, and FEMA is in the process of mapping those flood

17  plains and determining the quantity of water that runs through

18  the washes that go from the White Tank Mountains to the

19  Hassayampa River.

20         And as far as the Army Corps of Engineers, the Army

21  Corps of Engineers determined that we have jurisdiction of the

22  waters of the U.S. that run through our project and the other

23  projects along the Sun Valley Parkway, and we were required to

24  go through a process to obtain a 404 permit, and we have, we

25  actually went through that process.  On both sides of the

1  projects we have two separate permits.  We have individual

2  permits which took, you know, those permits themselves probably

3  took two and half years a piece to obtain.

4  Q    I'm going to put up on the screen, and realizing we'll

5  move this for admission, but a map we've seen many times before

6  already in the proceedings.  It's part of the record here and

7  at FERC.  This shows the pipeline routes, but it also shows

8  some of the mountain and alluvial fan features you were just

9  reciting.

10          So that the judge can be familiar, can you show us

11 generally, and I think you've learned how to work the arrow

12 feature there, where Tartesso is on this map?

13 A    I'm going to point to Tartesso West.

14 Q    And where are the White Tank Mountains?  And the

15 Hassayampa River that the waters flow down to?

16 A    Here.

17 Q    So the alluvial flood plains that FEMA and the Court have

18 jurisdiction over basically are running from right to left on

19 this map?

20 A    Yeah, generally they run from northeast to southwest.

21 Q    That's the prevailing surface flows in the area?

22 A    Yes, they normally run this way.

23 Q    And when we hear, we heard some testimony with Mr. Runte

24 about 40 and 404 permits.  Those are permits that those

25 jurisdictional entities issue to allow disturbance to the

1    ground level that might affect drainage?

2    A    The 404 permit --

3    Q    Chris, is you could back away a little bit and come back

4    to this calibrated handle.

5    A    The 404 permit is, is basically issued by the Army Corps

6    of Engineers, and that permit is basically, covers the

7    discharge, or actually the dredge and fill activities in the

8    waters of the U.S., which they have jurisdiction over with

9    oversight from the Environmental Protection Agency.  The 401

10   permit is actually a discharge permit that's granted in order

11   for us to discharge effluent from our sewage treatment plant

12   into the, a tributary of the Gila River.  And that's controlled

13   by the EPA predominantly with oversight from FEMA, or from Army

14   Corps of Engineers, so kind of the reverse.

15   Q    Is all of Tartesso at present annexed into the Town of

16   Buckeye?

17   A    Yes, it is.

18   Q    Could you describe for the Court your interfacing with

19   Buckeye during the development of Tartesso, you and your team?

20   A    The town, particularly during the initial stages of the

21   engineering of the first phase, we have standby weekly meetings

22   with the town that involve whatever departments within the town

23   are necessary for us to deal with whatever issues are, arise at

24   that point.

25   Q    And how long would you say you've had those daily or

HEETER - DIRECT                    96

1   weekly contacts with the Town of Buckeye and their officials?

2   A    Since before 2000.

3   Q    And do you have similar contacts with other developers up

4   and down the Sun Valley Parkway?

5   A    Yes, we have a number of issues that cross property

6   boundaries where we have to negotiate understandings between

7   developers that ultimately get approved by the town.

8   Q    Have you studied the location as initially proposed and

9   then certificated by FERC for the Transwestern Pipeline along

10  the Sun Valley Parkway?

11  A    Yes, I have.

12  Q    Have you specifically, you and your team studied that

13  location and its impacts on Tartesso?

14  A    Yes, we have.

15  Q    Have you taken the occasion to prepare an exhibit to

16  illustrate for the Court the effect of the pipeline, if built,

17  on Tartesso and surrounding areas?

18  A    Yes.

19  Q    Can you give the judge a general idea of what the slide

20  show contains and what you did to prepare it?

21       THE WITNESS:  Basically what we did, Your Honor, is

22  we provided an overview of what Tartesso is, what the quality

23  of the project is, the magnitude of it, its location, the

24  amenities and various features of the project, and then we also

25  took the engineering drawings, which are in CAD, and we

A/V▾ TRONICS, INC.
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 403-8024

1    basically highlighted certain improvements within the SRP

2    transmission easement that have currently been installed that

3    we feel are not able to be left in place based on the terms of

4    the easement that we've been given.

5    BY MR. HIRSCH:

6    Q    So who prepared the PowerPoint?

7    A    The PowerPoint was developed under my direction by some of

8    our consultants and the personnel within Stardust.

9    Q    Did -- does the PowerPoint contain digital photography of

10   what is actually on the SRP easement?

11   A    Yes, it does.

12   Q    And the surrounding areas?

13   A    Yes.

14   Q    Have you reviewed each and every one of those pictures in

15   the exhibit?

16   A    I have.

17   Q    Do they fairly and accurately portray what they're

18   showing?

19   A    Yes.

20   Q    There are also a few pages of facts and figures about

21   Tartesso designed to streamline the testimony here.  Have you

22   personally confirmed the accuracy of that information?

23   A    Yes, I have.

24        MR. HIRSCH:  So with that, Your Honor, I would move

25   Exhibit 104 which we've previously marked so I can get into it.

1          THE COURT:  All right.  Any objection?

2          MR. LEMASTER:  Your Honor, there's no objection to

3    the foundation he's laid to the exhibit for illustrative

4    purposes, but any particular slide I want to preserve any

5    objection to relevancy.

6          THE COURT:  All right.  Well I --

7          MR. LEMASTER:  I mean, there's 85 slides here.

8          THE COURT:  All right.  You, you can bring up --

9    I'll, we'll go ahead with the exhibit, and you can make an

10   objections on relevancy grounds as to any particular portion of

11   it that you feel is irrelevant and I'll rule on those

12   objections at the time.

13         MR. LEMASTER:  Thank you.

14         THE COURT:  And this is 104, correct, sir?

15         MR. HIRSCH:  This is 104, Your Honor.

16         THE COURT:  All right. So 104 is admitted subject to

17   rulings on any further objections on relevance.

18      (Defendant's Exhibit 104 received)

19   BY MR. HIRSCH:

20   Q    While we're doing admission, Mr. Heeter, did you also

21   commission a PowerPoint containing the form of easement that

22   was attached to Transwestern's condemnation complaint filed

23   against Stardust?

24   A    I, I did.

25   Q    Okay.  And what does that -- that is Exhibit 105 that we

1  we've marked for identification.  What is that PowerPoint

2  intended to illustrate?

3  A    It's basically intending to illustrate the issues that

4  Stardust has with the form of easement that we were given by

5  Transwestern that I understand we'll be forced to live with if

6  the, if the injunction is granted -- not granted.

7  Q    Or if --

8  A    Or if --

9  Q    -- the injunction is granted and construction proceeds?

10  A    Right.

11  Q    And was Exhibit 105 also prepared under your direction, as

12  104 was?

13  A    Yes, it was.

14        MR. HIRSCH:  We'd move 105, Your Honor.

15        THE COURT:  Any objection?

16        MR. LEMASTER:  Not for illustrative purposes.  We

17  want to reserve our right to object to relevancy on any

18  particular slide.

19        THE COURT:  All right.  As with 104, Exhibit 105 is

20  admitted.  The Plaintiffs have reserved the right to object to

21  portions of it on the grounds of relevance.  Leave it up to

22  them to make objections if and when they think it's

23  appropriate.

24     (Defendant's Exhibit 105 received)

25        MR. HIRSCH:  Thank you, Judge.

1  BY MR. HIRSCH:

2  Q    All right, Chris.  Let's proceed with the Exhibit 104.

3  Can you tell us what is portrayed on the screen as the first

4  slide of 104?

5  A    This is the main entry feature that you first see when you

6  come to the Tartesso Project as you progress north along the

7  Sun Valley Parkway.

8  Q    And tell me, is this an artist's rendering of something

9  that's going to be built years from now or does it exist in the

10 ground?

11 A    No, this is an actual photograph, untouched photograph.

12 Q    If we go to slide number 2, in your view does this -- well

13 strike that.  Tell us in your words what slide number 2, the

14 comparative pipeline routes, shows?

15 A    Can you put slide number 2 up for me, Steve?

16 Q    Yes, I will.

17 A    Thank you.

18       MR. LEMASTER:  Your Honor, this is an exhibit that we

19 object to because the route has been certificated by FERC.

20 Routing's not an issue in this court.

21       THE COURT:  Well I, I would agree that this Court

22 doesn't have the authority to alter the route, and to the

23 extent that that's your objection, it's sustained.  However,

24 the exhibit provides information that is useful to the Court

25 and I will allow further questioning by both parties regarding

1    this document, which has been the subject of previous

2    questioning as well.

3            Please proceed, sir.

4    BY MR. HIRSCH:

5    Q    Mr. Heeter, did you give a copy of this exact map to

6    representatives of Stardust in early August of 2006?

7    A    To representatives of Stardust or Transwestern?

8    Q    I'm sorry; Transwestern?

9    A    You know, I don't know if we gave them this exact diagram,

10   but what we gave them was the, we gave them the location of the

11   APS 500 KV corridor that's shown in this location on the map.

12   Q    The dotted black line?

13   A    Yes.

14   Q    To your knowledge did Transwestern have that in their

15   possession before they filed their FERC application?

16   A    I don't know the answer to that.

17           MR. LEMASTER:  Objection, Your Honor.  Irrelevant.

18   The route's been decided in this case.  What Transwestern had

19   in its possession regarding the route is not relevant to this

20   hearing.  FERC has decided the route in the certificate that's

21   in evidence, Your Honor.

22           THE COURT:  Mr. Hirsch?

23           MR. HIRSCH:  Well, Your Honor, if FERC controlled we

24   wouldn't be here.  You would have already granted the

25   injunction back when they asked that you do it back in

1  November.  It is extremely crucial for you to realize the

2  nature and extent of the alternative route on the issue of

3  substantial likelihood of success on the merits of the DC

4  Circuit.  And the fact that Transwestern knew that there was a

5  route that would avoid the public safety issues, the fire

6  safety issues, and all the interferences and conflicts you're

7  about to see, that was readily available to Transwestern that

8  they ignored.  And that's the nature of the appeal that we

9  contend needs to be fully heard before you grant immediate

10 possession and have it become a fait accompli by having it

11 constructed, subject to being removed later.

12         THE COURT:  All right.  I haven't yet, I haven't yet

13 made a determination of the law with respect to what if

14 anything I should take into account regarding the likelihood of

15 success in the DC Circuit, so for purposes of this proceeding

16 I'll allow the questioning.  I'm not sure that it ultimately

17 will prove relevant to my legal analysis, but it may.

18         MR. HIRSCH:  Okay.  And I'm not going to dwell on it.

19 And as I said in opening comments, re-try the FERC case here.

20 BY MR. HIRSCH:

21 Q    Does -- did you and your staff develop the APS corridor

22 alternative route as shown on slide 2 of Exhibit 104?

23 A    Did we develop it?

24 Q    Did you develop and come up with the concept of the dotted

25 black line as an alternative?

1    A    Yes.

2    Q    Or did others?

3    A    Yes.

4    Q    I want to ask one more question on this slide, then we'll

5    move on.  Starting at the upper left corner of the route as it

6    gets into the Sun Valley Parkway area, can you basically inform

7    the Court of the various developers and the names of their

8    projects from north to south till we get down to I-10?

9              MR. LEMASTER:  Objection.  Lacks foundation.

10             THE COURT:  Well I, I suspect he can lay one.  I'm

11   going out on a limb here and overrule that objection.  I

12   suspect that this gentleman's pretty well aware of who his

13   competitors are in the area.  I'll permit the question.

14   BY MR. HIRSCH:

15   Q    And Mr. Heeter, do you have regular meetings with each and

16   every one of the developer representatives that you're about to

17   describe to us, don't you?

18   A    Not with all of them, but we do have with a number of

19   them, yes.

20   Q    Okay.  So the ones you don't have regular meetings with

21   through your contacts with the Town of Buckeye and monitoring

22   the competitive development situation along Sun Valley Parkway,

23   do you feel you're familiar enough to give accurate testimony

24   to the Court as to who owns what land and what their plans on

25   it in general terms?

1   A    I may not be able to tell you who owns it, but I can tell

2   you the project names.

3   Q    Okay.  That's what we're looking for, just so we have some

4   labels.  What is the first project that the pipeline route as

5   certificated encounters in the Sun Valley area?

6   A    Festival Ranch.

7   Q    And that's being developed by Pulte Homes?

8   A    It's, a portion of it's developed by Pulte.  The rest of

9   it's owned by the Lyle Anderson Companies.

10  Q    Okay.  And we've heard of the legal term.  Shane Gosdis

11  was here representing 10,000 West, LLC, is that Lyle Anderson's

12  entity?

13  A    Yes.

14  Q    Okay.  And maybe using the John Madden chalk talk diagram

15  or an arrow, can you roughly approximately where Festival is?

16  A    It's right there.

17  Q    Okay.  What's the next development that the pipeline would

18  encounter if built?

19  A    The next project is Sun Valley, which is the WVSV project.

20  Q    Okay.

21  A    That's right --

22  Q    And are there a north phase and a south phase to Sun

23  Valley, to, yeah, the Sun Valley WVSV development?

24  A    That project runs all the way from where I just put that

25  last arrow to right there.  To Northern Avenue, actually.

1    Q    Okay.  Then what is the next development that is

2    encountered?

3    A    Anthem West.

4    Q    And who is developing that development?

5    A    That's developed, that's owned by Pulte Homes.

6    Q    And then we see the pipeline takes a jog from due south to

7    a southwesterly direction.  Is that where Tartesso is

8    encountered?

9    A    Yes, sir.

10   Q    And then are there further developments south of Tartesso,

11   or does that pretty well summarize the holdings up until

12   Interstate 10?

13   A    That's correct.

14   Q    All right.  Now in the terms of entitlement we see some

15   colored shading on the diagram here, number 2.  Each of those

16   developments that you mentioned, Festival and Sun Valley and

17   Anthem West and Tartesso, are they entitled or are they raw

18   desert land as of the date the condemnation actions were filed?

19   A    They're in various stages of entitlement.

20   Q    All right.  Let's -- I should have gone to slide 3 to help

21   illustrate that a little better.  Is this a close up showing

22   the developments specifically along the Sun Valley Parkway

23   Trail?

24   A    Yes.

25   Q    Route, I should say?  Now let me zero in to slide 4 on the

1  exhibit and ask you to tell us what this is depicting?

2  A    It's basically depicting the location of the proposed

3  Transwestern route as it bisects Tartesso West, which is right

4  here.

5  Q    And if we go to slide 5, can you tell us what is shown on

6  this slide, sir?

7  A    This is the master plan for Tartesso West, and the

8  transmission corridor is in this location right here.

9  Q    And does this master plan show all of the property

10 holdings of the Tartesso Project?

11 A    Just the portion of it that lays west of the Sun Valley

12 Parkway.

13 Q    If we go backwards one slide, well, looks like we won't be

14 able to, so let's keep proceeding.

15         Can you tell us generally for later reference what

16 the colors on page 5 that's up on the screen indicate regarding

17 those in connection with the legend that's on the diagram?  I

18 mean, don't go through each one of them, but what is that

19 intended to portray to the judge?

20 A    Those are, those various colors portray the various land

21 uses that are within the community, such as single family

22 residential, commercial, parks, commercial -- open space.  The

23 orange color is multifamily, and the dark, darker brown color

24 is another level of multifamily.  The purple is a mixed use.

25 So it's various, various land categories that the project's

1    approved for.

2    Q    When you say those projects are approved, these are land

3    density and use designations that have been approved by the

4    Town of Buckeye?

5    A    Yes.

6    Q    All right.  We're going to go to slide 6 on Exhibit 104.

7    Does the company not, or contract for regular fly-overs of the

8    development to show its status?

9    A    Yes.  While we were in active development of the first

10   phase, we were doing these on a monthly basis, and we're now

11   doing them on a quarterly basis.

12   Q    Now did I ask you to get a picture that was as close to

13   the date of today's hearing as possible?

14   A    Yes.

15   Q    And can you tell us the date that was the closest in

16   proximity to today's date that you were able to fly Tartesso?

17   A    March 14th, 2008.

18   Q    And can you tell us generally what's depicted, what part

19   of Tartesso is depicted in slide 6?

20   A    This is the first phase of Tartesso West.  What you see

21   there is, is the development of 3,375 single family lots, plus

22   ancillary uses that are involved in that first phase of the

23   project.

24   Q    And did you have your staff overlay the SRP electrical

25   transmission easement corridor onto the map?

1  A    We did.

2  Q    And have I now indicated where the SRP corridor is

3  located?

4  A    Yes.

5  Q    The PowerPoint will speak for itself, but does this give

6  us the total number of acreage and number of residential units

7  at build out approved in the Tartesso master plan?

8  A    Yes.

9  Q    And the population is expected to approach 100,000 people

10  eventually?

11  A    Yes.

12  Q    We actually heard with another witness or saw briefly a

13  development agreement.  Can you explain generally to the judge

14  what a community master plan is?

15  A    Under the ordinance of the Town of Buckeye, in order to do

16  a project of this magnitude we have to get a community master

17  plan approved, and as a condition of that community master plan

18  we have to enter into a development agreement with the Town of

19  Buckeye, and that development agreement basically vests certain

20  rights that we have to develop the project based on the filed

21  community master plan, and in our case we have a 35-year master

22  or a 35-year agreement with the town, and those development

23  agreements also impose certain obligations on each of the

24  developers.

25  Q    I think we heard the development agreement was recorded in

1    2003; does that comport with your memory?

2    A    I think that's correct, and it's been amended since as

3    well.

4    Q    These are long-term agreements that last more than three

5    decades?

6    A    Yes, sir.

7    Q    Is there a commercial component to Tartesso as well?

8    A    Yes, there is.

9    Q    Okay.  Could you generally describe that for the Court?

10   A    Basically on both sides of Tartesso there's about 1,358

11   acres of commercial and mixed use that are approved, and in the

12   approved, approvals, we could probably develop something like

13   15 million square feet of retail, office, hospitals, various

14   other uses.

15   Q    Is that part of the master plan that's been approved by

16   the Town of Buckeye?

17   A    Yes.

18   Q    A couple questions about transportation infrastructure.  I

19   think the map makes the first statement there pretty self

20   evident.  Tell us what the interchange access is to Tartesso at

21   the date these condemnation actions were filed?

22   A    We basically have two existing freeway interchanges that

23   service the property, one at Miller Road and one at Sun Valley

24   Parkway.  There's also five other interchanges that have, that

25   are in various stages of approval through the various

1  governmental agencies that'll service the project eventually.

2  Q    And if we move to the next slide in the exhibit, does that

3  show some of those existing planned access points?

4  A    Yes.

5  Q    Which ones are existing and which ones are planned?

6  A    All the white ones exist.  The three black ones were

7  approved at the time this drawing was done.  We also have

8  another interchange that's approved at 323rd Avenue, and then

9  there's also going to be another interchange that will service

10 the project at State Route 85.  It's not on this map.

11 Q    And have we now drawn in where the pipeline route is

12 generally located?

13 A    Yes, the yellow line.

14 Q    Go on to slide 11.  Can you describe for us generally what

15 is depicted on slide 11?

16 A    The entirety of the Tartesso West and Tartesso master

17 plans, and the purple area are adjacent master plans that we

18 shaded over.

19 Q    Owned by other, developed by others?

20 A    Yes.

21 Q    And I guess that's where the former high view map shows

22 the approved uses that are underway or approved within

23 Tartesso?

24 A    Yes.

25 Q    Turning to slide 12, does this slide accurately depict the

1  approved single family residential, multifamily residential,

2  and commercial acres and units for Tartesso West and Tartesso

3  East?

4  A    Yes, it does.

5  Q    And if we go back one slide to the slide 11, can you

6  generally describe for us what's considered Tartesso West and

7  what's considered Tartesso East?

8  A    This is the Sun Valley Parkway, that red line I just drew.

9  Tartesso West is everything on the west side of that line or to

10 the left, and everything to the right side of the line or to

11 the east is Tartesso.

12 Q    And do the figures set forth on slide 12 give us the

13 entitled and approved densities and build out at Tartesso as of

14 the time the condemnation suits were filed?

15 A    Yes, they do.

16 Q    Let's turn to phase I, and the area that we'll dwell on as

17 having a potential impact by the gas line, what is the cross

18 street at phase I across the parkway?

19 A    The cross street's now Tartesso Parkway.  It was

20 previously Indian School Road.  It's about three and a half

21 miles north of Interstate 10.

22 Q    When did physical grading that would have shown a passerby

23 that home sites and other amenities related to home sites were

24 going in at Tartesso Phase I?

25 A    November of 2004.

1    Q    And how many lots were begun in that date?

2    A    There was a beginning of 3,375 single family lots.

3    Q    Turning to slide 13 of Exhibit 104, does this slide depict

4    the basically current status as of March 31 of the number of

5    permits issued and starts and purchase, purchased lots as of

6    the date of the injunction hearing?

7    A    Yes, and the number of occupied homes as well.

8    Q    So essentially as of today's date there are 729 occupant,

9    occupied  homes in the Phase I as we saw in the aerial photo

10   later?

11   A    That's correct.

12   Q    Earlier, I mean.  How is wastewater dealt with in the

13   Tartesso community?

14   A    We have the regional sewer plant for most of the west side

15   of the Sun Valley Parkway from Northern down to I-10, and a

16   little bit of the property that's on the east side of the

17   parkway is located within the Tartesso community, Tartesso West

18   Community Master Plan, and we have the, that plant's approved.

19   We went through all the governmental approvals to get that

20   done, and we've constructed the first phase of that, that

21   plant, and it's currently operating and producing Class A

22   effluent, A+ effluent.

23   Q    And what is Class A or A+ effluent?

24   A    That's an industry term or a regulatory term, I'm not sure

25   which.  It's basically a type of effluent that you can directly

1  recharge into the groundwater because of its purity.

2  Q    And is there approval for a second plant to eventually be

3  built?

4  A    Yes, there's a sister plant that will be similar in size

5  that will be developed on the east, on Tartesso East just north

6  of Interstate 10.

7  Q    Turning to slide 15, I wanted to have you describe

8  generally some photos of what is existing and on the ground

9  around the Tartesso environs.  We have this as our cover slide,

10 so we've already described 15.  Can you show what's, can you

11 tell us what's portrayed in slide 16?

12 A    Yes, when you make a left turn off Sun Valley Parkway

13 headed north on into the project, this is the main entry

14 feature that you see, and this is a picture that was taken at

15 night.

16 Q    So this isn't a rendering; this is what actually exists

17 out there today?

18 A    Yes, sir.

19 Q    Do you have, turning to slide 17, other planned amenities

20 within the neighborhood?

21 A    We do.

22 Q    If we look at slide 17, probably becoming familiar now, is

23 the SRP corridor, well draw in with your black pen, sir, where

24 the SRP corridor is.  Okay.  What are neighborhood parks?

25 A    The neighborhood parks are our mid-tier amenity in the

1  project.  This park includes a water feature, a tot lot,

2  basketball courts, tennis courts, some green space, and a

3  variety of the things that the residents are able to use that

4  live in the community.

5  Q    And is Exhibit 18 an actual picture of the neighborhood

6  park that's referenced on the map?

7  A    Yes, sir.

8  Q    What are sports parks showing slide 19?

9  A    The sports park is our highest intensity amenity in the

10 community.  This community has, this park has parking

11 facilities.  It has, the first station's located within this,

12 the permanent fire station site's location within this, this

13 facility.  It has three regulation baseball diamonds that are

14 lighted.  It has soccer fields, basketball, tennis courts, and

15 a large open green space, Ramadas, barbeques.  It's a

16 full-fledges municipal park.

17 Q    And does 19 -- I'm sorry, slide 20 and the pop-ups that

18 have come up on the screen here show us some of those

19 amenities?

20 A    Yes, sir.

21 Q    And these are actually existing in the ground as of the

22 date of this preliminary motion hearing?

23 A    Yes, they are.

24 Q    And is this sports park portrayed on slides 19 and 20

25 located immediately adjacent to the SRP power corridor?

1  A    Actually portions of it are actually located within the

2  corridor.  The parking facilities are, are located within the

3  corridor itself.

4  Q    And did you have to get permission from SRP to do that?

5  A    Yes, we did.

6  Q    How easy is it to deal with SRP for entitlements such as

7  that, in your view?

8  A    I don't think they're any more difficult than anybody

9  else.  It's just a long process.

10 Q    Turning now to slide 21, what are pocket parks?

11 A    These are small, these are our lowest intensity amenity

12 within the community, and these, there's 20 of these on this

13 slide I believe, and these are basically designed for use by

14 small children where people can walk from their residence or

15 ride a bike to them and then use these tot lots, Ramadas,

16 barbeques, and then there's a place to throw a Frisbee or

17 whatever within these communities.  In these parks, I mean.

18 Q    Looking at slide 22, are these renderings or actual

19 pictures of what exists as of today at Tartesso?

20 A    These are actual pictures of one of the pocket parks.

21 Q    What is portrayed on slide 23 of Exhibit 104?

22 A    This is one of our off-site key-off signs that is located

23 along the Sun Valley Parkway at approximately the Thomas Road

24 alignment. This a list of the buildings that are, that we're

25 currently building in the project.

1    Q    And basically the end users that you've sold the finished

2    lots to that put houses on there?

3    A    Yes, sir.

4    Q    Is that the White Tanks in the background?

5    A    Yes, to the right.

6    Q    What is shown on slide 24?

7    A    This is a freeway signage that we have that you see

8    coming, when you're coming from California along I-10, this is

9    the west facing sign.

10   Q    Now we need to move along here.  And we've heard a number

11   of dates concerning the development of the Transwestern

12   pipeline, various pre-filing and filing dates at FERC.  I want

13   to have you correlate some of those to activity at Tartesso.

14   Does slide 25 set forth what you were doing and when in terms

15   of the reference steps at Tartesso?

16   A    Yes, they do.

17   Q    As of September of 2005 there were 51 home models actually

18   beginning construction?

19   A    Yes, sir.

20   Q    And homes actually began to be sold or closed by April of

21   2006?

22   A    That's correct.

23   Q    And through 2006 there's indication, and the early part of

24   2007, that infrastructure for units 1, 2-A, and 2-b were being

25   completed. Let me move forward to slide 26. Does that show us

1  the location of Units 1, 2-A, and 2-b?

2  A    Yes, it does.

3  Q    Now this is a little different date.  Can you tell us what

4  is intended to be portrayed on this fly-over date in slide

5  number 26?

6  A    This is the, this photograph was produced to show the

7  condition of the property on the date the FERC application was

8  filed by Transwestern, which I believe was on September 15th.

9  This was the closest photograph we had to that date.

10 Q    So the application was filed within a week of this date,

11 to the best of your knowledge?

12 A    Yes.

13 Q    Now let me add a couple of items that you had your staff

14 put in --

15       MR. HIRSCH:  -- and we'll supplement the record with

16 this exact citation, Judge.

17 BY MR. HIRSCH:

18 Q    Were you aware, Mr. Heeter, that the words that are set

19 forth on slide 26 were included within Transwestern's FERC

20 application as an avowal or representation to FERC?

21       MR. LEMASTER:  Objection.

22       THE COURT:  Just a moment.  I think there's an

23 objection.

24       MR. LEMASTER:  Objection.  This is irrelevant and

25 relating to the FER proceeding, Your Honor, but what happens in

1    FERC for this proceeding, it's just not relevant to this

2    proceeding at all.

3              THE COURT:  Mr. Hirsch?

4              MR. HIRSCH:  Well, it is directly relevant again on

5    the point of what we feel the DC Circuit as an independent

6    reviewing authority will do when faced with the evidence of

7    what actually was happening versus what was represented to

8    FERC.

9              THE COURT:  Well, I'm going to permit the

10   questioning.  I must tell you, I'm a little bit puzzled about

11   how this district court takes into account the DC Circuit.  I

12   will work that out before I'm done, but I can't be absolutely

13   certain that that isn't relevant at this point, so the

14   objection's overruled.

15   BY MR. HIRSCH:

16   Q    Now, what I want to establish is what the, what the status

17   was as of the date the FERC application was filed, plus or

18   minus.  Have you drawn in, had your people draw in where the

19   SRP corridor is?  Have I shown that on a slide at this point?

20   A    Yeah, the broad yellow line is the 330-foot approximate

21   location of the SRP transmission power line, and the red or

22   orange color is the approximate location of the Transwestern

23   easement within that power line corridor.

24   Q    So as you and your staff read the condemnation actions

25   that had been filed, Transwestern is seeking the eastern or

1    right-hand side of the SRP corridor for its easement and

2    associated work space for temporary easements and the like?

3    A    Yes.

4    Q    Now within the corridor that the, that we see as of the

5    date of the filing of the FERC application, in fact were there

6    any vertical improvements or buildings as of that date?

7    A    Within the corridor?

8    Q    Yes.

9    A    No.

10   Q    Okay.  What is your understanding of whether SRP permits

11   vertical buildings or structures within the corridor?

12   A    Under the terms of the easement I don't believe we're

13   permitted to put any vertical structures in the, in the actual

14   easement itself.

15   Q    Okay.  And does Stardust have any plans to build vertical

16   structures or buildings within the SRP corridor as part of its

17   plans we're looking at here?

18   A    No.

19   Q    Okay.  Are there other matters or structures that are

20   contained within the SRP corridor other than the power poles

21   themselves?

22   A    Yes.

23   Q    Can you generally describe before we get to the next

24   series of slides what use you as the developer of Tartesso have

25   made of the SRP 330-foot wide corridor in the development of

1   Tartesso?

2   A    We've used the easement for, almost the entire easement

3   for one use or another, drainage, utilities, parking, a number

4   of different things.

5   Q    Are there plan sets in your possession at Tartesso, CAD

6   drawings that show what uses have been made on an as-built or

7   grading plan basis within the SRP corridor?

8   A    Yeah, we have as-built drawings of every single

9   improvement that exists in the corridor.

10  Q    Did you have your staff put together the as-built drawings

11  to be able to portray and reference in describing what is in

12  the corridors and underneath the surface of the corridor in

13  terms of utilities and drainage ways?

14  A    Yes, we did.

15  Q    Did you have your staff color in to the best we could, and

16  we won't represent it as surveyed fact, but to the best they

17  could where Transwestern's declaration of taking covered for

18  its easement and its associated workspace?

19  A    We did.

20  Q    Let me show you slide 27. Can you describe for us what

21  slide 27 portrays?

22  A    It's a portion of the power line corridor with the

23  adjacent platted portions of Tartesso West, and certain various

24  improvements that have been put in the ground that are on this

25  drawing.

1    Q    Can you -- if you look over on the left-hand side, it's

2    kind of hard to see.  There is a line with Ls on either end

3    that says in capital letters, electrical easement; do you see

4    that?

5    A    Yes, sir.

6    Q    Can you use your light pen and show the judge what the, so

7    we have a scale here, what the 330-foot wide easement is?

8    Okay.  I was looking actually at the one over there on the

9    left.

10   A    Oh, okay.  I'm sorry.  Excuse me.  Well let me undo this

11   and --

12   Q    And the one that you drew is a little messed up because

13   there looks to be some cut and paste match lines there?

14   A    Yes, sorry.

15   Q    I want to have you tell us what the fact is.  Does the 330

16   foot extend to the eastern edge as you've shown here with your

17   red drawings, your red line?  And as I think has been

18   established, the Transwestern easement it is seeking generally

19   runs along the far east side, because this is laying on its

20   side basically running in an east to west direction of the SRP

21   corridor?

22   A    That's correct.

23   Q    Now we see a number of lines.  What are the contour lines

24   at Valinor Drive intending to convey in terms of what's

25   actually built at the site?

1    A    Those are lines that show the location of, of berms that

2    exist in the project that convey storm water through this

3    entire corridor from the north to the south.

4    Q    We're going to get into some more detail.  We won't use

5    this as the, as the example slide, but are there other surface

6    and underneath the surface utility locations that are shown on

7    these drawings?

8    A    Yes. In this case the ones at Valinor Drive, which is this

9    road right here, goes up and down, in this case actually runs

10   east and west, there are utilities, all types of utilities in

11   that street.

12         THE COURT:  Mr. Hirsch, as soon as you get to a

13   sensible place to interrupt your interrogation, I think it

14   would be appropriate, because it's just now noon.

15         MR. HIRSCH:  Okay.  I'm going to just finish two more

16   slides, which is the same series.

17   BY MR. HIRSCH:

18   Q    Does -- you might hit the erase feature there.  Does slide

19   28 show a similar as-built set of existing on or underground

20   utility interferences and impact within the corridor?

21   A    Yes, just in a different location a little bit farther

22   south.

23   Q    Okay.  We'll get into the, some details after lunch.  And

24   slide 29, is this similarly another area showing impacts that

25   the pipeline corridor would have on, within the SRP easement?

1   A    Yes.

2   Q    All right.

3            MR. HIRSCH:  With that, Judge, we'll be ready to go

4   into some of those details after lunch.

5            THE COURT:  All right.

6            Let me get an, if I may, get an idea of how much more

7   time you estimate will be consumed by testimony here?  I'm

8   trying to decide how long a lunch break we ought to take.

9            MR. HIRSCH:  You've got a handle on the pace that

10  we're moving here.  I would say we'd be done with the direct of

11  Mr. Heeter within 45 minutes.

12           THE COURT:  And how many more witnesses do you

13  anticipate calling?

14           MR. HIRSCH:  I  believe the Defense would, after Mr.

15  Heeter, call, Buckeye would call the town engineer, and then we

16  would call Mr. Pike Oliver of WDSV Holdings, and I think Mr.

17  Braselton has a witness.

18           MR. BRASELTON:  Just one, Your Honor.

19           THE COURT:  All right.  So that's four more witnesses

20  altogether?

21           MR. HIRSCH:  Yes.

22           THE COURT:  And is your witness -- I'm sorry.  Maybe

23  I miscounted.

24           MR. BRASELTON:  Three.

25           THE COURT:  We've got the City of Buckeye's engineer,

1  we've got Mr. Braselton's witness --

2          MR. HIRSCH:  And Mr. Oliver of WVSV, so three and a

3  half more witnesses.

4          THE COURT:  Okay.

5          Is your witness, Mr. Braselton, going to be Mr.

6  Denham?

7          MR. BRASELTON:   Yes, Your Honor.

8          THE COURT:  All right.

9          All right.  I think we can take a reasonably relaxed

10  lunch hour then and still finish all of this by tomorrow, or

11  certainly by Friday, so we'll, it's after noon now.  We'll

12  resume here in the courtroom at 1:30, and I purposely take a

13  somewhat long lunch hour so people actually are here when we

14  start.  I found early on when I tried to take one hour lunch

15  break at trial, it was always a one hour and 20 minute lunch

16  break anyway, so we'll adjourn to reconvene here at 1:30.

17          MR. HIRSCH:  Thank you.

18      (Recess)

19          THE CLERK:  All rise, the court is now in

20  session.

21          THE COURT:  Good afternoon, please be seated.

22  Mr. Hirsch, I believe we're ready for resumption of your

23  examination of Mr. Heeter.

24

25          MR. HIRSCH:  Thank you, Judge, good afternoon.

1    BY MR. HIRSCH:

2    Q    Mr. Heeter, when we broke we were on slide 29, and had

3    completed review of some of the plan sheets and superimposed on

4    the map.  I'd like now to turn to a virtual driving tour of

5    what one would see if they were on the ground touring the Salt

6    River Project corridor as part of unit 1, 2A, and 2B, which we

7    see portrayed here on slide 29, which has been portrayed

8    earlier.  Did you have somebody go out and take pictures of

9    various surface points along the SRP corridor so that it could

10   be correlated with the plans of what's on the surface and

11   underground at particular locations?

12   A    I did.

13   Q    Let's start with the north end of the area at slide 30.

14   Now the slide we are looking at -- and by -- just so we can --

15   we won't do this for every slide, but can get a general

16   relationship, I'm going to go back to slide 29 which is the

17   overview.  Can you click your arrow and show the Court where

18   Bruner Road is and where the first issue is we're going to look

19   at in detail?

20   A    This is Bruner Road right here.  It's a mile west of the

21   Sun Valley Parkway, just to give people a sense of scale.  The

22   portion of the project we're looking at is two and a half miles

1  wide and a mile north and south.

2  Q    So where you have the arrow on the TV screen is where

3  we're about to look at the picture?

4  A    Yeah, I can't get the arrow -- I guess it's right there,

5  really.

6

7  Q    Okay.  We'll go to slide 30 and you'll see that it's a

8  zoom in on that northern part of the Tartesso Unit 1.  Now can

9  you tell us what these yellow squares and red circles mean in

10  terms of numbers that you'll be using to illustrate your

11  testimony?

12  A    What we did is we numbered the various improvements that

13  we have constructed within the SRP transmission corridor, and

14  those are the numbers that are in the yellow blocks.  And the

15  red circled numbers that have the camera next to them are the

16

17  location which the photographs were taken from.

18  Q    All right.  Before we go to the first photograph, and we

19  won't go to this degree of detail with every one of these, but

20  can you basically indicate for us like box number 1 there's a

21  blue line, what does that show?

22  A    That particular one is two-inch landscape service.

23

24  Q    And what -- why would there with a water service line in

25  that location?

1   A    To provide a water source to the landscaping that we are

2   or have already installed within the SRP easement area.

3   Q    And do the blue lines on slide 30 show the actual

4   location, or as nearly as you can get them, the actual location

5   of the referenced services?

6

7   A    Yes.

8   Q    And there's a reference to a number 2 and number 3 to DIP

9   raw and DIP potable water lines.  What's DIP?

10  A    DIP stands for ductile iron pipe.

11  Q    And these are 20 inch in diameter pipes?

12  A    Yes.

13  Q    Tell the Court the difference between raw water and

14  potable water?

15

16  A    Within Tartesso we have two water systems.  We have a

17  series of domestic water wells in the community.  Those water

18  wells produce ground water.  That water is delivered under

19  pressure to a water storage facility where it's actually

20  treated at the water storage facility and then it's pumped into

21  a water tank, and that provides -- and then the -- that's the

22  water going in.

23

24  Q    Is that the raw water?

25  A    That's the raw water, untreated.  And then there's another

1  system of pipes that come out of the water tank that actually

2  provide the delivery to the various uses within the community

3  of treated -- what's called potable water.

4  Q    Are there generally landscape water lines and potable and

5  raw water lines located through the SRP corridor within

6  Tartesso?

7

8  A    Yes.

9  Q    Now yellow box 4 is a gunite channel.  Let's go ahead to

10 slide 31, which corresponds with a dot number 1 on everybody's

11 hard copy of their exhibit.  Can you tell us what this -- what

12 a gunite channel is?

13 A    This particular channel, it was designed to intercept one

14 of the alluvial floodplain washes that come through the

15 project.  And basically we're collecting the water, because it

16 comes into the project in a braided condition, which means it's

17 not in a condensed channel, it's kind of in a very broad wide

18 area.  The water is brought into this channel, it's forced into

19 a condensed stream of water, and then it's forced into this

20 gunite --

21

22 Q    Apron?

23 A    -- culvert right there at the bottom of it.  And at that

24 point we have a consolidated flow of water instead of being

25

1   spread out.

2   Q    And just for orientation on slide 31 that's up on the

3   screen, we see that little compass in the right, what does that

4   tell us?

5   A    That basically is showing the direction north.  And what

6   we've tried to do is orient most of these slides so they're

7   either facing north or south so we don't confuse people with

8   what direction we're looking at, because the improvements

9   basically run from north to south.

10  basically run from north to south.

11  Q    If we go back to slide 30 on this one, is that gray area

12  right blow the yellow 4 box the same gunite surface feature we

13  were looking at?

14  A    Yeah, that -- that gunite -- the reason it's gray on this

15  picture, part of it is because that's the photograph, and then

16  we've actually laid the improvements on top of the photograph,

17  we've actually laid the improvements on top of the photograph,

18  and that gunite channel actually goes like this.

19  Q    And is the gunite channel within the Salt River Project

20  easement?

21  A    A portion of it is and a portion of it's not.

22  Q    Okay.  Now we see the houses in exhibit -- or slide 30 of

23  Exhibit 104.  Are those houses essentially build right up to

24  the edge of the SRP corridor?

25

1   spread out.

2   Q    And just for orientation on slide 31 that's up on the

3   screen, we see that little compass in the right, what does that

4   tell us?

5   A    That basically is showing the direction north.  And what

6   we've tried to do is orient most of these slides so they're

7   either facing north or south so we don't confuse people with

8   what direction we're looking at, because the improvements

9   basically run from north to south.

10  Q    If we go back to slide 30 on this one, is that gray area

11  right blow the yellow 4 box the same gunite surface feature we

12  were looking at?

13  A    Yeah, that -- that gunite -- the reason it's gray on this

14  picture, part of it is because that's the photograph, and then

15  we've actually laid the improvements on top of the photograph,

16  and that gunite channel actually goes like this.

17  Q    And is the gunite channel within the Salt River Project

18  easement?

19  A    A portion of it is and a portion of it's not.

20  Q    Okay.  Now we see the houses in exhibit -- or slide 30 of

21  Exhibit 104.  Are those houses essentially build right up to

22  the edge of the SRP corridor?

1    A     Are you referring to these houses here, Steve?

2    Q     Yes.

3    A     Those houses are actually separated from the corridor by

4    the drainage channel where we're collecting this water.  In

5    this case, there's a drainage channel between this row of

6    houses and the corridor.

7

8    Q     In the construction approval process as you're preparing

9    these pads, do the regulators impose any requirements on you

10   about getting surface drainage off the properties where the

11   finished pads are?

12   A     Yeah, we have a number of issues related to the

13   construction of the graded pads.  We're required to drain the

14   lots from the rear yard to the front.  And then we're also in

15   the case these pads that are along the -- this is a -- this is

16   actually a wall that's a retaining wall, and those pads are

17   actually built up so that they're higher than the surface

18   elevation of the associated wash next door.

19

20   Q     All right.  We'll get into some of those points in some of

21   the additional photographs here.  Does that -- does the photo

22   31 back up on the screen show the retaining wall?

23

24   A     Yes, this is the retaining wall right along here.  Right

25   in front of those houses, that dark structure is -- it's

1    actually a privacy wall that's sitting on top of a retaining

2    wall.

3    Q    Let's go the slide 32, which is another picture taken from

4    the same north end of Bruner Road orientation, and we'll go to

5    slide 33 which shows us where that -- what that looks like at

6    that point on the earth's surface.  It has the phrase "box

7    culvert."  Can you explain to the Court what is being portrayed

8    in slide 33 with the box culvert?

9    A    Yeah, this is a -- this is actually a structural device

10   that's used to transport water underneath a roadway, and these

11   box culverts are designed to convey the storm water that's

12   coming off site through the channel and then basically onto the

13   other projects that are further south of us.  So we're

14   basically picking up water from the sites to the south -- or to

15   the north of us, conveying it through our property to the

16   projects to the south.

17   Q    And do we see the towers in the background of slide 33 of

18   the SRP transmission lines?

19   A    Yes.

20   Q    Now is this physical box culvert literally located within

21   the SRP easement or is it just outside of it?

22   A    This particular one coincidentally is outside the

1    easement, and this slide was provided to show that this is a

2    condition that's going to exist in certain locations where the

3    transmission corridor and the pipeline and roadway crossings

4    intersect.

5    Q    Let's go to slide 34, and it looks like we've moved down

6    the corridor a little bit from northeast to southwest to

7    Valinor Drive.  Let's identify some of the categories here that

8    we haven't identified before.  Six is a storm drain pipe.  Is

9    that what we see in blue on slide 34?

10   A    Yes.

11   Q    And what is a storm drain pipe?

12   A    In this particular case it's actually a balancing pipe to

13   transfer water from the earthen berm that's item 7, into the

14   retention basin that's on the -- actually in this case on the

15   western side of the corridor, and basically this whole corridor

16   -- this is basically showing that we've utilized this whole

17   corridor to convey water from the north end of it to the south

18   end of it in order to transport this water through the project.

19   Q    And is the storm drainage pipe basically taking water from

20   the basin that's marked as 7 and moving it over to the basin

21   that's 6, or vice versa?

22   A    Well basically 7 is the earthen berm that creates the

1   basin.  Basically there's water that runs through this whole

2   corridor.  Item 7, which is this brown berm, is basically

3   slowing that water down and then it's -- it's holding a certain

4   amount of it.  It's bleeding off that water into the -- into

5   6.  And then once that water reaches a certain level, both 6

6   and 7 will release water further south into the corridor.

7

8   Q    All right.  Let's -- we'll come back to this and identify

9   some of those other conflicting conditions, but I'm going to

10  move ahead to photo number 335, which we can reference by

11  looking at the camera and the circle 3 on 34, but tell us

12  what's portrayed on slide 35?

13  A    Well there's a number of things on slide 35.  This is a

14  picture headed northeast in the power line corridor.  This is

15  basically the -- this would basically be the eastern edge of

16  the power line corridor.  And you have the temporary fire

17  station.  This facility right here is a cell tower.  And we

18  also have other utilities in this area.  And we also have

19  another earthen berm right in this location.

20

21  Q    Now the line you first drew running up and down, does that

22  -- why don't we erase that Chris, and do your best job of

23  drawing on this photograph for the Court where the eastern edge

24  of is SRP corridor is.

25

1  A    Well it's right along the edge of this wall.  It runs just

2  like this, more or less.

3  Q    Okay.  And can you point an arrow at the berm structure

4  that we saw identified as box yellow 7 on the prior slide?

5  A    Right there.

6

7  Q    Okay.  So it's collecting waters behind the berm?

8  A    Yeah, it's a structure right here.

9  Q    All right, I'm going to go back to slide 34.  There's an

10  indication we've seen for the first time of 8, electric

11  telephone cable dry utilities.  What are dry utilities?

12  A    Dry utilities are cable TV, gas lines -- no, sorry, not

13  gas lines, they were separate in the case.  Cable TV, electric,

14  and telephone.

15  Q    And what color are they portrayed in?

16

17  A    That's sort of goldenrod color.

18  Q    And are those existing dry utilities at Valinor Drive that

19  exist across the SRP corridor as of today?

20  A    Yes.

21  Q    And we see self-explanatory street and landscaping

22  improvements.  24 are more dry utilities.  What is placed

23  there?

24

25  A    Those are the dry utilities that are running in the major

1  arterial street, which is Tartesso Parkway which is this road

2  here.

3  Q    And finally we have another category we haven't seen yet

4  of a well site and a future WSF.  What is WSF?

5  A    That green box is a future water storage facility.  Once

6  we reach a certain number of households in the community we

7  need to construct a separate -- a second water storage facility

8  to meet the demands of the residents.  And then there's an

9  existing well site that's producing potable water at that

10 location.

11 Q    Let's move on to slide 36, which is the same baseline

12 Valinor Drive with the same table, but here we have a picture

13 taken, a little upstream pointed south it looks like at picture

14 4, which I'll put up as slide 37 and we can confirm with the

15 compass up there in the upper right, we're generally pointed

16 southerly right down the heart of the SRP corridor in this

17 picture are we not?

18 A    Right, that's correct.  This was the berm that we were

19 looking at before right there.

20 Q    Okay.  And can you draw in as best you can where the edge

21 of the SRP -- eastern edge of the SRP corridor is?

22 A    It's right along the edge of this berm right here.  It's

1    right -- it's really literally right in the center of that

2    berm.

3    Q    Okay.  And does this picture also portray any landscaping

4    within the SRP easement?

5

6    A    Yes, along the right of ways.  We also have -- you can see

7    there's a fair amount of unlandscaped area where this berm and

8    they exist in the adjacent retention basin.  This is a

9    retention basin location.  Those will eventually be

10   hydro-seeded back into their native condition, we just haven't

11   done that at this point.

12   Q    All right.  What's the difference between a retention

13   basin and the earthen berm to retain storage water?

14

15   A    Basically the earthen berms are basically controlling

16   offsite storm water that comes through the project.  And the

17   retention basins are controlling the post-development run off

18   from the subdivision.

19   Q    Let's move on to our next illustrative photo, the same

20   baseline aerial, but here we're going to move the camera right

21   on to Valinor Drive as indicated on slide 38.  And we'll go to

22   slide 39 which is picture 5.  Does this show the actual

23   physical construction of what's at the Valinor Drive crossing?

24

25   A    Yes, it does.

1    Q    Now beyond the crossing I see a large box and then what

2    looks like to be a little cable TV stick up.  Can you show

3    those -- they're on the west side of the photo?

4    A    Yeah, those are there and there.

5    Q    And what are those items?

6    A    The little round stand up cylinder is a cable TV riser,

7

8    and that large brown box is an electrical switching cabinet.

9    Q    Let's move on to slide 40.  Again, we have the same

10   overhead orientation picture.  Now slide 41 will be picture 7

11   at the Valinor Drive crossing.  What is that we see in the

12   crossing itself?

13

14   A    Basically you have a picture of a water valve right here,

15   and then there's a water hydrant further down the street, and

16   then this is the actual improved surface that crosses the power

17   line easement from -- in this case from east to west.

18   Q    So this picture we're standing on the eastern edge of the

19   easement, plus or minus, and looking west across the 330 foot

20   expanse of the easement?

21   A    Yes.

22   Q    And could you click on the arrow on the fire hydrant so we

23   can see where that line would run to?  Thank you.

24

25          All right, a couple more.  That's the Valinor line,

1  the drive crossing.  Slide 42 shows us that we're now going to

2  go over to the edge of that storm drainage pipe basin and go to

3  slide 43.  Are we now over on the westerly side of the SRP

4  easement?

5  A    That's correct.

6
7  Q    And can you tell us the improvement we see -- what is that

8  on slide 43?

9  A    Are you referring to this item right here?

10  Q    Yes.

11  A    That's a storm drain outlet.  And that -- that's a bleed

12  off drain to allow water that's collected in this berm to drain

13  to the next storm drain facility that's further south across

14  the street.  And that's set to take a certain level of water,

15  and then once the water reaches a point above that it just

16
17  literally runs over the berm and on down the basin in a free

18  flow manner.

19  Q    And is this facility entirely within the SRP easement?

20  A    Yes, it is.

21  Q    If we go to slide 44 we see that under box 6.  Let's move

22  on to picture number eight, it looks like we're going to be

23  south of Valinor Drive crossing pointed south.  We'll go to

24
25  slide 45.  Is that a more close up of the electrical box and

1    the cable TV stick up you mentioned earlier?

2    A    Yes, there's an electrical switching cabinet there,

3    there's another one there, and then that's the cable riser.

4    Q    We see in the distance a house that sticks out in the --

5    right above the electrical box, right up to the edge of the row

6    of towers.  Is that approximately the eastern edge of the

7    easement?

8    

9    A    The property line of that house, which is five feet from

10   the western edge of that house, is the location of the edge of

11   the easement.

12   Q    Now we're going to move on to slide 46, which is another

13   aerial view with a green stripe in it.  Can you tell us what

14   that green stripe is?

15   A    One of the issues that we had with SRP is they have to be

16   able to maintain these two rows of power line towers that run

17   through project.  And apparently they have a piece of equipment

18   called a condor, which is 125-foot high portable crane that

19   apparently weighs about 110 -- about 100 tons, and we were

20   charged with figuring out a way to get that piece of equipment

21   from -- through this corridor in a way that they could drive

22   that through there on a surface that would handle that load,

23   and also give them access to all of their facilities and still

24   

25

1   allow us to do what we needed to do.

2   Q    And was that a condition of their approval to allow you to

3   put all of the infrastructure inside the corridor?

4   A    Yes, it was.

5

6   Q    And what is portrayed on the green stripe on slide 46?

7   A    That green stripe is the location that SRP and Stardust

8   agreed to as to where the condor would be able to be routed

9   through the power line corridor.

10  Q    And is that road located within the SRP corridor?

11  A    Yes, it was.

12  Q    And specifically as it runs along the east edge of the

13  corridor as shown on slide 46 right before it takes that hump

14  to go around that facility, is that right -- coterminous or in

15  alignment with the Transwestern 50-foot pipeline easement they

16
    are seeking?

17

18  A    Yes, it is.  It's sitting right on top of the easement

19  location where the pipe line is supposed to be placed.  I think

20  it runs 20 feet from the edge of the power line easement to the

21  edge of the road, and that would be five feet wider than where

22  the actual gas line was supposed to be located.

23
    Q    Now is Tartesso Parkway shown on Exhibit 46?
24
    A    Yes, it is.
25

**A/V▾ TRONICS, INC.**
E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 403-8024

1  Q    Can you generally draw a line, because we're going to go

2  to that next.  All right, thank you.

3         We're going to turn to slide 47, which is a new

4  overhead aerial alignment.  By now we're starting to catch up

5  with the definitions here, so I'll move through them a little

6  quickly.  We're not oriented a little further southwesterly yet

7  on the corridor at an area where the SRP corridor crosses

8  Tartesso Parkway; is that right?

9

10 A    That's correct.

11 Q    Okay.  I think we can follow the various lines in this

12 location.  We've identified the ductile iron potable water

13 line, the PVC raw water line, a little different diameter in

14 the case, the dry utilities.  Now 15 we have a natural gas line

15 feeder.  Now that's not the Transwestern line is it?

16

17 A    No, that's the Southwest Gas Company line.

18 Q    And can you tell us the nature of that line, diameter wise

19 and what it's made up of?

20 A    I don't know the actual size of it, but it's four to five

21 feet deep at that location.

22 Q    Thank you.  And then we see some more retention berms

23 which we'll look at some pictures of.  A -- 18, a raw water

24 line running along the very eastern edge of the easement.  A

25

1    storm drainpipe.  Now 42 is a little purple circle there is a

2    dry well.  What is that, sir?

3    A    Basically under both city ordinances, state and county

4    health department ordinances, all of the retention basins that

5    are included in Tartesso have dry wells in them, and those dry

6    wells are designed, along with some other features, to allow

7    these basins to become empty of water within 36 hours after a

8    rainstorm, and that's a vector control situation with the

9    county and the cities.

10   county and the cities.

11   Q    Let's go to the photos now, slide 47 shows us that picture

12   number 9 is going to be up at the northern end there looking at

13   the electrical telephone and cable issues, so we'll go to slide

14   48, which is picture 9.  What is that box we see on the

15   right-hand side of the photo?

16   right-hand side of the photo?

17   A    That is a switching cabinet for -- I believe this is a

18   switching cabinet for cable TV.

19   Q    For -- say that again, for what?

20   A    I believe it's a switching cabinet for cable TV.

21   Q    Oh, cable TV.  Thank you.  And does this picture also show

22   landscaping within the easement corridor?

23   A    Yes, all the landscaping that you see along Tartesso

24   Parkway in this location is all located within the SRP right of

25

1    storm drainpipe.  Now 42 is a little purple circle there is a

2    dry well.  What is that, sir?

3    A    Basically under both city ordinances, state and county

4    health department ordinances, all of the retention basins that

5    are included in Tartesso have dry wells in them, and those dry

6    wells are designed, along with some other features, to allow

7    these basins to become empty of water within 36 hours after a

8    rainstorm, and that's a vector control situation with the

9    county and the cities.

10

11   Q    Let's go to the photos now, slide 47 shows us that picture

12   number 9 is going to be up at the northern end there looking at

13   the electrical telephone and cable issues, so we'll go to slide

14   48, which is picture 9.  What is that box we see on the

15   right-hand side of the photo?

16

17   A    That is a switching cabinet for -- I believe this is a

18   switching cabinet for cable TV.

19   Q    For -- say that again, for what?

20   A    I believe it's a switching cabinet for cable TV.

21   Q    Oh, cable TV.  Thank you.  And does this picture also show

22   landscaping within the easement corridor?

23   A    Yes, all the landscaping that you see along Tartesso

24   Parkway in this location is all located within the SRP right of

25

1    way.

2    Q    Does all of that landscaping need to be irrigated with

3    drip lines or landscape watering?

4    A    Yes.

5    Q    We go to slide 49 which shows us the orientation of

6    picture 10, which is slide 50.  Can you by reference to

7    physical features on slide 50 show us where the eastern edge of

8    the SRP corridor is?

9

10   A    Yes, it's basically the right-hand side of that perimeter

11   wall.  Everything right of that wall is in the SRP power line

12   easement.

13   Q    And did the --

14   A    That's the property line separating the privately-owned

15   fee property and the SRP property that's an easement that's

16   also fee owned.

17

18   Q    You may have covered this, but what's the governing set

19   back from homes from that line?

20   A    Relative to Transwestern?

21   Q    Well, how far do you have to set back the homes from the

22   edge of the fee ownership?

23   A    Oh, under the Town of Buckeye, ordinances in the case five

24   feet.

25

1   Q    And if we take 50 feet to the right-hand side of that low

2   riding little wall we'll have the 50-feet swath that

3   Transwestern is attempting to take in these proceedings?

4   A    That's correct.

5   Q    This is slide 51 that shows us the orientation of the next

6   picture, which is picture 11.  Going to slide 52, we're looking

7   down that same wall.  Can you tell us what that green grass

8   improvement is underneath the towers?

9

10  A    It's a retention basin that's holding the post-development

11  storm water that drains from the adjacent subdivision into that

12  basin.

13  Q    So when you say it's holding storm water drainage from the

14  adjacent subdivision, does that mean it's collecting the

15  surface flow from the houses and the pavement that are on the

16  left side of the picture?

17

18  A    Yeah, by state statute, when we develop a community we

19  have to convey the amount of predevelopment storm water that

20  was entering our site, has to leave our site.  And any storm

21  water that we create as part of the development, whether

22  there's run off on the streets or run off from the tile roofs

23  or whatever, all of that post-development water has to be

24  retained on site in some location.

25

1    Q    And if we go to slide 53 showing us the location of the

2    next picture, are the houses on the lower right-hand side of

3    this picture, the houses that are developing that water to be

4    put into the outlet?

5    A    Yes.  These houses plus others.

6    Q    Would you have been permitted the right to have your

7    successors in interest build the houses on those lots without

8    taking care of the retention flows?

9    A    No, we wouldn't.

10   Q    Let's go on to slide 54, which will show us the picture

11   12.  Now here we see a -- actually, I'm going to go back and

12   ask one more question as to slide 52.  There's two little

13   concrete circles with some valve covers, what are those in

14   slide 52?

15   A    Are you referring to this -- these two items in.

16   Q    Yes.

17   A    Those are water valves.

18   Q    Okay, thank you.  Now going to slide 54, picture 12, same

19   general area we've been looking, but now you've oriented

20   around, you're pointed easterly looking at that row of houses;

21   is that right?

22   A    That's correct.

1    Q    Now what is this curb-cutted (sic) apron we see in the

2    foreground of the picture?

3    A    As part of our agreement with SRP, apparently this condor

4    piece of equipment cannot go over a curb, and so every place

5    that we needed to leave the easement to go across the street we

6    had to create a driveway ramp similar to this with no median in

7    the way so that SRP could navigate their piece of equipment

8    through their right of way.

9

10   Q    And beyond the curb cut, is that the road bed of the

11   condor road?

12   A    Yes, it is.

13   Q    Going to slide 55, we've got the same general overview

14   orienting us as to where the next picture 13 is going to be,

15   and --

16

17   A    Can I point something out on that?

18   Q    Certainly, please.

19   A    One thing that we didn't cover.  Even though you see these

20   earthen berms in this location, we're basically holding water

21   all the way across the -- or the SRP power line easement in the

22   location.  And the mechanism we're use to go do that with is

23   this road's actually elevated as it comes through -- this is a

24   super elevated turn, and this side of the road's actually

25

1    elevated to retain water as well.  So we're retaining water in

2    this whole area.  This whole area in here is holding water.

3    Q    And when you're working on entitlements, do you have

4    hydrologists and engineers calculate the capacity of the

5    holdings areas?

6

7    A    Right, and that has to be proved by the town and the

8    county flood department.

9    Q    Now we looked at where we were on picture 13 of the last

10   slide 55.  We now go to slide 56 which is picture 13.  Is that

11   the grassy retention basin you've already described?

12   A    Yes.

13   Q    Show us what just popped up on the screen at the yellow

14   dot location.

15   A    This yellow dot location right here is an inset of this

16   bigger -- of this larger picture.  And this device that you see

17   there is another drainage outlet structure that basically ties

18   this basin to the structure to the south that you'll -- you'll

19   see that outlined in one of the next few slides.

20   Q    Okay.  Going to slide 57.  We've now moved further south

21   to 303rd Avenue?

22

23   A    That's correct.

24   Q    And I think here we've already defined these boxes, so we

25

1    won't dwell on that.  What generally is that structure where

2    the camera and dot 14 is that the SRP road curves around?

3    A    That's the retention basin we just saw in the previous

4    slide.  I'm sorry, that's the retention basin that's further

5    south from the previous slide we just saw.

6    Q    Okay.  If we go to picture 14 on slide 58, can you tell us

7

8    where that retention basin is located?

9    A    Not from this picture, I really can't.

10   Q    Is the camera sitting here essentially on top of the

11   eastern boundary of the SRP easement?

12   A    The eastern edge of the easement is right along the edge

13   of this wall right here.

14   Q    So this is one of the existing houses that sit five feet

15

16   from the edge of the easement?

17   A    Yes.

18   Q    And the gas pipeline is slated to go in 15 feet inside of

19   the easement, is it not?

20   A    Yeah, probably about this location.

21   Q    Okay.  Let's move on to slide 59.  And here perhaps is the

22

23   picture you were thinking of to illustrate the retention basin,

24   picture 15 as shown on Exhibit 60, does that show the retention

25   basin?

1    A    Yes, it does.

2    Q    And then what is that concrete structure on the far left

3    side of the picture with the rails around it?

4    A    That's the outlet structure from the outlet pipe that was

5    in the previous basin showing the connection of this water as

6    it moves through the power line corridor.

7

8    Q    And what are these row of what look to be meter boxes in

9    the foreground?

10   A    Those are landscape controller boxes.  They're controller

11   valves that run the landscaping for the retention basin.

12   Q    Okay.  Slide 61 shows us the orientation of picture 16.

13   And now we'll go to slide 62 which is picture 16.  Is the caged

14   and railed outlet structure shown in this picture on the left

15   side, is that the same one you were just describing?

16

17   A    That one right there?  Yes.

18   Q    Okay.  Now what do we see in the foreground here with

19   additional rails, kind of running from right to left?

20   A    This is an outlet structure that's draining water from the

21   adjacent subdivision into this retention basin, and there's a

22   storm drainpipe that runs from the subdivision to the east into

23   this retention basin.

24

25   Q    Can you draw with your light pen what's under the ground

1  there running from the houses to that outlet structure?  What's

2  the orientation of that line?  Thank you.  Going to --

3  A    Go ahead, sorry.

4  Q    Going to slide 63, still at the 303rd Avenue crossing we

5  see our camera dot 17.  We'll go to slide 64.  Here we're on

6  the crossing looking north?

7

8  A    That's correct.  You can see another one of those

9  driveways -- SRP driveway ramps at that location right here.

10 And there's also a water line that runs right underneath where

11 the gas line is intended to go right in that location, right

12 along here.

13 Q    And we can see that by backing up to slide 63, and it's

14 the blue line that is running basically from the upper

15 right-hand picture to the lower left hand in part of the

16 picture?

17

18 A    Yes, it's this guy right here.

19 Q    Okay, thank you.

20 A    And that line is six feet off the property line -- six

21 feet off the easement of the easement, and it is five to seven

22 feet in depth from the finished grade of that condor road that

23 we built.

24 Q    If the Transwestern line is built 15 feet from the edge of

25

1  that corridor as certificated, what would the separation be

2  between that and the existing water line?

3  A    I don't know, because I don't know the width of their

4  trench, but it would be, you know, four to five feet maximum.

5  Q    All right.  Let's move on to our next picture which is

6  south of the crossing pointed south, picture 18.  Now we're

7  looking towards the southerly part of this phase of Tartesso.

8  And what is depicted in this picture in terms of potential

9  interferences with the gas line?

10 A    Basically you get a clear view of the condor road, another

11 A    Basically you get a clear view of the condor road, another

12 one of the driveway ramps at this point, and some landscaping.

13 This is in the right of way of 303rd Avenue.

14 Q    That's slide 66.  We go to slide 67 now, we'll go to the

15 Celeborn Drive crossing.  We see indicated in the yellow boxes,

16 and we won't draw on them for time purposes, storm drainpipes,

17 other natural gas lines, eight-inch water line.  Now here we

18 see a reference to a 30-inch sewer trunk line crossing the

19 corridor at that location, what is that?

20 A    Basically just what it says it is.  There's a 30-inch

21 major sewer line that runs at this location that basically

22 transports sewer down to the -- eventually down to the sewer

23 plant.

1    Q    And the sewer plant is to the south and west of this

2    location?

3    A    Yes.

4    Q    Tell us what 35 is, the substation location.

5

6    A    Basically because of the magnitude of the Tartesso

7    project, we have agreements with APS to provide a permanent

8    electrical substation.  That's currently being designed.  They

9    were obligated to start the design of that at the point we got

10   500 homes started in the project, and that is, you know,

11   currently under way or supposed to be under way at this point,

12   and that's where that substation location will be.

13   Q    And if we look at 41, that red line, what would that 65KV

14   overhead power line be?

15

16   A    Those are exactly what it says.  Those are 69,000 volt

17   power lines that run from the APS substation and go further off

18   the project to other locations.

19   Q    Okay.  Now up to now we've been looking at actual

20   improvements in the ground.  Are these improvements that will

21   be built when the substation is finished?  The 69KV line?

22   A    The 69CV lines are there today.

23   Q    Okay, what's what I wanted to clarify.

24   A    And the substation will be constructed.  It's, you know,

25

1    at APS's pace, whatever that is.

2    Q    All right.  Let's get on the ground and look at the

3    remaining few photos here.  If we go to slide 68, we're at the

4    Celeborn Drive crossing pointed north.  First off, the apron

5    and valve cover that's in the street there, what is that?

6

7    A    This is a manhole for that 30-inch sewer line.  You also

8    have another retention basin.  You have some electrical vaults

9    here and here that have -- that are underground conduits, you

10   know, in the project.

11   Q    Let me stop you there.  What are electrical vaults?

12   A    They're basically large underground facilities that in

13   this case APS using to service their lines in the project and

14   make connections.

15   Q    And then another retention basin along lines of what we've

16   seen previously?

17

18   A    Yeah, that retention basin actually -- water drains into

19   that from the sports park.

20   Q    And where is the sports park on this picture?

21   A    Right here.

22

23   Q    Going to slide 69, this is the same overhead view showing

24   us the orientation of our next picture 20, which is slide 70.

25   Looking north again, we see a rail -- a railed in structure in

1  the middle of the photo.  Can you tell us what that is?

2  A    Yeah, that's another inlet pipe that's coming off of this

3  subdivision.  There's a storm drain that runs right across the

4  power line easement at that location.  It's picking up the

5  storm water from the -- the post-development storm water from

6  these houses into the basin.

7

8  Q    And that location, it runs directly across the 50-foot

9  easement sought by Transwestern?

10 A    Yes.

11 Q    Going to slide 71, it looks like we're moving northbound a

12 little bit here to picture 21, which is slide 72.  Does this --

13 what does this depict?

14

15 A    This is a picture of the sports park.  It shows the

16 parking lot that we constructed in the power line easement.

17 This device right here is the drainage scuffer that's draining

18 the water from the sports park into that retention basin.  And

19 we also have another SRP driveway ramp for their condor at that

20 location.

21 Q    Slide 73 shows the picture of where the next picture will

22 be on Celeborn Drive.  Slide 22, what is -- picture rather 22

23 on slide 74 of Exhibit 104 shows?

24

25 A    That's just a picture of that blow up of that manhole

1    that's there that we discussed earlier.

2    Q    Slide 75 gives us picture 23, which I put up as slide 76.

3    What is shown by picture 23?

4    A    That's the location of the condor road again.

5    Q    And what is the -- behind the block wall on the right side

6    of the picture?

7

8    A    That's our -- I believe that's our third well site.

9    There's an existing well that we drilled some time ago, and

10   that is in the process of getting the head works put on it

11   right now, and it'll be put in production in the next 90 to 120

12   days.

13   Q    And if we go to another overhead view, 77, the green box

14   of 40, is that well site you just described?

15

16   A    That's correct.

17   Q    Are the lines running from that well site designed to go

18   right out into the SRP easement area?

19   A    You know, I don't know the answer to that question.

20   Q    All right.  Let's move on to slide 78.  What is depicted

21   on slide 78, which is picture 24?

22   A    There's actually two -- there's actually three things on

23   here.  There's this and this and this.  And what those are, the

24   middle item is an electrical manhole cover.  There's a vault in

25

1    there that we installed, and there's a line that runs right on

2    the -- it's a 10-foot easement that runs directly east of the

3    property line of the SRP easement, and it runs a distance of

4    something like a mile and a half down to our sewer plant, and

5    that provides the electrical service for the sewer plant.

6

7          And these two gray tubes are riser, because SRP

8    stubbed those risers out to edge of their easement so they

9    could use them for future times.  And that vault's about six

10   feet deep.

11   Q    And would the Transwestern gas line as planned go right

12   over the top of these improvements?

13   A    Yeah, effectively, or maybe a little bit to the right.

14   Q    Does slide 79 portray from an overhead plan aspect the

15   sanitary sewer crossing?

16

17   A    Yeah, this is the location of the electrical line that

18   goes down to the sewer plant, and it falls right inside the

19   electrical easement, it goes right to our plant which is in

20   this location.  And then we have another conflict at that point

21   where there's an 18-inch sewer line that we just got through

22   the public bid process.  It'll be under construction in about

23   30 days.  It crosses the Salt River Project transmission line.

24   Again, that's an 18-inch sewer line.

25

1   Q    And could you draw with your light pen where the

2   electrical goes to service the sewer plant?  All right, thank

3   you.

4           Let me ask you this question, Mr. Heeter, if Rockland

5   is given clearance to start laying a 36-inch gas line across

6   the improvements we just saw on April 21st, based on your

7   experience, is it possible for them to initiate and conclude

8   meetings with SRP and the county and the federal agencies in

9   and the state agencies in order to approve the moving of all of

10  these hundreds of structures we just reviewed?

11

12          MR. LEMASTER:  Objection, calls for speculation.

13  Lacks foundation.

14          THE COURT:  I'll allow the question.  I think based

15  on his experience in dealing with these very same agencies.

16  That's what it's based on, is it not?

17

18          MR. HIRSCH:  Yes.

19          THE COURT:  All right.  You may answer the question,

20  sir.

21          THE WITNESS:  I think maybe the appropriate way to

22  answer that, Steve, is we started designing some of these

23  improvements in 2001, and we finally got permission to do

24  everything, to start grading in 2004, so it took up

25

1  approximately three years to accomplish that.

2  BY MR. HIRSCH:

3  Q    If -- apart from pipeline construction, if you wanted to

4  move some utilities around and say cut into one of those

5  retention basins or shorten it or make it more shallow, could

6  you just do that, or do you have to seek permission from

7

8  various agencies?

9  A    We'd have to go back to all the original approving

10 authorities and get permission to do anything in those basins.

11 Q    If circumstances arose such that you needed to cut or

12 otherwise move a power line or a dry utility or a raw or

13 potable water line as we saw described here, can you go out and

14 do that, or do you need to get permits to do that?

15

16 A    We need approval of the design, the reconstruction, and

17 the permits to do all that work.

18 Q    Is it possible for you, if you were doing the work to

19 estimate the amount of time it would take your to move say even

20 one of those lines?

21 A    I would say anything that we had to remove or relocate

22 within the SRP power easement would take us at least 18 months

23 to get through the SRP process.

24

25 Q    And is part of that process demonstrating that you are

1    able to replace the capacity of what's being moved -- or the

2    retention basin that's being moved with a like or better

3    capacity?

4    A    Yes.

5    Q    Based on your planning for the undeveloped acreage or

6    Tartesso, is it also planned that you will make similar uses as

7    what we just saw in Phases 1 and 2 of Tartesso of the

8    330-foot-wide SRP easement?

9

10   A    In the little bit of the project that's left, yes.

11   Q    Okay.  My point is, is what we just saw an unusual use in

12   your development experience of an electrical easement corridor?

13   Is it a usual occurrence that developers use?

14

15   A    I would say it's a usable occurrence because neither the

16   town or the developers want just a basic strip of land there

17   with no use in it.

18   Q    Now in connection with the preliminary injunction that

19   Transwestern is seeking in this proceeding, did you have

20   occasion to review the easement form that they have insisted

21   upon in their condemnation filing in this action?

22   A    Yes, I have.

23   Q    And what did you do in looking at the easement form?

24   A    Basically, you know, my first reaction was, you know, I

25

1    don't know how in the world we could ever live with this

2    document with all these improvements that are existing in the

3    ground.

4             MR. HIRSCH:  Judge, at this time I'd like to turn to

5    Exhibit 105.  I'll ask my colleague to pull it up on the screen

6    here.

7    BY MR. HIRSCH:

8

9    Q    Have you got a hard copy of it there with you?

10   A    Yes, I do.

11   Q    Let's go ahead and start why would Landon's pulling that

12   up.  I'm going to turn to slide 2 of Exhibit 105, which is --

13   the Judge has got a hard copy as well, and we'll have it up on

14   the screen in a minute here.  The first paragraph of the

15   natural gas easement.  Now what are these red dots that we see

16   on this document?

17

18   A    I instructed my staff to -- I went through the document,

19   highlighted the issues in the document that we had with it, and

20   then I had them numbered so that I could refer to them as we

21   went through the document.

22   Q    Okay.  We'll try to use this to get through this as soon

23   as possible to conclude your testimony here.  What impact does

24   the word and term that Transwestern would become the "exclusive

25

1    user of this easement" they are seeking have on you from a

2    development perspective?

3              MR. LEMASTER:  Objection, calls for a legal

4    conclusion and misstates the document.  The document speaks for

5    itself.  His legal conclusion is irrelevant.

6              THE COURT:  Well, the objection is sustained to the

7    extent it calls for a legal conclusion.  But as someone who's

8    intimately involved with the construction and operation of

9    these other utilities, I'll allow him to give a response based

10   on his experience as to what impact it would have on their

11   operation.

12

13             THE WITNESS:  In this case I don't know how we could

14   give anybody an exclusive easement to the -- to any portion of

15   the power line corridor when we've already granted other

16   easements to SRP, the Town of Buckeye, and various other

17   entities.

18

19   BY MR. HIRSCH:

20   Q    Would as you would apply the word "exclusive" based on

21   development documents and easements you've seen, in the after

22   pipeline construction situation, would any of the water lines,

23   dry utilities, sewer lines, electrical conduit, retention

24   basins, or any other surface or subsurface use be allowed by

25

1    Transwestern after the preliminary injunction was entered?

2    A    No.

3    Q    Going on to point 2.  We see the yellow line in terms of

4    language that we can read for ourselves that talk about

5    altering and changing the size of a pipeline and other surface

6    and sub surface appurtenances.  What development and

7    constraints practically do you perceive that puts on Stardust

8    Tartesso if this injunction is granted?

9

10   A    Well, we already have issues with the depth of the pipe.

11   They came in and decided they were going to make the pipe

12   bigger or change its location.  Then we have these same issues

13   all over again that we would need to readdress.

14   Q    If we go to 3.  You've got -- sorry -- the words "natural

15   gas" highlighted.  What concern did that give you?

16

17   A    We just were concerned that they don't use the pipeline to

18   transport some other material.

19   Q    And 4, we may have already covered, talking about surface

20   and subsurface appurtenances.

21   A    Yes.

22   Q    Moving on a little lower in the document, but still on

23   page 1, what development impacts on Stardust Tartesso do you

24   see in terms of the dot number 5 yellow language in the

25

1  easement that is being sought in these injunction proceedings?

2  A    My reading of the document is it basically gives them

3  authority to kind of meander around wherever they want to in

4  the power line corridor, if they run into some construction

5  restrictions or impediments.

6

7  Q    And what concern is that of yours?

8  A    Same thing.  We have improvements throughout the power

9  line corridor and we don't really want them disturbed.

10 Q    Moving on to the bottom of page 1 up at the top of page 2,

11 we see it says -- it speaks for itself -- "to have and to hold

12 unto Transwestern those access roads located on the lands."

13 That's point 6.  What development concern is that to you if

14 this preliminary injunction is granted?

15 A    Same thing.  We don't where they want those access road.

16 We haven't been given any maps or where they are.  And they're

17 not provided for in any of the legal descriptions or anything

18 that we've been given at this point.

19

20 Q    Dot 7 talks at a minimum cover of 36 inches.  What -- and

21 that's consistent I'll tell you with what the FERC certificate

22 has allowed.  If a preliminary injunction is granted and

23 immediate possession is granted to allow the pipeline to be put

24 in while that's under review, what development impacts do you

25

1  see to Tartesso?

2  A    That will probably conflict with every single improvement

3  that we have that we've already gone over with, because you

4  have 36 inches of coverage, and another 36 inches of pipe

5  depth, so you have a six inch -- a six foot -- basically a

6  six-inch wall -- a six-foot deep wall of development --

7  non-development from the surface down, and most of our

8  improvements with conflict with that.

9

10  Q    Indication 8 talks about clearing brush and undergrowth by

11  Transwestern.  What development impacts do you feel Tartesso

12  would suffer if the -- if immediate possession was granted in

13  this instance?

14

15  A    Item 8 actually includes the impounding of water that's

16  further up in that paragraph, Steve.  And basically this

17  provision restricts us from holding any water in the

18  Transwestern pipeline, which you've already seen we're doing

19  currently, and we'd also have to remove all of our vegetation,

20  and they would have no responsibility to put it back or

21  maintain it.

22  Q    So you were referring initially to "the grantor shall not

23  impound water within the easement area."

24  A    Right.

25

1  Q    Moving on to number 9 on the bottom of page 2 in paragraph

2  3 of the sought easement.  What is the development concern you

3  have, in any, concerning that language?

4  A    This is basically another statement about the fact that we

5  can't maintain any landscaping in the easement.  And then

6  they're also going to replace the wells.  The problem with the

7  statement about replacing the wells, is those wells are

8  engineered in a certain location, and in order to, you know,

9  reengineer them and get them re-approved to the various state

10 and city approval process is going to take a long time to get

11 done.

12 Q    From your development perspective, Mr. Heeter, do you see

13 any way that Rockland construction between April and October of

14 this year can relocate the wells on your Tartesso property and

15 secure all the necessary permissions to do so?

16 A    I don't know how they're going to get through SRP in that

17 time frame.

18 Q    If we go the number 10, paragraph 4 of the easement, this

19 talks about what Transwestern is seeking the Court to order

20 that they may do with spoils -- or the dirt that's dug up from

21 your easement corridor.  What is your concern regarding

22 paragraph 4?

1    A    Well we have -- we have several concerns.  First of all,

2    they're basically suggesting that they're going to trench --

3    put their pipe in, and then they're basically going to take the

4    spoils from the site, put them on the top of the trench, and

5    then just leave a crown there without doing any compaction or

6    water settling of the trench after the fact, which is going to

7    allow water to move around through that trench and settle --

8    cause settlement of other improvements that we have in the

9    power line corridor.

10   Q    Okay.  The last sentence reads, "That grantor" -- that's

11   you -- "Stardust Companies will agree to provide to

12   Transwestern a location where they can dump their excess soil

13   and rock."  What development constraints do you see if the

14   Court orders the -- entered the order they are seeking in these

15   proceedings on Stardust under that clause?

16   A    That simply creates a burden for the developer to -- at

17   the future date have to remove that soil to some other offsite

18   location at our -- you know, it'd be at our cost, I assume.

19   Q    Paragraph -- or point 11 addresses a date on paragraph 5.

20   What is your issue you wish to raise concerning that provision?

21   A    I don't know have an issue with that at this point,

22   Steve.  I thought the day was different.

1  Q    If we go to point 12, there's a provision concerning

2  conditions imposed by Transwestern on your construction

3  activities.  What concerns does that raise in your mind if the

4  Court gives them that right?

5  A    Our experience with all utility companies has been that we

6  -- first of all they're not reasonable generally, and secondly

7  that the time frame to get anything approved takes a very, very

8  long time.

9

10 Q    If we go on to point 13 on page 3 of the easement there's

11 a number of -- well, there's a provision here (D) that talks

12 about conditions of surface and subsurface utilities.  What are

13 your concerns from Stardust's perspective if immediate

14 possession is granted on these terms?

15 A    Based on the existing improvements that we have in ground,

16 I don't think there's any way that we could abide by anything

17 that's in subsection (D), (E), or (F).

18

19 Q    And I will just scroll through those, the Court has a hard

20 copy of this.  Moving on to the next page of the easement

21 sought by Transwestern in these immediate possession

22 proceedings, we go to tabs -- or note 16 which is (G).  Are

23 those -- what are your comments concerning these provisions?

24

25 A    Well, basically paragraph subsection (G) gives

1    Transwestern the right to remove any of the roads that we've

2    constructed in the site.  And these are the actual access

3    ingress and egress roads for the residents living in the

4    community, and there's no requirement for them to provide any

5    secondary access or any means of ingress or egress to these

6    residents while this construction is taking place.

7

8    Q    If we look at paragraph 17, grantor is Stardust, correct?

9    A    That's correct.

10   Q    What concerns do you have about the Court entering as part

11   of its immediate possession order an order that you, at your

12   sole cost and expense, are responsible for maintaining and

13   repairing the roads following the installation of the pipeline?

14   A    Well the way I read this is basically requiring us to

15   remove all of our improvements and put them in a location

16   that's not going to conflict with the pipeline.

17

18   Q    Okay.  In your view, Mr. Heeter, is it feasible to do that

19   inside of a one-year time frame?

20   A    I honestly don't even know how I'd get permission to do

21   that within 18 months.

22   Q    Okay.  As you sit here, can you even conceive of a place

23   where for example you could move the storm water retention

24   facilities that were a condition of the homes to be built that

25

1  are there now to another site off site?  Where would that water

2  go?

3  A    You know honestly I haven't really given it much thought,

4  but you know, given enough time and enough money we can do

5  anything.

6
7  Q    Point 18 relates to subparagraph (I) as shown on the

8  screen.  What is the development constraint or conflict you see

9  regarding this term that Transwestern is seeking?

10 A    This is another portion of the easement that talks about

11 their ability to remove the landscaping and no obligation to

12 replant or restore anything.

13
   Q    Tab 19 in subparagraph  6(J) at the bottom of page 4.
14
   What are your --
15
16 A    I thought that's what we were talking about, I'm sorry.

17 Q    Okay.  Point 20, what your concern with paragraph 8?

18 A    I don't really have an issue with that Steve.

19 Q    But no dates have been provided --

20 A    Right.

21
   Q    -- for you in that, correct?
22
   A    That's correct.
23
24 Q    Tab 21, it's both in paragraph 11 of one of the easements

25 that's being sought, and in the opening paragraph -- I'll move

1   on to the next slide of another easement that's being sought

2   from you -- it talks about the term "warranting."  What

3   concerns does that have to you as president of Stardust

4   Companies?

5

6   A    We never agreed to warrant anything that we're forcibly

7   required to give to any municipality or utility company.  If

8   somebody wants to take something from us they're not going get

9   it with a warranty from us.

10  Q    Have you ever in your experience been the subject of a

11  condemnation where the condemnor is attempting to condemn not

12  only the property from you, on kind of a quitclaim basis, but

13  is trying to condemn from you an obligation to warrant title

14  against the world to them?

15  A    We've never had to do that.

16

17  Q    And paragraph 22 -- I'm sorry, point 22 on paragraph 13 of

18  this easement in the Stardust structured investments number 9

19  case, what is your concern with that language?

20  A    I don't know if there's going to be future agreements or

21  not, so I don't know if that's going to be appropriate or not

22  until we know that.

23  Q    Now these easements contain attached engineering drawings,

24  and I see that you've added a few notes of concern regarding

25

1    the engineering drawings.  Can you tell us what the concern is

2    regarding point 23?

3    A    Generally, when we are dealing with condemnations, we

4    generally get, you know, an ALTA survey of the property to be

5    condemned with the location of all the rights of ways and

6    various other things that are on the property, along with a

7    title report, and then we also get some way to tie down the

8    points of beginning.  And we haven't been supplied any of that

9    at this point.

10   Q    Does that summarize the concerns with 23, 24, and 25?

11   A    Yes.

12   Q    One of the legal descriptions on an exhibit of the sought

13   easement you've highlighted a beginning of a plain and a

14   distance.  What was the concern there?

15   A    We haven't been able to tie those points of beginning

16   down.

17   Q    And paragraph -- another point 25, that's one of the

18   points of beginning.  Your own surveyors have not been able to

19   tie it down?

20   A    That's correct.

21   Q    Finally on this exhibit there's a reference to the SRP

22   easement area eventually being deeded to a community

1    association.  Can you explain what the obligation is of the

2    Stardust Companies in that regard?

3    A    Under the conditions we have with the Town of Buckeye, the

4    actual easement area is -- the fee title of the easement area

5    is going to be conveyed to the Tartesso Community Association

6    which is the homeowner's association that's ultimately going to

7    be responsible for its maintenance.

8

9    Q    That has not happened as of this date?

10   A    Has not.

11   Q    And another point on your exhibit is 27.  Has Transwestern

12   offered to pay the cost of any of your internal expenses in

13   verifying its legals and acreages or an ALTA survey as you've

14   described?

15   A    Has not.

16

17   Q    Point 28 talks about damages that would be caused for

18   suspension of these utility services and cutting of the lines

19   and the like.  Have any provisions been communicated to you by

20   Transwestern or any of its representatives to so provide?

21   A    They have not.

22   Q    And 29 relates to remedies running against -- back against

23   Transwestern.  Did you see any -- or understand that there are

24   any and what they are condemning from you?

25

1    A    I did not.

2    Q    Point 30 talks about improvements to be installed in the

3    easement.  Do you perceive that if the immediate possession

4    order or preliminary injunction is granted here that you would

5    retain that right?

6

7    A    No, we wouldn't.  We wouldn't have any right to maintain

8    our improvements without Transwestern's approval.

9    Q    And can you -- we can read for ourselves what note 31 says

10   in the PowerPoint, but can you tell us in your own words what

11   the concern is regarding this point?

12   A    My reading of the easement requires us to install

13   improvements within the easement under a certain set of

14   standards.  And I don't think any single item that we've put in

15   the easement to date would meet the standards in the easement.

16

17   Q    And when you say "certain standards," I don't know what

18   you mean.

19   A    They need to be approved, they need to be at a certain

20   depth, they need to be designed to carry certain load; various

21   things like that.  And we didn't know this was existing, so

22   none of that's been taken into account at this point.

23   Q    Okay.  They were approved under a different set of

24   circumstances than they would be after the pipeline?

25

1    A    That's correct.

2    Q    Finally, point 32 talks about environment, medical issues,

3    and we talked about water and some of the other environmental

4    issues.  Did you see anything in the easements that are part of

5    the condemnation that would provide for a duty by Transwestern

6    to indemnify you?

7

8    A    No.

9         MR. HIRSCH:  Judge, I have a few more questions.

10   Might this be a good time for a break, or do you want me to

11   complete?

12        THE COURT:  Let me inquire before I decide.  Will

13   thereby other defense counsel who wish to present questions to

14   Mr. Heeter?

15

16        MR. PENNARTZ:  Your Honor, David Pennartz for the

17   Buckeye Defendants.  I have a few questions for Mr. Heeter, not

18   long.

19        THE COURT:  Anything else?

20        UNIDENTIFIED SPEAKER:  Your Honor, I don't believe I

21   have any.

22        THE COURT:  All right, let's see if we can finish

23   with your direct and Mr. Pennartz direct and then we'll take a

24   break after that.

25

1       MR. HIRSCH:  Thank you.

2   BY MR. HIRSCH:

3   Q    Mr. Heeter I'm going to wind up with the number and

4   content of discussions, communications, and meetings you or

5   your forces have had with the Transwestern folks.

6       How many meetings -- well let's break it down by time

7   frame.  How many meetings were you invited to attend -- well,

8   let's just leave it to invited to attend -- that you're aware

9   of by Transwestern concerning its proposed line at any time

10  before pre-filing occurred in November of 2005?

11  A    2005 or 2006?

12  Q    I'm starting with 2005.  Do you recall any such

13  invitations or meetings?

14  A    No.

15  Q    Okay.  We heard through the other testimony and it's in

16  the record that pre-filing docket number was assigned in

17  November of 2005 and various procedures took place for public

18  input.  Did you ever receive anything in the mail -- you were

19  here when Mr. Runte -- were you here when Mr. Runte testified

20  about thousands of mailers to all of the property owners?

21  A    No, I was not here for that.

22      MR. LEMASTER:  Objection, Your Honor, this is

1   irrelevant to this proceeding whether he received any FERC

2   filings in the mail.

3              THE COURT:  Mr. Runte testified that they were sent

4   out.  I'll allow him to examine on this topic.

5              MR. HIRSCH:  Okay.

6   BY MR. HIRSCH:

7

8   Q    Do you remember seeing and notice from Transwestern in the

9   mail that they were considering applying for a pipeline to go

10  through Tartesso?

11  A    I don't recall that.

12  Q    Okay.  Did you have any meetings of any nature with

13  representatives of Transwestern before early August of 2006?

14  A    No, I did not.

15  Q    What -- did you have any meeting with Transwestern -- have

16  you had any meetings with Transwestern since August of 2006 on

17  pipeline conflict and construction issues such as we've talked

18  about today?

19  A    No, we haven't.

20  Q    Okay.  What occurred at the early August of '06 meeting?

21  Where was it held?

22  A    It was held in the Stardust officers.

23  Q    Okay.  What occurred at the meeting?

24

25

1  A    Basically, Transwestern showed us that they were going to

2  put this pipeline in the SRP power line corridor.  We showed

3  them the development plans, we showed them the aerial maps that

4  we had at that time of the progress of the development, and we

5  also gave them the location for the alternative route at that

6  meeting.  That was basically the gist of the meeting.

7

8  Q    Okay.  Did you get any indication from the meeting that

9  Transwestern was actively considering any other route as it

10 related to Tartesso other than through the SRP corridor?

11 A    We didn't discuss any other routes, so I'm assuming they

12 didn't.

13 Q    Did anyone from Transwestern ever get back to you with any

14 follow up inquires or questions about the alternative route

15 that had been proposed?

16

17 A    No.

18 Q    Did anyone from Transwestern ever get back to you with any

19 follow up questions concerning the conflicts or interferences

20 that would arise if the line was put into the SRP corridor

21 through Tartesso?

22 A    No.

23

24 Q    No follow up questions with your planning or engineering,

25 public affairs, environmental people?

1    A    Nobody.

2    Q    Okay.  Since these actions were filed, have you had any

3    meetings with Transwestern to -- where they expressed any

4    willingness to discuss or come off of any of the easement

5    points that we just went through?

6

7    A    No, I haven't.

8    Q    Okay.  Have you expressed to them your eagerness to sit

9    down and meet and discuss with them those points?

10   A    Through you we have.

11   Q    Have any such meetings occurred?

12   A    No.

13           MR. HIRSCH:  Okay, that's all I have, Your Honor.

14           THE COURT:  Thank you, sir.  Mr. Pennartz.

15                      DIRECT EXAMINATION

16

17   BY MR. PENNARTZ:

18   Q    Good afternoon, Mr. Heeter.  For the record, David

19   Pennartz, for the Buckeye Defendants.

20           I don't use the fancy machine here, but I can use the

21   Elmo on a couple of things.  I think this was slide 35.  If we

22   can get the Elmo on.  That's the one that -- I think you were

23   here for the fire chief's testimony?

24

25   A    I was here for part of it.

1    Q    For part of it.  I don't know if you recall me showing the

2    fire chief this and him identifying this as one of the

3    temporary fire stations in the Town of Buckeye; do you remember

4    that?

5    A    No, I don't.

6    Q    Okay.

7    A    But that's what that is.

8    Q    But you testified during your testimony that this was one

9    of the temporary fire station sites, and I think it's also one

10   with the cell tower site behind it?

11   A    That's correct.

12   Q    Okay.  Let me go back one slide.  I think this will be

13   slide 34.  And right in this location, is this showing that

14   same fire station?

15   A    Yes, it is.  And behind that in the green box is the

16   second water storage facility and the well site.

17   Q    So in terms of orientation to the edge, the easement would

18   be approximately here?

19   A    Yes.

20   Q    Okay.  And -- I'll show you another one of the slides, it

21   was -- I don't know what slide number it was.  It was one of

22   your earlier slides.  It was about number 10 or so.  I don't

1  know if you remember seeing this one about the community master

2  plan?

3  A     Yes.

4  Q     Do you remember that?

5  A     Yes.

6  Q     Okay.  Let's get back into the entitlement issue just very

7  briefly if you will.  And you were talking about it from the

8  developers standpoint that before you can utilize your property

9  you've got to get approval from government regulatory agencies,

10 correct?

11 A     Yes.

12 Q     And one of those is the local government that regulates

13 land use, correct?

14 A     That's correct.

15 Q     And in this case that's the Town of Buckeye if it's

16 annexed within the town?

17 A     That's correct.

18 Q     Okay.  So part of the entitlement process to the Town of

19 Buckeye, if I understand your testimony correctly, was that the

20 Town of Buckeye for a project of this size requires a community

21 master plan?

22 A     That's correct.

1   Q    Okay.  So instead of just doing it in a zoning and regular

2   subdivision basis, if it was a few hundred lots, they require

3   you to master plan the area?

4   A    That's correct.

5   Q    And when you showed -- I think it was slide 2 that had all

6   the colored developments up and down the Sun Valley Parkway,

7   are those similar community master plan type projects?

8

9   A    The process is the same, yes.

10  Q    Okay.  So each one of those would be going through that

11  same process of a community level master plan?

12  A    Yes.

13  Q    Okay.  And what are the types of things, just briefly that

14  are considered in a community master plan -- are required to be

15  considered in a community master plan?

16

17  A    Really it's just about anything you could imagine.  We

18  basically have a master transportation plan.  We have a master

19  sewer plan.  We have a master water plan.  We have a storm --

20  master storm drainage plan.  We have land use plan.  We have

21  density calculations.  We have setback requirements.  We have

22  -- oh, I don't know, I mean the list just goes on and on.  It's

23  a very comprehensive document.  They're about four inches

24  thick.

25

1    Q    And how long does that process take in the Town of Buckeye

2    to go through getting a community master plan submitted and

3    approved for Tartesso?

4    A    Well, we actually have two of them.  We have Tartesso, and

5    we have Tartesso West.  And we have two development agreements,

6    so we have actually two documents, because the projects split

7    in two pieces.  The Tartesso one we started in 2000, and it was

8    approved I believe in late 2001.  And the Tartesso West one we

9    started in 2001, and you guys have the date of the development

10   agreement, which was sometime in 2003.  So I would say 18 to 24

11   months.

12   Q    Okay.  Now according to the slide there's a development

13   agreement that goes with that?

14   A    Yes.

15   Q    And the development agreement is entered into between the

16   master developer, in your case Stardust and the Town of Buckeye

17   as the regulatory authority?

18   A    It's actually entered into between the property owner and

19   the Town of Buckeye, and it's a recorded document against the

20   property.

21   Q    Okay.  And your understanding is once that's signed it

22   gets recorded in the county recorder's office against the

1    property?

2    A     Yes.

3    Q     Okay.  And so if that's got a 35-year term, what you're

4    saying is for 35 years that governs all of those things like

5    transportation, land use, and all those things you mentioned

6    within that area?

7

8    A     That's correct.

9    Q     So you're talking about -- I think you said on the

10   developer side there's the entitlements issue and it gives you

11   to authority to build.  And I think you said -- your word was,

12   "it also imposes obligations."  Now those obligations -- I'm

13   usually on the city attorney's table on these sorts of things.

14   A     I understand.

15   Q     Or across from you and your lawyer are arm wrestling over

16   these issues, correct?

17

18   A     That's correct.

19   Q     Okay.  But from the town's standpoint, what do those

20   obligations mean to the town as far as controlling those

21   issues, if you know?

22

23   A     Well it imposes certain obligations on us to -- there's

24   certain time frames in the agreement.  There's certain

25   obligations for us to construct certain improvements.  There's

1    certain obligations in the document that obligates us to pay

2    for operating deficits of certain town facilities or town

3    services.  And then it also -- there's warranty obligations in

4    the agreement.  There's a variety of things that are in there.

5    I mean, I don't have the whole document in front of me, but

6    there's a number of things.

7

8    Q    Certainly.  But from that standpoint then, all of those

9    services and facilities in the instance of Tartesso West were

10   planned without regard to this pipeline coming through the area

11   and disrupting that planning, correct?

12   A    That's correct.  Both master plans and development

13   agreements were in full force prior to any knowledge of the

14   transmission line -- or the gas line.

15   Q    Okay.  So stepping away for a moment to a little bit

16   broader view, not so much at the level of at this point there's

17   this water line, but from more of a -- I forget, 1358 acres are

18   commercial, I think you have 12- or 13,000 acres you said --

19   A    Yes.

20   Q    -- in the master plan?  From that level planning

21   standpoint, does the pipeline in your experience, as a

22   developer trying to get these entitlements and submit these

23   plans, have any bearing on the ability to plan those things?

24

25

1   A    You mean if we'd known about it ahead of time?

2   Q    Oh, what if it comes in now if you have to retrofit and

3   detail with it?

4   A    Yeah, I think everything will have to be changed in the

5   master plan if this thing comes through.

6   Q    Okay.  And that's something -- so basically what you're

7   saying is that master plan has to be redone?

8   A    That's correct.

9         MR. PENNARTZ:  I have no further questions,

10  Your Honor.

11        THE COURT:  Thank you, Mr. Pennartz.  On the

12  assumption, which I assume is reasonable, that the Plaintiffs

13  will have some examination, we'll take a recess at this time,

14  unless you're going to tell me you don't have any examination.

15        MR. LEMASTER:  I have some, Your Honor.

16        THE COURT:  All right.  Well we'll give the witness

17  and all the rest of us an opportunity for a brief recess then.

18  We'll take a 15 minute recess at this point.

19     (Recess)

20        THE CLERK:  All rise.  Court is now in session.

21        THE COURT:  Good afternoon again.  Please be seated.

22  I think we're ready to commence cross-examination of Mr. Heeter

23  at this time.  Mr. Lemaster, when you're ready.

24        MR. LEMASTER:  Thank you, Your Honor.

25

1             CROSS-EXAMINATION

2    BY  MR. LEMASTER:

3    Q    Good afternoon, Mr. Heeter.  I'm John Lemaster and I

4    represent TransWestern in this matter.  I want to go over just

5    a few things that you talked about today.  You had some

6    discussions with Mr. Hirsch and Mr. Pennartz regarding

7    entitlements.  Do you recall that testimony?

8    A    Yes.

9    Q    And you said there are a variety of stages in the

10   entitlement process; correct?

11   A    That's correct.

12   Q    And once those entitlements are given and the conditions

13   that existed under them are met, those entitlements can't be

14   revoked; correct?

15   A    That's not correct.

16   Q    When can they be revoked?

17   A    They can be revoked if certain timeframes aren't met.

18   Q    That's what I meant by conditions.  If the conditions are

19   met they can't be revoked; correct?

20   A    That's correct.

21   Q    And the TransWestern pipeline project doesn't revoke those

22   entitlements, do they?

23   A    Not that I'm aware of.

24   Q    And that's true whether immediate possession is given now

25   or whether this case proceeds to trial; true?

1   A    I don't know the answer.

2   Q    You're not aware of any reason the perm -- or the

3   entitlements would be revoked because of the immediate

4   possession being given; correct?

5   A    I'm not aware of any.

6   Q    Let me show you slide 5, one of the exhibits in your slide

7   presentation.  And I believe that the yellow line through the

8   Tartesso development approximately -- I think I might be able

9   to draw here.  No, not on that one.  Does it?

10       (Counsel and clerk confer)

11           MR. LEMASTER:  Oh yeah.

12           MR. PENNARTZ:  It's a challenge.

13           MR. LEMASTER:  I don't think I'll get anywhere close

14   on this.  Yeah, I'm not.  So how do I get rid of it?

15       (Counsel and clerk confer)

16           MR. LEMASTER:  All right, thank you.

17   BY MR. LEMASTER:

18   Q    I won't do that then, I apologize.  I'll do it with my

19   finger over the elbow.  The yellow line here, that's basically

20   the SRP easement; correct?

21   A    Yes.

22   Q    And when these developments, Tartesso developments were

23   entitled, you took into account the SRP easement in developing

24   the properties; correct?

25   A    That's correct.

1  Q    And I think you indicated that you can't build houses or

2  vertical structures within that easement; correct?

3  A    That's correct.

4  Q    You also understand that the TransWestern pipeline is

5  going to be entirely within that easement?

6  A    As it passes through that portion of Tartesso, yes.

7  Q    Let me show you another one of those slides.  And I

8  apologize, I don't remember what slide number it was, but it

9  shows number 39, which is a well site.  Do you recall that

10 slide?

11 A    Yes.

12 Q    In fact several of the slides had well sites on them;

13 correct?

14 A    Yes.

15 Q    And in each case the well site is outside of the easement

16 area; correct?

17 A    The raw water well sites are, yes.

18 Q    And again I don't recall the slide numbers, but these are

19 some slides where you show some, think you called them CAD

20 drawings of certain utilities and other improvements within the

21 easement area; is that correct?

22 A    Yes.

23 Q    And those improvements included things like waterlines and

24 cable lines, and some retention basins and things like that;

25 correct?

1   A    Yeah.  Different slides had different things.

2   Q    And you're aware -- this is a little hard to read, but

3   you're aware that there was a final environmental impact

4   statement issued on this project?

5   A    Yes.

6   Q    You're aware that TransWestern has to comply with the

7   conditions and the obligations set forth in that environmental

8   impact statement?

9   A    I'm not sure of that.

10  Q    You don't have any reason to doubt that?

11  A    No.

12  Q    We look here where it says survey and staking, the last

13  sentence.  It's a little hard to read, but it says "Existing

14  utility lines and other sensitive resources would be located

15  and marked to prevent accidental damage during pipeline

16  construction"; is that correct?

17  A    I see that.

18  Q    This is also a part of the environmental impact statement.

19  This paragraph -- and it's the second full paragraph on the

20  page, of 320 of the environmental impact statement.  Says "To

21  address concerns raised by developers in the town of Buckeye,

22  the pipeline would be installed below existing utilities that

23  are within approximately 7 feet of the land surface"; is that

24  correct?

25  A    Yes.

1    Q    And in Tartesso there are certain areas where utility

2    crossings are in place; correct?

3    A    Yes.

4    Q    And certain crossings where they're not in place; correct?

5    A    Yes.

6    Q    You talked about -- and by the way, that's going to be

7    true -- those utility crossings that are in place today,

8    they're going to be in place if the preliminary injunction is

9    granted today or whether this case goes to trial on the merits

10   before possession's given; correct?

11   A    I'm not sure I understand the question.

12   Q    Nothing's going to change about the existing utilities

13   that are in place today and three years from now when this case

14   goes to trial, or two years from now, or a year from now when

15   this case goes to trial on just compensation, on existing

16   utilities?

17   A    I don't know the answer to that.

18   Q    You might change some, you might not?

19   A    I don't have any way to answer the question.  I'm not sure

20   I understand it.

21   Q    Okay.  Let me try it this way.  Today, under the document

22   I just read you, TransWestern has to go under existing

23   utilities that are at 7 feet and above.  Is that what the

24   document stated?

25   A    I think that's what it said.

1    Q    Okay.  And that's going to be true today or later down the

2    road under this obligation; correct?

3              MR. HIRSCH:  Objection; lack of foundation.  The

4    document's inconsistent with a condemnation action in any

5    event.

6              THE COURT:  That may be, but he's asking a question

7    about the document.  You can certainly follow up with some

8    further questioning when your turn comes.

9              THE WITNESS:  I don't have any -- I don't really know

10   the answer to the question.

11   BY MR. LEMASTER:

12   Q    You were talking about the process Tartesso had to go

13   through to get its permits from Salt River Project with the

14   easement; correct?

15   A    Yes.

16   Q    Do you know that Salt River Project is one of the

17   customers or shippers on the TransWestern pipeline project?

18   A    Yes.

19   Q    Do you know where TransWestern stands in its agreement

20   regarding access to the SRP easements in this case?

21   A    No, I don't.

22   Q    You're aware when a complaint was filed in this action, I

23   believe there are two, maybe three against Stardust and the

24   Tartesso development, that there were plats attached to the

25   complaint?

1  A    Yes.

2  Q    And you understand that that's the property that

3  TransWestern is seeking to take in this case?

4  A    I understand they're trying to obtain easement over it.

5          MR. LEMASTER:  That's all I have, Your Honor.

6          THE COURT:  Thank you, Mr. Lemaster.

7          Mr. Hirsch, did you have anything further?

8          MR. HIRSCH:  If I could have a minute, Your Honor.

9          THE COURT:  Certainly.

10                     REDIRECT EXAMINATION

11 BY MR. HIRSCH:

12 Q    Chris, do you remember a process server showing up at the

13 office out at Stardust with a boxful of documents of suit

14 papers in this case?

15 A    Yes.

16 Q    Okay.  And do you remember shipping them immediately over

17 to me and not wanting to look at them?

18 A    Yes.

19 Q    Okay.  I'm going to put on the Elmo the complaint for what

20 I believe is the MA numbers for the Stardust Tartesso case.  In

21 reviewing and preparing your PowerPoint and your easement point

22 of contention exhibit that we looked at earlier, were you

23 operating under the understanding that the scope of the

24 condemnation in this matter was that -- was driven by the terms

25 of the easement that was attached to the complaint?

1    A    Yes.

2    Q    If we ask you to focus on paragraph 21 of the complaint,

3    did you note the terms that says -- alleges that TransWestern

4    has the right to condemn a perpetual easement and right-of-way

5    consistent with the terms of Exhibit 3, the terms of which are

6    incorporated herein?

7    A    Yes.

8    Q    And did you turn to the index of exhibits and see that

9    Exhibit 3 was the proposed form of easement?

10   A    Yes.

11   Q    And in pulling up the easements that you put in the slide

12   show that we looked at earlier, did you see that those

13   easements were the Exhibit 3 easements?

14   A    Yes.

15   Q    Is that the reason why you expressed concerns over the

16   scope of the taking based on those easements?

17   A    Yes.

18   Q    Now the easement you were served with said that

19   TransWestern was seeking from this Court the right to

20   immediately possess your properties such that they could build

21   the pipe 36 inches below the surface of the ground, not 7 feet;

22   correct?

23   A    That's correct.

24   Q    Did you see anywhere in the complaint or the easement

25   document that said "Ah, but for you, Mr. Heeter, we'll go 7

1   feet under existing utilities"?

2   A    No.

3   Q    In the August of 2006 meeting, admittedly pre-FERC filing,

4   did any of the TransWestern people, when faced with the plans

5   you were giving them, say "Oh, we'll be happy to bury it deeper

6   than 36 inches where you have existing utility conflicts"?

7   A    No.

8   Q    Since these concerns were raised, has anyone at

9   TransWestern offered to amend the terms of its easement as to

10  Stardust Tartesso to allow you the concession of offering to

11  bury the line as much as 7 feet under existing utilities?

12  A    No, and we haven't received any offers to figure out what

13  we're going to do with the lines that run parallel to their

14  line either, which was -- which is a different depth issue.

15  Q    Okay.

16  A    We have a separation issue there, not a depth issue.

17  Q    The crossings relate to the perpendicular issues running 7

18  feet under.

19  A    Plus we have many crossings that are 8 feet, 16 feet, 20

20  feet.  So we have things that are way deeper than 7 feet.

21  Q    Is -- has there been any dialogue whatsoever with the

22  TransWestern engineers such that, at least from you, that they

23  have been transmitted the depth of any of the existing

24  utilities at Tartesso?

25  A    We haven't had any dialogue with anybody at TransWestern

1    about anything.

2    Q    Has anyone from Rockland contacted you regarding steps to

3    survey, stake or mark surrounding utilities so as not to damage

4    them during construction?

5    A    No.

6    Q    Had you ever met the superintendent who was on the stand

7    today from Rockland?

8    A    No.

9            MR. HIRSCH:  That's all I have, Your Honor.

10           THE COURT:  Thank you, sir.

11           Mr. Pennartz, did you have anything further?

12           MR. PENNARTZ:  No, thank you, Your Honor.

13           THE COURT:  Mr. Braselton, did anything in

14   Mr. Lemaster's examination cause you to wish to pose questions?

15           MR. BRASELTON:  No, Your Honor.  Thank you.

16           THE COURT:  And any other defense counsel have

17   anything?

18           Anything further from you, Mr. Lemaster?

19           MR. LEMASTER:  No, Your Honor.

20           THE COURT:  Thank you very much, sir.

21           THE WITNESS:  Thank you, sir.

22           THE COURT:  I very much appreciate you coming in and

23   giving us --

24           THE WITNESS:  Appreciate the opportunity --

25           THE COURT:  -- your testimony.

1          THE WITNESS:  -- to testify.

2          THE COURT:  Who would the next witness be for the

3     defendants?

4          MR. PENNARTZ:  Your Honor, David Pennartz for Town of

5     Buckeye.  We would call the town engineer, Woody Scoutten,

6     Woodrow Scoutten.

7          THE COURT:  All right.  If he's in the courtroom --

8     please step forward, sir.  And if you'll stand in front of the

9     lady who is seated here just in front of me, she will give you

10    an oath.

11         THE CLERK:  Would you please state you name, and

12    spell it for the record.

13         THE WITNESS:  Woodrow Charles Scoutten, Jr.  W-O-O-D-

14    R-O-W, C-H-A-R-L-E-S, S-C-O-U-T-T-E-N.

15         THE CLERK:  Thank you.  Please raise your right hand.

16      WOODROW C. SCOUTTEN, JR., DEFENDANTS' WITNESS, SWORN

17         THE CLERK:  Thank you.  Please have a seat.

18         MR. PENNARTZ:  Your Honor, maybe while Mr. Scoutten

19    is doing that, just a couple housekeeping matters.  I think

20    when we had Chief Costello on the stand I didn't actually admit

21    his resume, Defendant's Exhibit Number 103, even though the

22    Court accepted him as an expert witness.  I would move to admit

23    Defendant's 103.

24         THE COURT:  Any objection to that?  All right,

25    Exhibit 103 is admitted if it wasn't previously admitted.

1      (Defendant's Exhibit 102 received)

2          MR. PENNARTZ:  Then one other housekeeping thing.

3  During these proceedings the Stardust Tartesso defendants have

4  electronically filed document 91 in the weed case, CV 07-2287,

5  which is a notice of defendant's submissions of portions of the

6  FERC record.  And the Buckeye defendants would join in that as

7  well without filing -- efiling joinders, if the Court would

8  allow.

9          THE COURT:  All right.  I understand you joined in

10  that filing.

11          MR. PENNARTZ:  Thank you.

12          THE COURT:  If you're ready then, please proceed.

13          MR. PENNARTZ:  Yes, thank you very much, Your Honor.

14                      DIRECT EXAMINATION

15  BY MR. PENNARTZ:

16  Q    Would you please tell the Court your name and what your

17  position is?

18  A    My name is Woodrow Scoutten.  I am a consulting engineer.

19  I serve as the town engineer for the Town of Buckeye.

20  Q    Are you a registered professional engineer?

21  A    Yes.

22  Q    Okay.  And how long have you been a registered

23  professional engineer?

24  A    Oh, about 28 years.

25  Q    Okay.  And how long have you served as the town engineer

1    for the Town of Buckeye?

2    A    Since 19 -- September 1995.

3    Q    and have you served as a city or a town engineer for any

4    other communities in Arizona?

5    A    Yes, I have.

6    Q    Have you served with the City of Tolleson?

7    A    Yes, City of Tolleson for about 25 years.

8    Q    Okay.  Any -- what are the other communities in Arizona

9    that you can recall that you serve or have served as the town

10   or city engineer for?

11   A    The town of Dewey Humboldt, the town of Star Valley, the

12   city of Wilcox, the town of Huachuca City, the city of

13   Litchfield Park.  I'm sure I'm leaving out a few, but --

14   Q    City of Surprise?

15   A    For a short period, yes.

16   Q    For a short period.  And Surprise is at the upper end of

17   the Sun Valley Parkway area we're talking about?

18   A    That's correct.

19   Q    Okay.  What about Gila Bend?

20   A    Yes.  I did serve as the town engineer for the town of

21   Gila Bend for --

22   Q    I --

23   A    -- about three years.

24   Q    We had testimony from another witness that State Route 85,

25   where it takes off from Interstate 10 and goes south through

1    the edge of Buckeye, goes down to Gila Bend, intersects

2    Interstate 8.  So just to orient the Court, that's -- Gila Bend

3    down there is where you also served as the town engineer?

4    A    That's correct.

5    Q    Okay.  Have you also worked with, either in that capacity

6    or in any other capacity, with developers with regard to

7    project planning?

8    A    Yes.

9    Q    Okay.  And would you give the Court an idea of your

10   background and experience in that respect?

11   A    Well, with -- as city engineer for the City of Tolleson,

12   of course, I've been involved in all of the land development

13   projects that have occurred in the city of Tolleson for the

14   last 25 years.  For the City of -- for the Town of Buckeye I've

15   been involved in all of the land development projects that have

16   been planned or constructed in the town of Buckeye since

17   September 1995.  Similar experience with the City of Litchfield

18   Park with all the land development projects occurring in the

19   city of Litchfield Park.  Also with the Town of Huachuca City

20   and with the Town of Dewey Humboldt.

21   Q    Okay.  And have these included rapidly developing areas?

22   A    Yes.

23   Q    Okay.  And with your service with Buckeye since 1995, has

24   that included working with developers in a rapidly developing

25   scenario?

1   A    Yes.

2   Q    Okay.  Do you have any professional memberships or

3   affiliations?

4   A    Yes.  I belong to the American Waterworks Association, the

5   Arizona -- American Public Works Association, the Western

6   Maricopa Coalition, various chambers of commerce.

7   Q    Okay.  Now, Mr. Scoutten, let me -- we're going to bring a

8   slide up here hopefully.

9          MR. PENNARTZ:  Slide 2, Your Honor, of Defendant's

10  104, I believe.

11         MR. HIRSCH:  Yes.

12         MR. PENNARTZ:  Slide 2, Defendant's 104, the map that

13  we've used several times before.

14  BY MR. PENNARTZ:

15  Q    Mr. Scoutten, are you familiar with this region that's

16  kind of colored in on the center of this map here, Interstate

17  10 toward the bottom and so forth?

18  A    Yes.

19  Q    And what does that depict?

20  A    Basically shows the -- what we call the Sun Valley area,

21  which is a portion of Buckeye located north of I-10.

22  Q    Okay.  And the more traditional area of Buckeye or earlier

23  developed area of Buckeye is to the lower right of the screen?

24  A    That's correct.

25  Q    Okay.  And I think we talked about the town of -- or city

1    of Surprise briefly.  That would be on the -- start perhaps on

2    the far upper right corner and extend off the picture?

3    A    Yes, the upper right corner.

4    Q    Okay.  Those are the White Tank Mountains there that are

5    shown on the right edge of the map?

6    A    Yes.

7    Q    Okay.  So Surprise is kind of to the north and east of the

8    White Tanks then?

9    A    That's correct.

10   Q    Okay.  Now are you familiar with this dark black line

11   being essentially the proposed alignment of the TransWestern

12   pipeline as it would be constructed to that part of Buckeye?

13   A    The solid black line, yes.

14   Q    Yes, the solid black line, correct.  And that's what I'd

15   like to focus on at this point.  And in your position as the

16   town engineer, are you involved with respect to development

17   that occurs within the town or is applied for within the town?

18   A    Yes.

19   Q    We had a term that was used earlier by a witness about

20   entitlements.  An entitlement, you start with raw desert land

21   and then you get it entitled, and all the way up to the point

22   of having a community master plan.  Are you generally familiar

23   with that process as well?

24   A    Yes.

25   Q    Okay.  And is that part of something that you've been

1    involved with in your career as the town engineer?

2    A    Yes, very much so.

3    Q    Okay.  What has been the nature of your involvement in

4    that entitlement process from the city or town side?

5    A    I am involved from the very beginning of a project when

6    it's first presented to the City, all the way through the

7    construction of the improvements and exception -- acceptance of

8    the public improvements on behalf of the City.

9    Q    Okay.  And Mr. Heeter talked about something that was

10   referred to as a community master plan.  Are you familiar with

11   community master plans in your work with the town of Buckeye?

12   A    Yes.

13   Q    What is a community master plan?

14   A    A community master plans outlines the conceptual project

15   for land development, typically of a mixed use type of a

16   project that would include residential, commercial, and perhaps

17   industrial uses, as well as public uses.  It identifies the

18   proposed land uses as well as determines what infrastructure

19   needs to be built in terms of roads, water systems and sewer

20   systems, so on.

21   Q    Mr. Heeter testified that Tartesso has two approved

22   community master plans, I think for Tartesso East and Tartesso

23   West.  Are you familiar with that?

24   A    Yes.

25   Q    Were you or your office involved in -- with respect to

1  either one of those master plans and reviewing them before

2  their approval?

3  A    Yes, both of them.

4  Q    And what was the nature of your involvement?

5  A    Well, again, we would review the project master plan from

6  the standpoint of adequacy of the infrastructure, primarily the

7  roadway, water and sewer systems, as well as drainage and flood

8  control aspects of the project.

9  Q    Now when you say drainage and flood control, explain to

10 the Court just a moment what that has to do with the community

11 master plan review and approval.

12 A    When land is developed it must present a means for

13 controlling the storm water runoff, especially the additional

14 storm water runoff that will occur because now we're building

15 impervious surfaces like roads and houses.  So the master plan

16 must present a plan for how that additional storm water runoff

17 will be controlled and managed through the project.  In terms

18 of flood control, especially in the area north of I-10 there

19 are a lot of washes that come out of the White Tank Mountains

20 that pass through these master plan communities, and they must

21 also be controlled from the standpoint of scour and meandering

22 of the washes.

23 Q    Mr. Heeter testified based on his experience as a

24 developer getting approval of community master plans in the

25 Tartesso area that there's kind of a general northeast to

1    southwest drainage flow in that part of Buckeye that you have

2    to deal with.  Is that your experience as well in reviewing

3    those plans?

4    A    Yes, that's true.

5    Q    Okay.  Is there also a river in that area of Buckeye?

6    A    Yes, the Hassayampa River.

7    Q    Hassayampa River.  Now our rivers in Arizona are a little

8    different than rivers maybe in some other states, aren't they?

9    A    Yes.  They flow underground.

10   Q    They flow underground.  They also flow during storm water

11   events, don't they?

12   A    That's correct.

13   Q    Okay.  And when they -- when we have storm water events is

14   that something that's part of your task on behalf of the

15   regulatory authority, the town, and making sure that storm

16   water events are adequately planned for as it relates to how

17   it's going to pass through a development?

18   A    Yes.

19   Q    Even on the scale of a whole watershed or river system?

20   A    That's correct, yes.

21   Q    Okay.  So when the storm flows occur, are these still

22   underground?

23   A    No.  When a storm of a large enough magnitude occurs the

24   water, of course, runs out of the mountains and off of the land

25   and into these washes.  The washes run from inches deep to

1  several feet deep and with high velocity towards the river.

2  Q    I take it since you've been, I think you said for Tolleson

3  the town engineer for about 28 years and Buckeye since 1995,

4  that you served in those capacities at points when the Salt

5  River itself was running fast and deep during storm events?

6  A    That's correct.

7  Q    Do you remember an event in the 90's where there were --

8  was a major storm event in the Salt River?

9  A    Yes, I do.

10         MR. LEMASTER:  Objection, Your Honor.  I'm not sure

11  the relevance of the testimony at this point on events in the

12  90's.

13         MR. PENNARTZ:  We're just dealing with community

14  planning for events like this, Your Honor.

15         THE COURT:  I --

16         MR. PENNARTZ:  I'll move on quickly.

17         THE COURT:  All right.  That objection's overruled,

18  but I -- but let's not get too far afield here.

19         MR. PENNARTZ:  Thank you, Your Honor.

20         THE COURT:  I think it's pretty clear that the

21  gentleman is well qualified as an engineer.  We don't need to

22  go too far back to establish that.

23  BY MR. PENNARTZ:

24  Q    Now, Mr. Scoutten, with respect to -- we've been talking

25  about storm drainage in terms of surface flows.  Those surface

1    flows have to find their way into structures of some kind?

2    A    The -- in a natural condition, they find their way to the

3    river that, you know, eventually carries it away to the ocean

4    ultimately.  In a developed condition on a watershed there may

5    be some structures such as dams or flood retardant structures

6    that would capture the water.

7    Q    Okay.  And when we look at slide 2 here of Defendant's 104

8    there's different colors for different developments here.  Do -

9    - and we had testimony that some of these developments are in

10   different stage of entitlement.  Are you familiar with that at

11   all --

12   A    Yes.

13   Q    -- in general?  And so there are different stages of

14   review with your office as well?

15   A    Yes, they are in various stages.

16   Q    Okay.  With respect to that, we have -- and you said you

17   deal with all sorts of infrastructure issues.  Does the town as

18   a whole look more globally even than a community master plan

19   level at a -- to plan its infrastructure and other services?

20   A    Yes.  A lot of times the master plan communities are just

21   focused on the land that they control.  We must look around the

22   master plan community and make sure that, especially in this

23   case where we've got several master plan communities that abut

24   each other, that the infrastructure all fits together and works

25   together as a whole.

1    Q    Is there a document in Arizona known as a general plan

2    that communities use?

3    A    Yes.

4    Q    Can you explain for the Court -- and again, I'm not asking

5    you to be a planning lawyer or a zoning lawyer, but from your

6    standpoint as the town engineer what a -- what the general

7    plan, how it fits into the scheme of things from the regulatory

8    authority standpoint.

9    A    The general plan is a document that is ultimately approved

10   by the voters which establishes the land patterns for the

11   community as a whole.  It also addresses certain other

12   infrastructure conditions such as water supply, wastewater

13   treatment, circulation with roadway systems.

14   Q    Okay.  So -- and is that on a communitywide basis?

15   A    It covers the entire community.

16   Q    Okay.  Now about how many square miles, if you know, are

17   there within the boundaries, the annexed boundaries of the town

18   of Buckeye today?

19   A    Within the annexed boundaries it's approximately 300

20   square miles.

21   Q    About 300 square miles?

22   A    Yes.

23   Q    Is there also something known as the municipal planning

24   area?

25   A    Yes.

1    Q    Okay.  And is that smaller or larger than the annexed

2    areas for the town of Buckeye at this time?

3    A    It's much larger.  It's approximately 600 square miles.

4    Q    Okay.  And so that -- what is that?  Is that like an area

5    of future growth for the town?

6    A    It's an area that is determined through the MAG regional

7    planning organization.  The cities kind of map out what areas

8    they perceive being under their control in the future.

9    Q    Now you used a term MAG, and I'm not sure that everyone

10   knows what that term means.  What acronym is that for?

11   A    It stands for the Maricopa Association of Governments.

12   Q    Okay.  So that's a regional government association?

13   A    Regional planning agency, yes.

14   Q    Okay.  And through that agency then I believe you -- your

15   testimony was the communities attempt to plan out what areas

16   they're going to be responsible for?

17   A    That's correct.

18   Q    Okay.  So the general plan of the town of Buckeye covers

19   the entire 600 plus square miles for the municipal planning

20   area of the town?

21   A    That's correct.

22   Q    All right.  So even if we were to look at an area like

23   this where maybe some of it's annexed today and it's not

24   annexed, some of it's not annexed yet, is the town already

25   doing planning in areas that are still in the county?

1    A    Yes.

2    Q    Okay.  And what's the purpose of doing planning at that

3    level?

4    A    Well, the -- it's, you know, it's important for the town

5    to try to plan the major infrastructure systems on a regional

6    basis so that as the land develops in a piecemeal basis it will

7    all ultimately fit together and work together as a whole.

8    Q    Okay.  Would -- have you been involved, your -- has your

9    office been involved, both from a community master plan and

10   from a general plan standpoint, in planning infrastructure in

11   this part of Buckeye that's shown on slide 2?

12   A    Yes.

13   Q    For how long?

14   A    Well, strictly speaking, since September of 1995.  More

15   recently, with the current general plan update that the town is

16   going through right now.

17   Q    I didn't hear the last --

18   A    The town is currently going through a general plan update

19   which we've been involved with as well.

20   Q    Okay.  And do those community master plans for the large

21   developments have any relationship to the general plan update?

22   A    Yes.  They are existing master plans that need to be

23   incorporated into the overall general plan for the town.

24   Q    Okay.  So I'm kind of getting that even though maybe

25   Tartesso is 12,000 acres, I'm getting the sense it's like a

1   puzzle piece that has to fit with all the other pieces?

2   A    That's exactly right.

3   Q    Okay.  All right.  Now let's talk about this pipeline

4   coming through this area.  When these community master plans

5   were submitted -- I think Mr. Heeter testified that it's been a

6   number of years ago that the application was first submitted

7   for Tartesso.  This pipeline was not in contemplation at that

8   time from the developer or the town's standpoint.  Is that your

9   understanding?

10  A    That's true.

11  Q    Okay.  And you were involved in that process at that time?

12  A    That's correct.

13  Q    Okay.  So when these community plans like Tartesso's were

14  done and were approved, what account did they take of the need

15  to account for a high pressure 36-inch gas line?

16  A    None.

17  Q    Okay.  Now that the gas line is proposed, do you

18  understand at what depth of coverage generally proposed to be

19  constructed through the town?

20  A    Yes.

21  Q    What is that?

22  A    Three feet.

23  Q    Okay.  So it's a three foot gas line buried under three

24  foot of cover?

25  A    Yes.

**A/V▾ TRONICS, INC.**

E-Reporting and E-Transcription
Phoenix, AZ (602) 263-0885
Tucson, AZ (520) 403-8024

1    Q    All right.  From your standpoint -- and again, I'm not

2    talking specific crossings or anything, I'm talking the global

3    planning perspective here.  What impact, if any, does that

4    pipeline coming through the town, this area of the town, what

5    impact does it have on the need to plan or replan that part of

6    town and how these things that you're responsible for work or

7    don't work?

8    A    Basically a pipeline at that depth and of that size

9    creates a barrier through the area which will hinder the

10   planning of the utilities that will pass through that area or

11   will be constructed by the developers as the land develops.

12   Q    Why would it be a hindrance?

13   A    Because the pipeline with three feet of cover will be at a

14   total depth of about six feet, which is right in the zone where

15   we place a lot of our utilities, such as waterlines and power

16   lines, telephone communication systems, other -- natural gas.

17   Other types of utilities tend to be in that five to seven foot

18   zone beneath the ground level.

19   Q    Okay.  One of the things Mr. Heeter was talking about

20   during the entitlement process was getting the point of

21   approval where you could actually construct your development.

22   And then he was asked a question about -- I don't know if you

23   were here during his examination, that part of his examination

24   about whether the existence of this pipeline would cause those

25   approvals to be revoked.  Were you here for that question?

1   A    Yes, I believe so.

2   Q    Okay.  I think Mr. Heeter's answer was he didn't think it

3   would be.  Do you have any information on whether a developer

4   like Stardust would actually lose the ability to build its

5   development at all, go back to bare desert entitlements, as a

6   result of a pipeline?

7   A    Yeah, I don't think so.

8   Q    Okay.  But just because it wouldn't go back to bare desert

9   land in terms of entitlements, does that mean it's not a

10  hindrance when things have already been planned in the absence

11  of the pipeline?

12  A    No.  It would tend to be an obstacle that would get in the

13  way of planning utility systems.

14  Q    Okay.  And would that be an obstacle, in your opinion and

15  in your experience, as to only future utilities, or existing

16  utilities, or both?

17  A    Both.

18  Q    Okay.  And how would that be an obstacle with respect to

19  existing utilities in your opinion?

20  A    Well, existing utilities that are installed in that zone

21  of, you know, five to seven feet below ground surface would be

22  in direct conflict with a pipeline that would be coming through

23  that area at a similar depth.

24  Q    Okay.  And what about future utilities?

25  A    Well, from the standpoint of future utilities, it's

1   primarily going to require waterlines to be dipped under the

2   pipeline, which means additional cost of construction.  Dipping

3   under other pipelines creates high points in the water system

4   which now is an area where air will collect and we'll have to

5   bleed that air off.  It generally tends to increase the

6   construction costs and the maintenance costs of the utilities.

7   Q    With respect to the -- both from the town's effort

8   standpoint, time and effort, and the developer's time and

9   effort standpoint, do you have an opinion on whether this

10  obstacle, as you've described it, is something that is going to

11  be a burden on planning developments and community master

12  plans?

13  A    Yes.  It will be a constraint that will always be there

14  that will have to be dealt with in terms of installing

15  underground utilities in the future.

16  Q    And we had a gentleman in here this morning, I'm sure you

17  were not here for his testimony.  He was a superintendent for

18  one of the pipeline contractors that is tasked to actually

19  build the pipeline.  And I don't think you were here for his

20  testimony, but he talked about the waterline that supplies

21  cooling water to the nuclear power plant.  Are you familiar

22  with that waterline?

23  A    Yes.

24  Q    Okay.  And that waterline runs east and west through the

25  town of Buckeye, doesn't it?

1    A    That's correct.

2    Q    Okay.  And it runs from Phoenix all the way out west of

3    Buckeye to the nuclear power plant?

4    A    Yes.

5    Q    Okay.  Is that power line -- I'm sorry, waterline

6    something that, in your experience both for the City of

7    Tolleson and the Town of Buckeye, has presented an obstacle to

8    utility and other municipal improvement work?

9    A    Yes, very much so.  More with the Town of Buckeye from the

10   standpoint that we have had to deal with that pipeline with

11   respect to sewer lines and roadway crossings and waterline

12   crossings.

13   Q    Okay.  And I think the gentleman this morning testified

14   that, you know, they were hard to work with and they would only

15   shut it down one time a year.  And so he had to go ahead and

16   start his work and bore under it now because it's the only time

17   of year they were going to dry it up.  Are you familiar with

18   having to deal with that timing issue?

19   A    Yes, I am.

20   Q    Okay.  Do you have any opinion, Mr. Scoutten, based upon

21   your experience in municipal engineering and infrastructure

22   planning, whether dealing with this gas pipeline and the

23   hindrance or obstruction it would have would cause you similar

24   concerns with respect to dealing with it in the future?

25   A    Yes, it would, primarily from the standpoint of installing

1  future utilities around that pipeline.  Obviously it's

2  something that would have to be dealt with very carefully and

3  we'd want to stay as far away from it as we can.

4  Q   Okay.  So one issue the Court is dealing with in this

5  hearing is the issue of the pipeline potentially being

6  constructed now, let's say, or in 2008 versus perhaps being

7  constructed later after these cases go to trial.  If the

8  pipeline were constructed a year or two later, or even six

9  months or more later, would that window of time provide any

10 benefit to the town and to the development community that you

11 work with in terms of trying to plan for how you would deal

12 with this pipeline?

13 A   I think it would, you know, continue to present an issue

14 that we'd just have to deal with, regardless of the timeframe.

15 You know, it's something that is being planned so we have to

16 start planning around it right now.

17 Q   Okay.  Would it be something that perhaps you could use

18 the time to get some additional information or spend some more

19 planning time on how to deal with it?

20 A   Yes.  From the standpoint that we have these various

21 master plans that are in various stages, we would at least have

22 the opportunity to try to redesign some of the utility systems

23 that would serve them.

24 Q   Okay.  Let me ask you some questions in another area.  At

25 the far northeast corner of our slide here, at the north end of

1    the White Tank Mountains where the solid black pipeline route

2    enters the town of Buckeye, do you know what master plan

3    community that is up there?

4    A    Yes.  That's called Sun City Festival.

5    Q    Okay.  Is it also known as Festival Ranch?

6    A    Yes.

7    Q    Okay.  And there's -- are you familiar with what a

8    community facilities district is?

9    A    Yes.

10   Q    What is a community facilities district within your

11   understanding?

12   A    It's a means by which the infrastructure facilities,

13   public infrastructure facilities can be financed by levying

14   assessments or taxes against the property that will benefit

15   from those improvements.

16   Q    Okay.  And so this mechanism is something where there is a

17   public entity created by the town called a community facilities

18   district?

19   A    Yes.  The town council creates the district and that --

20   and then later serves as its board of directors.

21   Q    Okay.  There are all kinds of special districts, special

22   taxing districts that you've dealt with as an engineer under

23   Arizona law, aren't there?

24   A    Yes.

25   Q    I mean you can get down to where a particular stretch of a

1    street needs to be widened and you can do a local improvement

2    district for that; correct?

3    A    Yes.

4    Q    And so as an engineer, you've sometimes had to be the one

5    to draw diagrams of what property's going to be included in the

6    district and assess liens for those kinds of districts;

7    correct?

8    A    Yes.

9    Q    Okay.  So this is a concept that's familiar to you both in

10   a very narrow geographic term or in a larger area as well;

11   correct?

12   A    Yes.

13   Q    Okay.  So a community facilities district up in Festival

14   Ranch, was that something that you had involvement with on

15   behalf of the town?

16   A    Yes, I did.

17   Q    Okay.  And are you aware through your work for the town as

18   town engineer that there was in fact formed the Festival Ranch

19   Community Facilities District for that master plan community?

20   A    Yes.

21   Q    Okay.  And when that gets formed is there anything, to

22   your knowledge, that gets recorded after the council forms

23   that?

24   A    Yes.  There is the formation documents themselves, the

25   resolution of the town council which forms the district.

1  Q    Okay.  And to your knowledge, was that done for Festival

2  Ranch?

3  A    Yes.

4  Q    Okay.  And to your knowledge, have there been improvements

5  that have been constructed in the Festival Ranch Master Plan

6  Community for which the community facilities district has the

7  financing?

8  A    Yes.

9  Q    Okay.  And without getting into detail, are we talking

10  about storm drains or streetlights, or what -- in general, do

11  you know what we're talking about?

12  A    Yes.  We're talking generally about the backbone major

13  infrastructure for Festival Ranch, which would include the

14  major roadway systems, the water system and the wastewater

15  system.  We're also talking about the roadways within the

16  parcels themselves.

17  Q    Okay.  Is there also a development agreement?  Mr. Heeter

18  testified about development agreements that gettered -- entered

19  into between the town and developers and get recorded.  Was

20  there also a development agreement in conjunction with that

21  community facilities district?

22  A    That's my understanding, yes.

23  Q    Okay.  And so based on your understanding with the

24  recordation of the formation documents, was there also a

25  district formed up there of property within Festival Ranch

1  that's an assessment district area?

2  A    Yes.

3  Q    Okay.  And you're not a lawyer, but you are an engineer

4  that deals with these things on a regular basis; correct?

5  A    Yes.

6  Q    And is it your understanding that the Town of -- that the

7  community facilities district holds a lien on properties within

8  that assessment district for part of the cost of the financing?

9  A    Yes.  That's the security for the financing.

10  Q    And where does the money come from for the financing?

11  A    The district sells bonds to the, you know, to the

12  marketplace.

13  Q    Okay.  So they issue in effect municipal bonds that are an

14  obligation of the district?

15  A    I wouldn't call them municipal bonds.  They're special

16  district bonds.

17  Q    Okay, district bonds.  They're government district bonds

18  then?

19  A    Yes.

20  Q    All right.  And do you know the approximate magnitude of

21  the bonds that have been issued up there in -- for

22  infrastructure construction by the community facilities

23  district?

24  A    I don't know the exact number, but it's several million

25  dollars.

1   Q    Okay.

2   A    Probably 6 million, 7 million, something like that.

3   Q    So those -- the security for that would be the property

4   within the Festival Ranch community development area?

5   A    That's correct.

6   Q    Okay.  And that's the area through which the pipeline runs

7   in general?

8   A    Yes.

9   Q    Okay.  So to the extent that the pipeline would -- and I'm

10  not asking you for an opinion whether it does impair, but if it

11  did impair the value of those properties, that would

12  potentially impair the value of the CFD's security?

13  A    Yes, that's correct.

14  Q    We had a gentleman testify yesterday for TransWestern who

15  talked about -- this was Mr. Runte?  Have you ever met

16  Mr. Runte?

17  A    I'm not sure.  I don't believe so.

18  Q    Okay.  And I think there was some testimony about back in

19  '05 or '06 there being some kind of a submittal to the town of

20  plans by TransWestern.  Are you aware of anything at all being

21  submitted to the town back in that timeframe?

22  A    I'm sorry, I was thinking.  Are you referring to a

23  Mr. Earl Runte?

24  Q    No.  I think this is a Mr. David Runte.

25  A    Okay.  Then I don't know David Runte.

1    Q    Okay.  But back to the incident that I'm referring to.

2    Were you -- are you familiar back in the '05 or '06 timeframe

3    of any kind of plans or submittals being submitted to your

4    office by TransWestern --

5    A    Yes.

6    Q    -- with respect to this pipeline?

7    A    Yes.

8    Q    Okay.  And what was it that you received?

9    A    I received a set of plans that showed a aerial view of the

10   route of the pipeline and the general location of the pipeline

11   on that aerial view.

12   Q    Okay.  Was it in greater scale and detail than what we

13   have on slide 2 here?

14   A    Slightly.

15   Q    Slightly.  Not much more than that?

16   A    It was at -- and I don't remember the exact scale, but it

17   was at a very large scale, perhaps 1 inch equals 500 feet, and

18   very conceptual in nature.

19   Q    Okay.  When -- from an engineering standpoint, and

20   specifically town engineer standpoint, when something is

21   submitted to you that you're saying is conceptual in nature,

22   describe for the Court what you mean as compared to what you

23   would get maybe from Mr. Heeter for actual approval to

24   construct?

25   A    Typically with any underground utility installation you

1    have a set of construction drawings that would have a plan and

2    a profile which would show -- the plan would show the

3    horizontal location of the pipeline with respect to existing or

4    proposed improvements.  And then the profile would show its

5    vertical location with respect to the ground surface and any

6    other utilities that might be in the general area.  The plans

7    that we received from TransWestern did not have a profile on

8    them.  They simply had a plan view.  And again, it was very

9    schematic in nature.  It did not show existing utilities or any

10   other improvements.

11   Q    What is -- within your experience of reviewing plans for

12   governmental agencies and as a professional engineer, what is a

13   construction level plan as compared to conceptual plan?

14   A    A construction level plan is one that is detailed enough

15   that you can go obtain a permit with it and go construct it.

16   Q    Did you get construction level plans from TransWestern at

17   that time?

18   A    No.

19   Q    Were there construction details in the plans that you

20   received at that time?

21   A    No, there were no details.

22   Q    Are you aware that there may have been a fee paid by

23   TransWestern at that time for you to look at what they did

24   submit?

25   A    I've heard that they paid a fee, yes.

1   Q    Okay.  Were the plans that you received, you called them

2   schematics.  Were they complete or incomplete?

3   A    My recollection is that they showed the pipeline basically

4   where it ran through what I would call the Sun Valley area,

5   which would be from the Sun City Festival or Festival Ranch

6   area down to the approximate vicinity of I-10.

7   Q    Okay.  But with respect to the level of detail that you

8   would expect to receive if you were being asked to issue an

9   approval, were they complete or incomplete?

10  A    They were incomplete.

11  Q    In fact, did you have any sense in your dealings with the

12  TransWestern representative whether these were being shown to

13  you for purposes of information or being shown to you to

14  actually obtain approval to construct?

15  A    My recollection is that they were intimating that these

16  were construction plans.

17  Q    That they were construction plans?

18  A    Yes.

19  Q    But from your standpoint, were they construction plans?

20  A    No.

21  Q    Were you ever asked to actually approve them or give -- I

22  think there's a term, redline comments.  Is that an accurate

23  term in engineering terms?

24  A    Yes, it is.

25  Q    What are redline comments?

1    A    Redline comments are exactly that.  We take a red pencil

2    and mark on the plans where we think there are deficiencies or

3    where it doesn't meet our standards and send those redline

4    comments, those redline marked up plans back to the engineer or

5    the applicant.

6    Q    So even with the level of engineering let's say that's

7    gone into Tartesso West with the community master plan and so

8    forth, when someone wants to come in and actually build the

9    infrastructure they have to submit construction level plans?

10   A    That's correct.

11   Q    And even those plans at that point may get redlined and go

12   back?

13   A    They normally do, yes.

14   Q    They normally -- so that is not atypical?

15   A    No.

16   Q    Okay.  So -- and they may go back and forth several times

17   before they're approvable by your office?

18   A    Usually, yes.

19   Q    Okay.  So were you ever requested to provide redlines of

20   these conceptual plans back in '05 or '06?

21   A    I don't know that we were actually requested, but the

22   plans were sent to us for review, which we presumed meant to be

23   for construction purposes.

24   Q    Did you -- were you able to review them?

25   A    No, we were not.

1    Q    Why weren't you able to review them?

2    A    Because they were so incomplete.

3    Q    Did you redline them?

4    A    No.

5    Q    Why didn't you redline them?

6    A    It would have been a waste of time.

7         MR. BOLVES:  Your Honor, at this point I need to

8    interject an objection.  This line of questioning has gotten

9    into an area that's completely irrelevant given the fact that

10   the City -- or the Town of Buckeye has no jurisdictional

11   control over the design or location of these facilities.

12        MR. PENNARTZ:  Your Honor, it --

13        MR. LEMASTER:  According to case law.  So I don't

14   know why we're talking about whether or not they approved it,

15   redlined, redesigned it, made comments.  It's not relevant to a

16   federal project.

17        MR. PENNARTZ:  It's in rebuttal to Mr. Runte's

18   testimony that TransWestern got some kind of an approval for

19   its plans back in '05 or '06 from the Town of Buckeye.  I'm

20   merely demonstrating that they did not.

21        THE COURT:  I'll permit the line of questioning to

22   continue for a while.

23   BY MR. PENNARTZ:

24   Q    And again, I'm essentially done with this, but you did not

25   redline them and you could not why?

1   A    they were not construction level plans --

2   Q    All right.

3   A    -- in my opinion.

4   Q    Okay.  So did you or did you not approve those plans as

5   submitted by TransWestern in '05 or '06?

6   A    I did not.

7        MR. PENNARTZ:  I have no further questions at this

8   time.  I don't know if Mr. Hirsch may have some.

9        THE COURT:  Thank you, Mr. Pennartz.

10       Mr. Hirsch?

11       MR. HIRSCH:  Very briefly.

12                    DIRECT EXAMINATION

13  BY MR. HIRSCH:

14  Q    Mr. Scoutten, you may have heard me earlier.  I'm Steve

15  Hirsch.  I represent Stardust Tartesso and the Sun Valley WBSB

16  people, as well as other developers.  Good afternoon, sir.

17  A    Thank you.

18  Q    I just have a question about the nature of the existing

19  sewer lines in the town of Buckeye that might be impacted by

20  the proposed pipeline along the route that we see on slide 2 of

21  Exhibit 104 here.  We heard some detail within Tartesso, but

22  those are particular sewer lines dealing particularly with

23  Tartesso.  Are there larger trunk wastewater lines within this

24  larger stretch of Buckeye that are in place to serve Festival

25  and these other developments that are occurring up and down the

1   parkway?

2   A    There are some trunk pipelines, yes.

3   Q    Okay.  Can you describe for us generally where they run

4   from and to, which way the wastewater is flowing?

5   A    In the Sun City Festival area, the Festival Ranch area,

6   there's a large interceptor sewer that generally follows the

7   Wagner wash from where the existing development is occurring

8   down to the Festival Ranch wastewater treatment plant.  There's

9   also a larger interceptor sewer that runs through Tartesso that

10  extends south to the Tartesso wastewater treatment plant.

11  Generally it runs from the northeast to the southwest.

12  Q    Okay.  Now I don't know if the T -- the monitor in front

13  of you is properly configured, but do you have a pen?  You

14  might be able to draw on the screen.  And let me give --

15  A    I don't have a pen.

16  Q    -- you mine.

17       MR. HIRSCH:  If I can approach the witness, Judge?

18       THE COURT:  Certainly.

19  BY MR. HIRSCH:

20  Q    Don't actually draw with the point or we're --

21  A    Okay.

22  Q    -- in trouble with GSA, but I think if you touch it and

23  draw, go up in the upper left and just doodle a minute and see.

24  There you go, okay.  Now is it possible for you to draw -- get

25  back to the microphone here for the reporter.  Is it possible

1    for you to draw with the stylus the interceptor line that

2    serves Festival Ranch, in general terms?

3         (Witness complies)

4    A    That's pretty hard to see, but I think it generally comes

5    from this area and flows to the east up into there.  That's --

6    that line I drew is about two miles wide, so -- it's kind of

7    hard to get more specific than that.

8    Q    Okay, that's fair enough.  It gives us a general idea.

9    And then can you draw in similarly roughly where the Tartesso

10   existing line is?

11        (Witness complies)

12   A    Something like that.

13   Q    Okay.  Now we're going to get into a bit of wastewater

14   engineering here.  Water -- potable water or raw water we can

15   understand pressure and head pressure, and pressure booster

16   stations and that sort of thing.  How does wastewater generally

17   flow within these interceptor channels?

18   A    Flows by gravity.

19   Q    And the flow here as you indicated, the gravity flow would

20   be from the northwest to the -- northeast to the southwest?

21   A    Yes.

22   Q    All right.  When the lines are being designed and planned

23   do they have to be tilted so that the wastewater's flowing

24   downhill?

25   A    Yes, they do.

1    Q    Without getting too graphic here this afternoon in federal

2    district court, are there some engineering reasons why it's

3    important to guarantee a particular angle of slant and flow in

4    such interceptor pipes?

5    A    Yes, there are.  And generally that is to maintain a

6    certain velocity, minimum velocity of the water in the pipe so

7    that solids remain suspended.

8    Q    So that everything's flowing and things don't start to

9    separate within the line?

10   A    That's correct.

11   Q    How large are the lines that you drew on the -- on slide 2

12   diameter wise?

13   A    In the case of Tartesso, I think the interceptor sewer

14   gets as large as 60 inches.

15   Q    Five feet?

16   A    Five feet, yes.

17   Q    Are -- within the master plans and entitlements that are

18   in some of the other areas such as the Sun Valley development

19   and the other phases of Tartesso, are the wastewater

20   interceptor lines established as to where they're going to go

21   when demand suggests that they be installed?

22   A    Generally speaking, those routes have been determined

23   because of the master planning that's occurred.

24   Q    Okay.  In the area of the proposed TransWestern gas

25   pipeline is it possible for us -- for you to give us the depths

1    at the start of the line?  How deep do these lines go to

2    maintain that downward flow and the gravity flow that you

3    mentioned?

4    A    It varies all over the place.  It could be anywhere from

5    6 feet deep to 30 feet deep.

6    Q    And a location where they might have to be 30 feet deep is

7    simply an area where the gravity flow has to be maintained

8    toward the bottom part of the interceptor system?

9    A    Generally speaking, the sewer lines tend to get deeper as

10   they approach the treatment plant, yes.

11   Q    Is -- in your view as town engineer, would the burial of a

12   36-inch natural gas pipeline with 3 feet of cover provide

13   sufficient clearance for an interceptor wastewater line in

14   Buckeye?

15   A    Yes.

16   Q    Well, let me restate my questions.  I'm not sure if you

17   understood it.  If there was 3 feet of cover in between the

18   surface and the natural gas line, would there or would there

19   not be interferences with the wastewater line?

20   A    Well, assuming that the wastewater line is below the gas

21   line.

22   Q    Okay.  If -- are there instances where the wastewater line

23   may have to be relocated -- well, let me strike this.  Have you

24   walked -- have you read the easement that is attached to the

25   complaint filed by TransWestern in these proceedings?

1   A    No.

2   Q    Okay.  Do you know whether or not permission is required

3   of TransWestern to allow any crossing of the pipeline at any

4   point?

5   A    I have heard that, yes.

6   Q    Are you, as you sit here, are you familiar where -- with

7   any particular instance where there would be interferences with

8   a -- well, were you here during Mr. Heeter's testimony when he

9   discussed the Tartesso interceptor line at the lower part of

10  his --

11  A    I don't think so.

12  Q    -- development?

13          MR. HIRSCH:  Okay, I think that's all I have, Your

14  Honor.

15          THE COURT:  Thank you, Mr. Hirsch.

16          Mr. Braselton, any questions for --

17          MR. BRASELTON:  No, Your Honor.

18          THE COURT:  All right.  Anything further from

19  plaintiff?  Mr. Bolves?

20          MR. BOLVES:  Yes, sir.

21                          CROSS-EXAMINATION

22  BY MR. BOLVES:

23  Q    On be -- with respect to the Sun Valley sandwich parcel,

24  sir.  I believe that Mr. Lemaster may have a couple of other

25  questions on some other parcels.  Good afternoon, sir.  My name

1    is Brian Bolves on behalf of TransWestern.  Sir, you're the

2    town engineer for the Town of Buckeye; that's correct?

3    A    Yes.

4    Q    And you and your talking about background, I think you

5    said that you have been an engineer for many other communities

6    in the area, various different towns and municipalities?

7    A    Yes.

8    Q    And have you ever been the engineer for a community that

9    had buried within it large pipelines for things like natural

10   gas or water mains, things of that nature?

11   A    In the city of Tolleson there's a jet fuel pipeline that

12   runs through the, I think it's the Buckeye Road corridor

13   through the city of Tolleson.

14   Q    Okay.  And in the city of Buckeye you have this large

15   water cooling line that goes to a nuclear power plant?

16   A    Yes.

17   Q    You also have an El Paso natural gas line out there too,

18   don't you?

19   A    I believe so.  It's in the southern part of Buckeye, yes.

20   Q    All right.  Isn't it true that these type facilities exist

21   all over Arizona, and for that matter the United States, don't

22   they?

23        MR. HIRSCH:  Objection; foundation.  And what's meant

24   by all over?

25        MR. BOLVES:  I -- well, I'll withdraw all over and

1     let me restate the question.

2     BY MR. BOLVES:

3     Q    Are you aware of the fact that underground utility

4     pipelines exist throughout the United States?

5           MR. PENNARTZ:   Your Honor, it also exceeds direct.

6     We didn't ask him to give opinions about what happens to the

7     rest of the United States.   We asked him to talk about Buckeye.

8           MR. BOLVES:   Your --

9           THE COURT:   Overruled.   Frankly, I'm prepared to take

10     judicial notice that there are gas pipelines --

11           MR. BOLVES:   All right.   Thank you, sir.

12           THE COURT:   -- across the country.

13           MR. BOLVES:   If their witness is not aware of them

14     then I'd like to know that too.

15     BY MR. BOLVES:

16     Q    Let me ask you this, sir.   Isn't it true that these type

17     of underground utilities are routinely crossed by water pipes

18     and sewer pipes and storm water drainage systems?

19     A    Yeah.   I wouldn't say routinely, but yeah, they are

20     crossed.

21     Q    They're crossed in many places, aren't they?

22     A    Yes.

23     Q    The jet fuel line that you talked about in this other

24     town, I've not even seen it but I -- is it accurate that that

25     was crossed by many utilities lines and streets and all kinds

1  of things?

2  A    Yes, it was crossed.

3  Q    Okay.  Let me show you the -- this is --

4       (Counsel and clerk confer)

5  Q    Sir, I'd like to direct your attention to page 4-141 of

6  the environmental impact statement issued by the federal

7  government in this case.  Let me read this into the record.

8  I'd like to publish this paragraph.

9            "In compiling the information presented

10           in Table 4.7.3-2, TransWestern consulted

11           with county officials, landowners,

12           developers, and reviewed land title records

13           and available plans.  In addition, the FERC

14           staff, TransWestern, local government

15           officials, developers, and other

16           stakeholders attended technical conferences

17           in Casa Grande and Buckeye, Arizona on

18           December 13 and 14, 2006 respectively to

19           discuss project impacts on the developed

20           area.  We also encouraged local planning

21           authorities, developers, and other

22           stakeholders to file comments or

23           supplemental information pertaining to the

24           approved and proposed developments within

25           a quarter mile, 0.25 miles of the proposed

1          project facilities, with the secretary

2          during the draft EIS comment period."

3    My question with respect to that topic is this.  Did you, on

4    behalf of Buckeye, participate in any of those informational

5    conferences that were convened by the Federal Energy Regulatory

6    Commission?

7    A    I don't believe so, no.

8    Q    Did the Town of Buckeye participate in the FERC process

9    leading up to the issuance of the certificate of public

10   convenience and necessity?

11   A    I believe so.

12   Q    Okay.  And in fact, TransWestern provided you with plans

13   as early as 2005.  Is that your testimony, for this project?

14   A    I don't recall exactly when we received the plans.  I

15   don't think it was 2005.

16   Q    Was it prior to the issuance of the certificate of public

17   convenience and necessity?

18   A    I wouldn't know that.

19   Q    Okay.  Was it quite some time ago?  How long ago was it

20   approximately?

21   A    I would say it was in 2006.

22   Q    Okay.  Let me direct your attention finally to the list of

23   projects, and this is under the section entitled Plan

24   Developments, 4.7.3.2.  Specifically I'll show you a chart

25   which appears on page 4-138.  The map that's been shown as the

1   Buckeye reroute commences at approximately mile marker 136.3

2   and terminates at mile marker 162.7.  This is a chart of

3   approved and proposed plans within a quarter mile of the

4   Phoenix expansion project.  I'd ask that you publish into the

5   record starting with "The Mesquite Mountain Ranch development

6   at mile marker 130."  You see that?

7   A    Yes.

8   Q    If you would just read that list into the record of

9   subdivisions and planned developments down -- that exist that

10  are listed from mile marker 130 to mile marker, let's say 159,

11  starting with Mesquite Mountain.

12  A    Mesquite Mountain Ranch, Surprise Foothills, Sun City

13  Festival, Sun Valley, Valley Village III (Sun Valley Village),

14  Elianto, Sun Valley South, Tartesso, Desert Creek, Verma II,

15  Maricopa Freeway Center Unit 1, and Sonoma.

16  Q    Okay.  Are you familiar with any other either of these --

17  the table indicates that these are either approved or proposed

18  developments within the Buckeye area.  Are you aware of any

19  other developments which were not taken into consideration by

20  FERC in connection with -- that do not appear on this list?

21           MR. HIRSCH:  Object; lack of foundation, Your Honor.

22           MR. BOLVES:  I'll rephrase the question, Your Honor.

23  That was probably poorly phrased.

24  BY MR. BOLVES:

25  Q    Are there other developments which occur within a quarter

1  mile of the facility between those mile markers that you're

2  aware of that were not listed on this report?

3          MR. LEMASTER:  Again, lack of foundation as to

4  whether this witness even knows the date of the report.

5          THE COURT:  Well, the -- I think the question is

6  whether he's aware of any developments other than those that

7  are listed.

8          MR. BOLVES:  Yes, sir.

9  BY MR. BOLVES:

10 Q    Did they miss any?  When the government looked at plan

11 developments impacting in the community did they miss any.

12 That's the question.

13 A    There's a project -- oh, Elianto is on there.  There's a

14 project called Valle Del Sol which actually has the pipeline

15 route running right through it, which fronts on Sun Valley

16 Parkway.  I don't see that on the list.

17         THE COURT:  What was the name again, sir?

18         THE WITNESS:  I think it's Valle Del Sol, V-A-L-L-E,

19 D-E-L, S-O-L.

20 BY MR. BOLVES:

21 Q    What is the status of that project?

22 A    It was -- I believe it went through the rezoning process,

23 but there are no other entitlements on it, on the property.

24 Q    So it's vacant land that's been zoned for some sort of a

25 development?

1    A    Yes.  And a master plan was submitted and reviewed, but

2    I'm not sure it was ever approved.

3    Q    You don't know.  You're not sure if it was approved?

4    Okay, thank you.  All right, thank you very much.

5            THE COURT:  Thank you, Mr. Bolves.

6            MR. BOLVES:  Yes, sir.

7            THE COURT:  Oh, I'm sorry.  Were you finished?

8            MR. BOLVES:  Yes, sir, I am.

9            THE COURT:  Oh, that's what I thought.  All right,

10   Mr. Lemaster.

11           MR. BOLVES:  Yes, I am.  Thank you.

12           THE COURT:  We'll maybe be able to finish with the

13   witness tonight.

14                       CROSS-EXAMINATION

15   BY MR. LEMASTER:

16   Q    Good afternoon.  I only have one question for you.  You're

17   aware that FERC issued its certificate of public convenience

18   and necessity on this project on November 15, 2007?

19   A    Yes.

20   Q    Are -- you are?

21   A    Yes.

22   Q    I can't hear.

23   A    I'm sorry, yes.

24   Q    I'd like to look at paragraph 146.  It states:

25           "Any state or local permits issued with

1          respect to the jurisdictional facilities

2          authorized herein must be consistent with

3          the conditions of this certificate.  The

4          Commission encourages cooperation between

5          interstate pipelines and local authorities.

6          However, this does not mean that the state

7          and local agencies, through application of

8          state or local laws, may prohibit or

9          unreasonably delay the construction or

10          operation of facilities approved by this

11          commission."

12  Is that what that states?

13  A    Yes.

14          MR. LEMASTER:  That's all I have.

15          THE COURT:  Thank you, Mr. Lemaster.

16          Anything further, Mr. Pennartz?

17          MR. PENNARTZ:  Just a couple questions, Your Honor.

18  Let's see, is the Elmo in?

19                    REDIRECT EXAMINATION

20  BY MR. PENNARTZ:

21  Q    Mr. Scoutten, this is a portion of that previous map that

22  we saw at a little closer scale.  Can you read that?

23  A    Yes.

24  Q    Okay.  Does that show some of the master plan communities

25  in the northern part of the Sun Valley Parkway area?

1   A    Yes.

2   Q    Okay.  And are there any that you see on there that were

3   not referenced on that list that Mr. Bolves showed you?

4   A    There's several, yes.

5   Q    Which -- point those out to the Court, if you would.

6   A    There's the -- this project here, which I'm having -- I

7   can't remember the name of it.

8   Q    Do we have the little red dot?  Okay.

9   A    Yeah.

10  Q    So there's a project there.  Is that called Trillium?

11  A    Trillium, yes.

12  Q    Okay.

13  A    There's also Sun Valley South, which is in this --

14  Q    And where's that?  Okay.

15  A    Right in that area.

16  Q    Is that within a quarter of a mile of the pipeline?

17  A    Yes.  It actually straddles the pipeline route.

18  Q    Okay.  What's across the pipeline from that one that you

19  just had there?  Is that Merabell (sic)?  Is that what that

20  name is right here?

21  A    Well, yes.  The Sun Valley Master Plan was split up into

22  three parcels, one of which is now known as Mirielle and

23  another one which is known as Anthem at Sun Valley South.

24  Q    I think it's on here Anthem West.  Do you see that name

25  about in this area here?

1   A    Yeah.  Yes, that was one of the early names for that

2   project.

3   Q    Okay.  And there's Elianto, there's Elianto West.  Do you

4   see those?

5   A    Yes.

6   Q    Okay.  Then this is Tartesso down in here?

7   A    Yes.

8   Q    Okay.  In fact, I think this is a little different scale

9   for some of that same area.  Can you clear those dots?  Maybe I

10  can here.  I've never done that before.  Oh wow, look at that.

11  Okay.  So again, this shows that there are some developments

12  there.  And those are in, at this point, either entitled or in

13  the process of being entitled through that process we talked

14  about?

15  A    Yes.

16  Q    And how long has this process been underway?

17  A    Oh, since at least 2000.  Actually some of the original

18  Sun Valley master planning was done back in the 80's.

19  Q    Okay.

20  A    And an area plan was approved for the Sun Valley area in

21  1996.

22  Q    Okay.

23       MR. PENNARTZ:  I have no further questions.

24       THE COURT:  Thank you, sir.

25       MR. BOLVES:  Your Honor, just one follow-up if I may

1    based on that --

2            THE COURT:  Well, all right.  Let me -- do you have

3    anything further, Mr. Hirsch?

4            MR. HIRSCH:  No, I have nothing.

5            THE COURT:  All right.  Yes, sir.  Mr. Bolves --

6            MR. BOLVES:  Just one.

7            THE COURT:  -- I'll give you one.

8                      RECROSS-EXAMINATION

9    BY MR. BOLVES:

10   Q    Sir, are you aware of the fact -- was this map submitted

11   to FERC as part of the comments to the draft environmental

12   impact statement?

13   A    I don't know that.

14   Q    Okay, thank you.

15           THE COURT:  Mr. Scoutten, thank you very much for

16   coming in, sir.  You're excused at this time.

17           THE WITNESS:  Thank you.

18           THE COURT:  Nice to have you here.

19           I would like to inquire with respect to tomorrow how

20   many more witnesses the defendants anticipate calling.  I know

21   that Mr. Denham will be coming.

22           MR. HIRSCH:  Yes.  Mr. Denham will be the second and

23   last of the two tomorrow, although, Jim, if you want to put him

24   on first and get him on his way that'll be okay with us.

25           MR. BRASELTON:   Think it's better for him to go

1    later, if that's --

2            MR. HIRSCH:  Okay.

3            MR. LEMASTER:  -- okay with you.

4            MR. HIRSCH:  We'll call Mr. Pike Oliver of WVSV/Sun

5    Valley first thing.

6            THE COURT:  Do you -- would you anticipate his

7    testimony lasting as long as Mr. Heeter?

8            MR. HIRSCH:  No.  We're going to try to not have him

9    -- he doesn't have 80 plus slide show.  He's got about a 7

10   slide show, so --

11           THE COURT:  Okay.  So he should be 9 percent of -- or

12   something like that.

13           MR. HIRSCH:  Plus or minus.

14           THE COURT:  We could probably then anticipate

15   argument tomorrow afternoon.  Does that -- is that reasonable

16   to plan for that?

17           MR. HIRSCH:  I would sure think so, Judge.

18           MR. LEMASTER:  Yes, Your Honor.

19           THE COURT:  All right.  That's what we'll plan for.

20   We'll see if we get there.  We'll resume here in the courtroom

21   tomorrow morning with the last two witnesses at 9 a.m.  So I

22   bid you a fond adieu for the evening.  I'll see you tomorrow.

23   We're adjourned.

24       (Proceedings Concluded at 4:39 p.m.)

25

1

2

3

4                          CERTIFICATE

5

6    I (we) certify that the foregoing is a correct transcript from

7    the electronic sound recording of the proceedings in the

8    above-entitled matter.

9

10   Dated: April 18, 2008

11                                    Harold Ferguson
                                      A/V Tronics, Inc.
12                                    365 E. Coronado Road
                                      Suite #100
13                                    Phoenix, AZ  85004-1525

14

15

16

17

18

19

20

21

22

23

24

25